**Marquis Aurbach**
Craig R. Anderson, Esq.
Nevada Bar No. 6882
10001 Park Run Drive
Las Vegas, Nevada 89145
Telephone: (702) 382-0711
Facsimile: (702) 382-5816
canderson@maclaw.com
Attorneys for Defendants LVMPD, Smith and Huntsman

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ROCHELLE SCOTT, individually and as Co-Special Administrator of the Estate of ROY ANTHONY SCOTT and FREDRICK WAID, as Co-Special Administrator of the Estate of ROY ANTHONY SCOTT,<br><br>Plaintiffs,<br><br>vs.<br><br>LAS VEGAS METROPOLITAN POLICE DEPARTMENT; KYLE SMITH, individually; THEODORE HUNTSMAN, individually and DOES 1-10, inclusive,<br><br>Defendants. | Case Number:<br>2:20-cv-1872-RFB-EJY<br><br>**DEFENDANTS LVMPD, KYLE SMITH AND THEODORE HUNTSMAN'S MOTION FOR SUMMARY JUDGMENT** |

Defendants Las Vegas Metropolitan Police Department ("LVMPD"), Officer Kyle Smith ("Ofc. Smith") and Officer Theodore Huntsman ("Ofc. Huntsman) (collectively "LVMPD Defendants"), by and through their counsel, Marquis Aurbach, hereby file their Motion for Summary Judgment.  This Motion is made and based upon Memorandum of Points & Authorities, the Declaration of Craig R. Anderson, Esq. attached hereto, the pleadings and papers on file herein, and any oral argument allowed by counsel at the time of hearing.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

This is a tragic case. On March 3, 2019, Roy Anthony Scott ("Scott") called 911 and reported that three men, armed with a saw, were attempting to break into his apartment. LVMPD officers Smith and Huntsman responded. At the apartment the officers encountered

MAC:14687-307 4587544_1 2/7/2022 8:10 AM

an agitated Scott armed with a pipe and knife, but did not find three men armed with a saw. The officers recognized that Scott might be in medical crisis or on drugs and decided to take Scott into custody to get him medical help. Scott voluntarily surrendered his pipe and knife, but refused to be patted down for other weapons. The officers explained to Scott that they were there to help him, but that they needed to ensure he had no additional weapons. The officers spoke calmly, maintained their distance, displayed no weapons, and requested additional units respond. However, when the agitated Scott began to reach into his jacket, Ofc. Huntsman stopped him by grabbing his left arm. The officers then attempted to handcuff Scott from a standing position. Scott resisted the officers' efforts and dropped himself to the ground. Once on the ground, Scott continued to resist by twisting and turning while kicking his legs. The officers continued to speak calmly to Scott and reassure him they were there to help him. They never punched, kicked, or struck Scott. To control Scott and prevent him from kicking them, Ofc. Huntsman did place his right knee on Scott's shoulder/upper back area and Ofc. Smith placed a knee on Scott's buttocks. Due to Scott's resistance, it took the officers just over 90-seconds to handcuff Scott. Once handcuffed, both officers removed all body weight from Scott and placed Scott in a "recovery position."[1] Despite the fact Scott showed no signs of injury or inability to breathe, the officers also called for medical assistance. Several minutes after handcuffing, while the officers waited for medical to arrive, Scott became unresponsive and his breathing became shallow. The officers verified Scott's pulse and requested medical to "expedite." Medical arrived but were unable to revive Scott, who eventually passed away. The medical examiner concluded Scott died due to methamphetamine intoxication - not asphyxiation.

Based on these facts, Scott's daughter, Rochelle Scott ("Plaintiff"), filed this lawsuit both in her individual capacity and on behalf of Scott's Estate. The lawsuit alleges: (1) excessive force under §1983, (2) denial of medical care under §1983, (3) interference with

---

[1] The "recovery position" entails placing a restrained person on their side to facilitate breathing.

MAC:14687-307 4587544_1 2/7/2022 8:10 AM

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

familial relations under §1983, (4) *Monell*[2] claims against LVMPD, (5) violation of Americans with Disability Act ("ADA"), and (6) state law claims for wrongful death. Discovery is now complete and the defendants request summary judgment on all claims.

## II.   LR 56-1 STATEMENT OF FACTS OF UNDISPUTED FACTS

### A.   THE SUBJECT INCIDENT

#### 1.   Scott calls 911.

On March 3, 2019, at around 3:09 a.m., Scott called 911 reporting three assailants were outside his apartment with a saw. Scott refused to answer any dispatcher questions and hung up. Attempts to reconnect with Scott were unsuccessful. (LVMPD Dispatch Audio, **Exhibit A;** LVMPD CAD Report, **Exhibit B**.) Defendant LVMPD officers Huntsman and Smith, were assigned to the call. (Huntsman Depo. at 11, **Exhibit C**.)

#### 2.   The defendant officers contact Scott.

At 3:20 a.m., the defendant officers arrived at Scott's apartment. The officers found "there[] [was] nothing suspicious" outside Scott's apartment. (Smith Depo. at 19-20, **Exhibit D**; Smith BWC I at T11:25:20Z, **Exhibit A**.) The two officers knocked on Scott's door to make sure he was okay and Scott responded by telling the officers to "kick the door in." (Ex. D at 20; Ex. C at 13; Huntsman BWC at T11:26:41Z, **Exhibit A**.) When Scott refused to voluntarily open the door, the two officers left the apartment door and contacted their sergeant, who told them to knock again to make sure everyone was okay. (Ex. D at 21-22; Ex. C at 15-16; Smith BWC I at T11:29:41Z.) The officers, using a flashlight, were able to visualize Scott in his apartment and verify he was alone. (Ex. D at 23; Officers' BWC at T11:31:58Z.)

Per the Sergeant's instructions, Ofc. Smith returned to the apartment and knocked. (Ex. D at 24; Officers' BWC at T11:32:20Z.) He heard commotion inside the apartment and someone rushing the door. (Ex. D at 24-25; Officers' BWC at T11:33:00Z.) Ofc. Smith retreated back down the stairs. (*Id.*) Scott exited the apartment holding a metal pipe in his

---

[2] *Monell v. Dep't of Soc. Svcs.*, 436 U.S. 658 (1978)

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

hand. (Ex. D at 25; Officers' BWC at T11:33:05Z; Pipe Photo, **Exhibit E**.) Ofc. Smith pulled his firearm and twice ordered Scott to drop the pipe. (Ex. D at 25; Ex. C at 19-20.) Scott dropped the pipe and Ofc. Smith holstered his firearm. Ofc. Huntsman grabbed the pipe and threw it behind the officers. (Ex. C at 24; Officers' BWC at T11:33:18Z.)

### 3.     The officers go hands on with Scott

The officers recognized that Scott was "in some sort of mental distress" or "possible drug usage." (Ex. D at 26; Ex. C at 16.) Although the officers did not intend to arrest Scott for a crime (Ex. D at 52), they did conclude that Scott met the legal qualifications for a medical hold to determine whether he was a danger to himself or others. [3] In Nevada, this type of detention is known as a "Legal 2000." *See* NRS §433A.160.[4]

Scott walked past the officers and placed his back against an apartment building wall. The officers calmly asked Scott to show his hands so they could frisk him "for weapons." (Officers' BWC at T11:33:31Z.) Scott responded "I don't have any weapons," while simultaneously pulling a knife from his right-front pants pocket and handing it to Ofc. Huntsman. (Officers' BWC at T11:33:40Z; Knife Photo, Ex. E.) Ofc. Huntsman discarded the knife and the officers asked Scott to turn around. Scott refused telling them "I have paranoid schizophrenia." (Officers' BWC at T11:33:43Z.) The officers calmly told Scott "I get it" and "that's fine." (Officers' BWC at T11:33:48Z.) Scott asked the officers to "just put me in the car." (Officers' BWC at T11:33:58Z.) The officers kept their distance, never displayed any weapons or tools, and continuously attempted to reassure Scott in calm voices that they were only there to help him. (Officers' BWC at T11:33:48Z-T11:35:00Z.)

---

[3] Plaintiff does not allege that officers lacked probable cause to take Scott into custody for a mental health hold. (*See* Compl., *generally*.)

[4] A Legal 2000 is an involuntary commitment of a mentally ill subject.  Nevada Revised Statute §433A.160 governs such commitments.  According to that statute, a police officer, without warrant, may "[t]ake a person alleged to be a person with mental illness into custody to apply for the emergency admission of the person for evaluation, observation and treatment . . . if the . . . officer . . . has, based upon his or her personal observation of the person alleged to be a person with mental illness, probable cause to believe that the person has a mental illness and, because of that illness, is likely to harm himself or other if allowed his or her liberty." *See* NRS 433A.160 1(a).

MAC:14687-307 4587544_1 2/7/2022 8:10 AM

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

Because Scott had already produced two dangerous weapons, the officers were concerned that other weapons might be in his possession. (Ex. D at 27-28.) Still, they attempted to accommodate Scott's requests to perform a non-threatening pat down by allowing him to dictate the location. (Ex. C at 40.) The officers never rushed Scott or escalated the situation. However, when Scott reached into his jacket, Ofc. Huntsman responded to the threat by grabbing Scott's left arm. (Officers' BWC at T11:35:12Z; Ex. C at 42-43.) Ofc. Huntsman placed Scott's arm behind his back as Ofc. Smith approached Scott's right side to assist. (Officers' BWC at T11:35:23Z.) Scott began to physically resist the officers and asked "what are you doing?" over and over. (*Id.;* Ex. D at 35.) Scott eventually dropped himself to the ground. (Officers' BWC at T11:35:38Z; Ex. C at 42; Ex. D at 48&120; Compl. at ¶30, ECF No. 1.)

Once on the ground, Scott rolled onto his back. The officers attempted to control Scott by using a "segmenting" technique with Ofc. Huntsman attempting to control Scott's upper body and Ofc. Smith controlling his lower body. (Ex. C at 58.) The officers describe Scott as "extraordinarily strong" and having "superhuman strength." (Ex. C at 49-50; Ex. D at 54-55.) This strength prevented the officers from getting Scott onto his stomach and controlling his arms. Rather than use force, the officers attempted to just wait hoping he would tire himself out. (*Id.*) Ofc. Huntsman placed his right knee on Scotts' hip area, while keeping most of his weight on his left leg. (Officers' BWC at T11:35:51Z.) Scott continuously yelled "please, stop" and "leave me alone" while kicking and thrashing his legs. (*Id.*)

During the struggle, one of Scott's neighbors, Ed Davis, exited his apartment and tried to assist the officers by telling Scott to "calm down." (Officers' BWC at T11:36:32Z.) The officers continued to talk calmly with Scott and reassure him that they were only there to help. (*Id.*) The officers told Scott they wanted to "sit [him] up," but Scott continued to struggle and attempt to kick the officers. (Officers' BWC at T11:38:23Z.) Eventually, the officers were able to roll Scott over onto his stomach. (Officers' BWC at T11:38:34Z.)

MAC:14687-307 4587544_1 2/7/2022 8:10 AM

Once the officers rolled Scott onto his stomach, Ofc. Huntsman attempted to control Scott by placing his left knee across Scott's back and shoulder area. The majority of Ofc. Huntsman's weight remained off of Scott and on the ground. (Officers' BWC at T11:38:35Z; Ex. C at 58.) Ofc. Smith placed his left knee on Scott's buttocks, with the majority of his weight also still on the ground. (Huntsman BWC at T11:38:56Z; Ex. D at 57.) Scott continued to struggle with the officers and "tried to grab" Ofc. Huntsman and Ofc. Smith's handcuffs. (Officers' BWC at T11:39:06Z; Ex. D at 107.) After about one minute, the officers finally handcuffed Scott. (Officers' BWC at T11:39:52Z; Ex. C at 58.) During the struggle, Ofc. Huntsman's knee briefly moved up towards Scott's head and neck area. (Officers' BWC at T11:39:57Z; Ex. C at 58.) Ofc. Huntsman removed all body weight a few seconds after handcuffing was completed. The officers immediately placed Scott into a recovery position. (Officers' BWC at T11:40:10Z and Ex. C at 56&70.) Although Scott never complained of injury or inability to breathe, the officers proactively called for medical. (Ex. B at 03:42:31; Ex. C at 55-56.)

The term "recovery position" refers to "[t]he placement of a subject's body in a manner that does not restrict breathing or obstruct the airway, i.e., on their side or upright." (LVMPD's Use of Force Policy, 6/002.00 at §II, **Exhibit F**.) LVMPD officers are trained to take this protective action. (*Id.* at §VII.)

### 4. Post-handcuffing

After Scott was placed in the recovery position, he continued to thrash about on the ground and yell at the officers - showing no signs of respiratory distress. (Officers' BWC at T11:40Z.) While the officers waited for medical, they monitored Scott, actively prevented him from "hurt[ing] himself" by keeping his head out of the landscaping rocks, and ensured he remained in the recovery position. (Officers' BWC at T11:40:52Z - T11:42:18Z.) The officers continuously reassured Scott they were there to help him and medical was on its way. (Officers' BWC at T11:42:50Z.)

After several minutes, Scott ceased yelling and thrashing around. (Officers' BWC at T11:45:13Z.) Noticing the change, Ofc. Smith patted Scott on the left shoulder and asked

MAC:14687-307 4587544_1 2/7/2022 8:10 AM

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

him "you alright man?" (Officers' BWC at T11:45:31Z.) Ofc. Smith told Ofc. Huntsman that "its weirding me out how calm he is." (Officers' BWC at T11:46:14Z.) The officers confirmed that Scott was "still breathing" and Ofc. Huntsman found a "regular pulse." (Officers' BWC at T11:46:20-58Z; Ex. C at 56.) Ofc. Huntsman updated dispatch as to Scott's condition, asked medical to expedite. (Ex. B; Ex. C at 62-63.) He then performed a sternum rub. (Officers' BWC at T11:47:52Z; Ex. C at 63-64.) Ofc. Smith called his sergeant to inform him that Scott's breathing was "faint." (Officers' BWC at T11:49:20-40Z.) Eventually, Ofc. Smith ran to the street to attempt to "flag medical down." (Officers' BWC at T11:52:00Z.) At no time during the entire encounter did Scott ever tell the officers he could not breath or that he was having any medical distress. (Ex. D at 128.)

After Ofc. Smith directed medical to Scott's location, paramedics began treating Scott and eventually transported him on a gurney. (Officers' BWC at T11:54:10Z.) Scott was eventually pronounced deceased.

### 5. Percipient witnesses

Two of Scott's neighbors witnessed the event: Ed Davis ("Davis") and Koatha Gorden, Jr. ("Gorden") According to Gorden, it was his perception that Scott was "agitated and erratic." (Gorden Depo. at 15, **Exhibit G**.) It was his impression that the officers only wanted to "help" Scott and he never saw any actions by the officers he felt were excessive or unnecessary. (*Id*. at 17-19&22.) He described the officers as "professional." (*Id.* at 17.)

Davis also witnessed most of the encounter and noted that the officers did not "just attack" Scott, but rather "sat there . . . talking to him" (Davis Stmnt. at 7, **Exhibit H**.) The officers also asked Davis to help de-escalate the situation by asking him to talk to Scott. (*Id*. at 8.) Davis told detectives that Scott threw himself on the ground. (*Id*. at 8&10.) Further, Davis did not see the officers use any unnecessary force, but did see Scott attempt to kick the officers. (*Id.* at 11.)

### B. AUTOPSY

On March 4, 2019, an autopsy was performed on Scott by Dr. Leonardo Roquero ("Dr. Roquero"). Dr. Roquero concluded that Scott died as a result of methamphetamine

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-307 4587544_1 2/7/2022 8:10 AM

intoxication and the manner of death was ruled an "accident." (Autopsy Report, **Exhibit I**.) It is Dr. Roquero's opinion that the defendant officers did not asphyxiate Scott and the officers' restraint techniques did not contribute to Scott's death. (Dr. Roquero Depo. at 40-41; 47; 49, **Exhibit J**.) Dr. Roquero explained that prone-restraint asphyxia occurs when an individual becomes unresponsive "with someone on top of him." (*Id.* at 40.) It is a medical fact that asphyxia "does not occur in a delayed manner later in the future" as the impact on the suspect's breathing will occur immediately – and not six minutes into the future. (Dr. Vilke Expert Report at 12-13, **Exhibit K**.)

## III.   SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Rules of Federal Procedure, "[a] party may move for summary judgment, identifying each claim or defense - - or the part of each claim or defense - - on which summary judgment is sought [and] [t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  It is well established that the purpose of summary judgment "is to isolate and dispose of factually unsupported claims." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).  The rule, however, is not a "procedural short cut," but a "principal tool [] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327.  The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents . . . affidavits or declarations . . . or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute . . ." Fed.R.Civ.P. 56(c)(1)(A) and (B).

According to the Supreme Court, in 42 U.S.C. §1983 use of force cases, a court should use video evidence when available in deciding reasonableness. *Scott v. Harris*, 550 U.S. 371, 380 (2007); *Mason v. Las Vegas Metro Police Dep't.*, 754 Fed. Appx. 559,

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-307 4587544_1 2/7/2022 8:10 AM

560 (9th Cir. 2019). And, although a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'" the court need not credit facts "unsupported by the record such that no reasonably jury could believe them, [and] need not rely on those facts for purposes of ruling on the summary judgment motion." *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) (quoting *Scott*, 550 U.S. at 378-80).

## IV.   LEGAL ARGUMENT

### A.   PLAINTIFF'S 42 U.S.C. §1983 CLAIMS

The Complaint alleges three §1983 claims: (1) excessive force, (2) denial of medical care, and (3) denial of familial relations. Defendants are entitled to summary judgment on all three claims.

#### 1.   General §1983 legal standards and qualified immunity.

Section 1983 is not itself a source of substantive rights, but merely the procedural vehicle by which to vindicate federal rights elsewhere conferred. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994). To make out a prima facie case under §1983, a plaintiff must show that a defendant: (1) acted under color of law, and (2) deprived the plaintiff of a constitutional right. *See Borunda v. Richmond*, 885 F.2d 1384, 1391 (9th Cir. 1989). The officers do not dispute that they acted under color of law. Therefore, the first task of this court is to determine whether the defendant officers violated the Constitution. *See Albright*, 510 U.S. at 271. In addition, the officers have raised the affirmative defense of qualified immunity.

"In determining whether an officer is entitled to qualified immunity, [a court] consider[s] (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014) (citation omitted). The Supreme Court has advised lower courts construing claims of qualified immunity to "not to define clearly established law at a high level of generality." *Plumhoff v. Rickard*, 572 U.S. 765, 729 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). The import of that

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-307 4587544_1 2/7/2022 8:10 AM

instruction is, as the Supreme Court has explained, that "doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id.* The Supreme Court has explained that "[t]he doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known'." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law'." *Ashcroft v.al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

## 2.  Fourth Amendment excessive force claim (First Claim)

Plaintiff's primary allegation is that the defendant officers used excessive force by asphyxiating Scott. It is not disputed that the officers had the lawful right to take Scott into custody under a mental health hold. Therefore, the issue is whether the officers used reasonable force in performing a lawful detention. Scott's Estate's excessive force claim is based upon the officers' 95-second use of body weight to control the actively resisting Scott. (Compl. at ¶61, ECF No. 1.) This claim is held by Scott's Estate and is against the individual officers. *See Moreland v. Las Vegas Metro Police Dep't.,* 159 F.3d 365, 369-70 (9th Cir. 1998); NRS §41.100(3) (In Nevada, only a decedent's estate can pursue claims on behalf of a decedent who suffered an alleged Fourth Amendment violation). The officers counter that they used reasonable force, and, even if they did not, they are protected by qualified immunity.

In evaluating a Fourth Amendment excessive force claim, a court asks "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989). To determine whether an officer's actions were objectively reasonable, a court is to consider: "(1) the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of

MAC:14687-307 4587544_1 2/7/2022 8:10 AM

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

force inflicted, (2) the government's interest in the use of force, and (3) the balance between the gravity of the intrusion on the individual and the government's need for that intrusion." *Williamson v. City of National City*, --- 4th ---, 2022 WL 201071, *3 (9th Cir. 2022) (quoting *Lowry v. City of San Diego*, 858 F.3d 1248, 1259 (9th Cir. 2017)). *Graham* identifies three factors that courts should consider in evaluating the government's need to use force: "(1) the severity of the crime; (2) whether the suspect posed an immediate threat to the officers' or public's safety; and (3) whether the suspect was resisting arrest or attempting to escape." *Graham*, 490 U.S. at 396. Of the three *Graham* factors, the most important is "whether the suspect posed an immediate threat to the safety of the officers or others." *A. K. H. by & through Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) (quoting *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011)). Courts judge reasonableness "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.)

"Restraining a person in a prone position is not, in and of itself, excessive force when the person restrained is resisting arrest." *A.B. v. Cty. of San Diego*, 2020 WL 5847551, *17 (S.D. Cal. Oct. 1, 2020) (citing *Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997) *accord Tatum v. City & Cty. of San Francisco*, 441 F.3d 1090, 1007-98 (9th Cir. 2006)). "It is also well-established that police officers 'are not required to use the least intrusive degree of force possible.'" *Williamson v. City of National City*, --- 4th ---, 2022 WL 201071, *3 (9th Cir. 2022) (quoting *Lowry v. City of San Diego*, 858 F.3d 1248, 1259 (9th Cir. 2017).

### a.   Qualified immunity prong #1: the officers' force was reasonable.

The first qualified immunity prong addresses whether the officers used unreasonable force in viewing the facts in the light most favorable to the plaintiff.

### (1)   <u>Type and amount of force</u>

A court must "first assess the quantum of force used to arrest [the individual] by considering 'the type and amount of force inflicted.'" *Drummond v. City of* Anaheim, 343

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-307 4587544_1 2/7/2022 8:10 AM

F.3d 1052, 1056 (9th Cir. 2003). The nature and degree of physical contact are relevant to this analysis, as are the risk of harm and the actual harm experienced. *Williamson*, 2022 WL 201071, *4 (citations and quotation marks omitted). For example, the Ninth Circuit has held that police officers did not act unreasonably in using "pain compliance techniques" against protesters because this use of force was "less significant than most … [where] police did not threaten or use deadly force and did not deliver blows or cuts." *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994); *see also*, *Johnson v. Cty. of Los Angeles*, 340 F.3d 787, 793 (9th Cir. 2003) (describing "hard pulling and twisting" used to removed fleeing armed robbery suspect from car as "minimal intrusion" under the circumstances). Viewing the evidence in Scott's favor, the type and amount of force used by the officers in this case was minimal.

In this case, Plaintiff characterizes the officers' brief use of body weight as "deadly force." - (Compl. at ¶67.) Just because Scott passed away does not mean that deadly force was used. Courts must evaluate what *the likelihood* of serious bodily injury would be given a particular use of force.  *Smith v. City of Hemet*, 394 F.3d 689, 706 (9th Cir. 2005). No court has ever held that the brief use of body weight to control a resisting suspect *prior to handcuffing* is "deadly force." *See Drummond*, 343 F.3d at 1054-56 (characterizing the use of body weight *on a prone, restrained, and non-resisting* suspect as "severe" force.)*. When body weight is used to faciliate handcuffing on a resisting suspect, the Ninth Circuit has indicated that the intrusion is less. *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000). Therefore, Plaintiff's attempt to characterize the force used in this case as "deadly force" is inappropriate.

### (2)   Government Interest

Next, the court must evaluate the state's interests at stake by considering the three *Graham* factors – severity of the crime at issue, whether the suspect posed an immediate threat, and whether the suspect was actively resisting.  In assessing the governmental interests involved in subduing a mentally ill individual who is unarmed, the Ninth Circuit has offered this general guidance:

MAC:14687-307 4587544_1 2/7/2022 8:10 AM

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

As we have held, "[t]he problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense." [Citation omitted]. Although we have refused to create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals, we have found that even "when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted ... with a mentally ill individual.  [] The same reasoning applies to intermediate levels of force.  A mentally ill individual is in need of a doctor, not a jail cell, and in the usual case – where such an individual is neither a threat to himself nor to anyone else – the government's interest in deploying force to detain him is not as substantial as its interest in deploying that force to apprehend a dangerous criminal.  Moreover, the purpose of detaining a mentally ill individual is not to punish him, but to help him.  The government has an important interest in providing assistance to a person in need of psychiatric care; thus, the use of force that may be justified by that interest necessarily differs both in degree and in kind from the use of force that would be justified against a person who has committed a crime or who poses a threat to the community.

*Bryan v. MacPherson*, 630 F.3d 805, 829 (9th Cir. 2010).

Here, it is undisputed that Scott's had not committed a serious crime and he was being taken into custody for a mental health hold pursuant to NRS §433A.160. Because the officers had the lawful right to take Scott into custody, some force was allowed. *See Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012) (citation omitted) ("Even passive resistance may support the use of some degree of governmental force if necessary to obtain compliance . . . depend[ing] on the factual circumstances underlying the resistance."); *see also Williamson*, 2021 WL 201071 at *5 (same).

Then Ninth Circuit and other district courts have addressed the use of body weight to help control an unrestrained and resisting individual. The courts uniformly hold that it is reasonable to use such force until the individual is handcuffed and no longer a threat. This standard has been specifically applied to mentally ill suspects – like Scott.

In the seminal case of *Drummond v. City of Anaheim*, the Ninth Circuit reversed a grant of summary judgment to defendant police officers in an excessive force case.  343 F.3d at 1063.  Drummond, a schizophrenic, was "hallucinating and in an agitated state" in a convenience store parking lot; the officers were called to take Drummond into custody to

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

"help protect" him. *Id.* at 1054.  Even though Drummond had not committed a crime, was not a danger to himself or others, and did not offer resistance, the officers knocked him to the ground and placed a knee to the back of his neck as they placed him into protective custody.  *Id.*  Two officers continued to place their entire body weight on Drummond's back and neck for twenty-minutes after he was restrained, controlled, prone, no longer a threat, and pleading for air.  *Id.* at 1054–55. Drummond suffered a heart attack soon thereafter and fell into a permanent coma.  *Id.*

The *Drummond* Court was not critical of the officers' actions prior to the handcuffing (i.e., "knock[ing] him to the ground" and controlling him noting that "some degree of physical restraint may have been necessary to prevent [injuries]."  *Id.* at 1059. The court only took issue with the force applied "after he was handcuffed and lying on the ground" because:

> Once on the ground, prone and handcuffed, Drummond did not resist the arresting officers. Nevertheless, two officers, at least one of whom was substantially larger than he was, pressed their weight against his torso and neck, crushing him against the ground.

*Drummond*, 343 F.3d at 1054. Thus, *Drummond* stands for the proposition that it is unconstitutional for multiple officers to put their entire body weight on the torso and neck of a handcuffed, prone, and non-resisting suspect for several minutes. *Id.* at 1061.

In *Gregory v. Cty. of Maui*, the Ninth Circuit found that police officers did not use excessive force when a trespasser died of a cardiopulmonary arrest shortly after being forcibly arrested by three officers.  523 F.3d 1103, 1105 (9th Cir. 2008).  The trespasser had been wielding a pen as a weapon; the officers verbally ordered him to drop the pen; and when he refused, the officers wrestled him to the ground and handcuffed him. *Id.* Throughout the struggle, he kept shouting that he could not breathe but continued to fight the officers. *Id.*  When the officers finally handcuffed him, they discovered that he was not breathing and were unable to resuscitate him. *Id.*  The cause of death was determined to be a heart attack caused in part by a preexisting heart condition and police restraint procedures. *Id.* The district court dismissed the claims against the officers and the Ninth Circuit

affirmed.  In support, the Ninth Circuit noted the trespasser's erratic behavior throughout the confrontation, his resistance when they tried to take his pen, the officers resorting to physical confrontation only after verbal requests failed, and the lack of evidence that the officers used weapons. *Id.* at 1106-07.  The court concluded:

> Accordingly, although the confrontation came to a tragic end, we must conclude that the officers did not use excessive force.  The severity of [the suspect's] trespass and of the threat he posed were not overwhelming, but we are satisfied that the force used by the officers was proportionate to both. The Fourth Amendment does not require more.  *See Forrester v. City of San Diego*, 25 F.3d 804, 807-08 (9th Cir.1994) ("Police officers ... are not required to use the least intrusive degree of force possible ... [T]he inquiry is whether the force that was used to effect a particular seizure was reasonable.").

> *Id.*

The *Gregory* Court further explained the *Drummond* decision.  The court noted that the officers (like the Defendant Officers in the subject case) "did not immediately use force upon encountering Gregory, but rather [attempted verbal commands]" and because Gregory "posed a threat to them, because he refused their requests, acted in an aggressive manner . . .", "resisted the officers throughout the entire encounter, and the officers in this case ceased using force once Gregory was handcuffed." *Id.* at 1108-09.  The court found the officers acted reasonably.

In *A.B. v. Cnty. of San Diego,* 2020 WL 5847551*, \*2-5, 17-19 (S.D. Cal. Oct. 1, 2020), several officers applied seven minutes of body weight restraint to a physically resisting suspect. The suspect passed away. The district court found the officers' actions reasonable because the subject, suspected of a minor crime, physically resisted the officers. The *A.B.* court distinguished the case from *Drummond* noting that *Drummond* requires that a suspect be compliant and offering no resistance, crying for air, and have body pressure applied "for a substantial period of time." *Id; see also Gordon v. City & Cty. of San Francisco*, 2021 WL 5449074, \*11-12 (N.D. Cal. Nov. 22, 2021) (placing a knee into the back of a resisting suspect to facilitate handcuffing reasonable "even if it caused a

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-307 4587544_1 2/7/2022 8:10 AM

significant injury.")

Based on the above cases, the current state of the law is clear: it is reasonable to use body weight to control a resisting non-handcuffed individual, but it is unreasonable to continue to use body weight on a prone, handcuffed, and non-resisting suspect.

Here, the officers acted reasonably and thoughtfully in the force they used to handcuff and control Scott. The officers reasonably perceived a threat because Scott, who had already possessed two weapons, was objecting to a non-invasive safety frisk from a standing position. Any reasonable officer would be concerned under the facts of this case. *See United States v. Brown*, 996 F.3d 998, 1007-08 (9th Cir. 2021) (An officer is justified in conducting pat-down search of an individual if officer reasonably believes that his safety or that of others is in danger). Because the officers were legitimately concerned, they attempted to resolve the situation with the lowest level of force available - i.e., officer presence, verbal commands, and a pat down.  This is exactly what the law requires.  *See Gregory*, at 1107 (officers acted reasonably by first issuing verbal commands and not "immediately engage[ing] in physical confrontation"). Scott resisted these efforts and escalated the situation when he reached into his jacket. *Gregory*, at 1106-07 (reasonable to perceive a threat when a suspect refuses officer commands and acts in an aggressive manner). Still, the officers responded with a measured response by only controlling his arms.  This decision also complies with the law.  *See Drummond*, at 1059 ("some force surely justified in restraining" mentally ill individual not suspected of a crime); *Gregory*, 523 F.3d at 1108 (reasonable to handcuff a mentally ill suspect who is not complying with verbal commands). In response to this low-level force, Scott escalated the situation further by physically resisting. Still, rather than just "knock [Scott] to the ground," *Drummond*, 343 F.3d at 1054, the officers attempted to keep Scott upright and handcuff him from a standing position.

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711  FAX: (702) 382-5816

MAC:14687-307 4587544_1 2/7/2022 8:10 AM

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

Scott continued to actively resist and dropped himself to the ground.[5]

The officers, pursuant to their training, secured different limbs and/or areas of Scott's body to facilitate handcuffing.   Due to Scott's continued resistance, the officers briefly applied weight to Scott's shoulder/upper back area and buttocks to control him. This is proper police procedure. (Expert Jack Ryan Report at 51-52, **Exhibit L**.) This action was reasonable.  *See Drummond,* 343 F.3d at 1059 (force used to take mentally ill suspect, not suspected of a crime, to the ground and handcuff him was reasonable and only criticism is of force applied "*after he was handcuffed* and lying on the ground . . ." (emphasis added)); *Gregory,* 523 F.3d at 1108-09 (reasonable to take mentally ill individual suspected of minor crime to the ground for handcuffing purposes where individual resisted and did not comply with verbal commands); *see also Gibson v. Cty. of Washoe*, 290 F.3d 1175, 1183 & 1198 (9th Cir. 2002) (reasonable to hold down inmate and "climb[] onto back and legs, while the other deputies helped restrain his arms and legs" for three minutes to facilitate handcuffing). The fact that the officers never used any tools, punches, kicks, or strikes confirms that the officers were carefully monitoring the situation and only using necessary minimal force. *Forrester*, 25 F.3d at 807. Scott continued to physically resist and attempted to kick the officers.

There can be no dispute that the officers' actions during the 90-second struggle were not only reasonable, but admirable as well. The officers were using not only reasonable force, but the minimal force necessary to get Scott into custody. *See Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) (issue is whether officers act reasonably, not whether they use minimal force). The officers acted in a manner consistent with standard police training. (Ex. L at 45-55.) Most important, the officers removed all body weight and placed Scott in the

---

[5]Although Scott placed himself on the ground, it would have been reasonable for the officers to initiate this task.  *See Drummond*, 343 F.3d at 1059 (no criticism of taking mentally ill not suspected of a crime suspect to ground to facilitate handcuffing); *Gregory*, 523 F.3d at 1108 (same).

MAC:14687-307 4587544_1 2/7/2022 8:10 AM

recovery position immediately after handcuffing. *See Moore v. City of Berkeley*, 801 Fed.Appx. 480, 483 (9th Cir. 2020) (no excessive force where officers did not apply pressure to areas that would have restricted breathing and moved suspect into recovery position as soon as safe to do so).

### b. The law regarding the officers' use of force was not clearly established

Under the second prong of the qualified immunity analysis, a court evaluates whether the officers' conduct violates clearly established statutory or constitutional rights of which a reasonable officer would have known. *Rivas-Villegas v. Cortesluna*, ___U.S.___, 142 S.Ct. 4, 7 (2022) (citing *White v. Pauly*, 580 U.S. ___, 137 S.Ct. 548, 551 (2017)). "It is the plaintiff who bears the burden of showing that the rights allegedly violated were clearly established," *Shafer v. Cty. Of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017) (internal quotation marks and citation omitted).

The Ninth Circuit has issued several opinions in positional asphyxia cases. As discussed in detail above, the law in this circuit is fairly straightforward: an officer can use body weight to control and restrain a prone resisting suspect, but should remove all body weight once the suspect is handcuffed and no longer a threat. *See Drummond*, 343 F.3d 1052; *Gregory,* 523 F.3d 1103; *A.B. v. Cnty. of San Diego*, at *18-20; *Slater v. Deasey*, 776 Fed.Appx 942, 944-45 (9th Cir. 2019) ("*Drummond* provides fair warning" ... "In *Drummond*, we clearly established that 'squeezing the breath from a *compliant, prone, and handcuffed individual* ... involves a degree of force that is greater than reasonable'.") (Emphasis added); *Abston v. City of Merced*, 506 Fed.Appx. 650, 653 (9th Cir. 2013) ("It was clearly established that defendants' use of body compression to restrain a *prone and bound suspect*, who was in no position to offer any meaningful resistance, would violate the rule established by *Drummond*.") (Emphasis added); *Zelaya v. Las Vegas Metro. Police Dep't.*, 682 Fed.Appx. 565 (9th Cir. 2017) (jailers continued use of body weight for "at least

MAC:14687-307 4587544_1 2/7/2022 8:10 AM

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

90 seconds after [suspect] *was handcuffed and had stopped resisting*" violated clearly established law of *Drummond*) (emphasis added); *Gordon v. City & Cty. of San Francisco*, 2021 WL 5449074, *11-12 (N.D. Cal. Nov. 22, 2021) (qualified immunity to officer who used knee to the back to assist with handcuffing of resisting suspect).

Here, he facts of this case are much closer to *Gregory v. Cty. of Maui* where the court found the defendant officers acted reasonably, then *Drummond* where the court criticized the defendant officers' post-handcuffing use of body weight. There is no Supreme Court or Ninth Circuit case that would have put the Defendant Officers that their use of bodyweight under the facts and circumstances of this case could be unconstitutional.

Finally, Plaintiff may argue that the mere act of placing a knee into a suspect's back can be excessive. Recently, the Supreme Court overturned a Ninth Circuit decision holding as much. *See Rivas-Villegas v. Cortesluna*, ___U.S.___, 142 S.Ct. 4 (2022). Therefore, at minimum the officers are entitled to qualified immunity under the second prong of the analysis.

### 3.   Fourth Amendment denial of medical care claim (Second Claim)

According to Plaintiff's second claim for relief, the officers had a Fourth Amendment "duty to provide medical care to persons injured while being apprehended and taken into custody and/or to timely summon medical care for these individuals." (Compl. ¶72.) This is a knowingly false statement by Plaintiff.

The Fourth Amendment requires that law enforcement officers provide objectively reasonable post-arrest care.  *See Tatum v. City & Cty. of San Francisco*, 441 F.3d 1090, 1098-99 (9th Cir. 2006).  The Ninth Circuit has not delineated the exact contours of what constitutes objectively reasonable post-arrest care.  *Borges v. City of Eureka*, 2017 WL 363212, *6 (N.D. Cal. Jan. 25, 2017) (citing *Tatum*, 441 F.3d at 1099).  All that the Ninth Circuit has stated is that police officers are required to "seek necessary medical attention by promptly summoning help or taking the injured arrestee to a hospital." *Id.* (citing *Estate of Cornejo ex rel. Solis v. City of Los Angeles*, 618 Fed.Appx. 917, 920 (9th Cir. 2015) (citing

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-307 4587544_1 2/7/2022 8:10 AM

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

*Tatum*, 441 F.3d at 1099)).  In *Tatum*, the Ninth Circuit held that "a police officer who promptly summons the necessary medical assistance has acted reasonably for purposes of the Fourth Amendment" where the arrestee's labored breathing after being handcuffed made it clear he was in distress.  *Tatum*, 441 F.3d at 1099 (citation omitted).  And, the *Tatum* Court held that the officers did not violate the Fourth Amendment by failing to perform CPR, since officers are not required to provide "what hindsight reveals to be the most effective medical care for an arrested suspect." *Id.* at 1098-99 (citing *Maddox v. City of Los Angeles*, 792 F.2d 1408, 1415 (9th Cir. 1986)).

Here, the facts are undisputed that the officers met their constitutional obligations. One minute and thirty seconds after Scott was handcuffed, the officers requested medical for precautionary reasons. (Ex. B at 03:42:31.) At the time of the medical request, Scott had not complained of injury nor was he having difficulty breathing. When Scott showed signs of medical distress, Ofc. Huntsman requested that medical expedite. (*Id.* at 03:49:32.) Throughout the encounter the officers monitored Scott's breathing and pulse and provided updates. Therefore, the officers met their constitutional obligations to promptly summon medical assistance.

At a minimum, there is no clearly established law prohibiting the manner in which the officers handled Scott's medical treatment. *See, e.g., A.B. v. Cty of San Diego*, at *20-22; *Gordon v. City & Cty. of San Francisco*, at *13..

### 4.   Fourteenth Amendment deprivation of familial relationship claim (Third Claim)

Plaintiff's third claim alleges that her individual constitutional rights were violated by the officers depriving her of a familial relationship with her father. (Compl. at ¶79.) The Ninth Circuit recognizes that certain family members have standing to pursue §1983 claims on behalf of relatives killed by law enforcement.  *Moreland*, 159 F.3d at 370 (mother and children of Childress allegedly killed by officer's excessive force lacked standing to assert a survival action under §1983 and Fourth Amendment but could pursue a Fourteenth

MAC:14687-307 4587544_1 2/7/2022 8:10 AM

Amendment due process claim); *see also Jones v. Las Vegas Metro Police Dep't.*, 873 F.3d 1123, 1132-33 (9th Cir. 2017).

Only "[o]fficial conduct that 'shocks the conscience' in depriving parents of that interest is cognizable as a violation of due process." *Id.* at 1132-33 (citing *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)). There are two different types of shocks the conscience cases. *See e.g., A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013). Conscience shocking actions are those either taken with (1) "deliberate indifference" or (2) a "purpose to harm . . . unrelated to legitimate law enforcement objectives." *Id.* The lower "deliberate indifference" standard applies to circumstances where "actual deliberation is practical." *Id.* (citing *Wilkinson*, at 554). The "purpose to harm" standard is more demanding and applies when an officer cannot practically deliberate, such as where "a law enforcement makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to a legitimate law enforcement objective." *Id.; see also Porter v. Osborn,* 546 F.3d 1131, 1137 (9th Cir. 2008)); *Jones*, 873 F.3d at 1133: *Flores-Zelaya v. Las Vegas Metro Police Dep't.,* 2016 WL 697782, *10-11 (D. Nev. Feb. 19, 2016). "The purpose to harm standard is a subjective standard of culpability." *S.R. v. Browder*, 929 F.3d 1125, 1139 (9th Cir. 2019) (citing *A.D.*, 712 F.3d at 453).

This case involves the purpose to harm standard based on the fact the officers were required to make split-second decisions. *See Jones v. Las Vegas Metro Police Dept.,* 873 F.3d 1123, 1132-33 (9th Cir. 2017) (purpose to harm standard applies where "officers must react to rapidly changing situation"). The officers in this case were simply attempting to lawfully handcuff Scott and, once their task was completed, immediately placed him into the recovery position and summoned medical. There is no evidence the officers attempted to "bully" Scott or "get even." *Wilkinson*, 610 F.3d at 554. At a minimum, there is no clearly established law putting the officers on notice that their actions in this case could possibly violate the Fourteenth Amendment.

MAC:14687-307 4587544_1 2/7/2022 8:10 AM

### B.   PLAINTIFF'S *MONELL* CLAIMS (FOURTH, SIXTH, AND SEVENTH CLAIM)

Plaintiff's Complaint alleges three *Monell* claims against LVMPD: (1) unconstitutional policy or custom (fourth claim for relief), (2) failure to train (sixth claim for relief) and (3) ratification (seventh claim for relief). Plaintiff conducted no discovery on the *Monell* claims and has no evidence supporting the claims.

#### 1.   Relevant *Monell* law.

Under *Monell v. Dep't of Soc. Svcs.*, a municipality is liable for constitutional torts that its employees commit pursuant to a municipal policy. *Monell v. Dep't of Soc. Svcs.*, 436 U.S. 658, 698 (1978). The Ninth Circuit has explained that a litigant may recover from a municipality under §1983 on three different theories: commission, omission, or ratification. *See Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249-50 (9th Cir. 2010). "Commission" refers to a local government implementing its official policies or established customs that are deliberately indifferent to a constitutional right, which includes, for example, the inadequate training of government officials. *Id.* "Omission" refers to the government's omission to an official policy - such as a failure to train. *Id.* "Ratification" refers to an authorized policymaker's purposeful approval of a subordinate's unconstitutional conduct. *Id.*

#### 2.   Analysis of Plaintiff's *Monell* claim

From the outset it is important to note that if the Court has already concluded that the officers did not violate the Plaintiff's constitutional rights, then all the *Monell* claim fails as a matter of law. *See City of Los Angeles v. Heller*, 475 U.S. 796 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the [constitutional violation] is quite beside the point."); *Hayes v. Cty. of San Diego*, 736 F.3d 1223, 1231 (9th Cir. 2013) (constitutional violation required to support *Monell* liability).

Assuming *arguendo* the Court found a constitutional violation, this claim still mandates dismissal because Plaintiff generated no evidence supporting a *Monell* violation.

MAC:14687-307 4587544_1 2/7/2022 8:10 AM

First, Plaintiff never identified a single policy or practice that she alleges to be unconstitutional. LVMPD has an exhaustive and comprehensive use of force policy and policies dealing with the handling of the mentally ill. (Ex. F; and LVMPD Mental Health Policy 6/005.00, **Exhibit M**.) Plaintiff produced no evidence challenging the sufficiency of these policies.  Second, the evidence in this case shows that LVMPD exhaustively trains its officers in both use of force and its treatment of the mentally ill. (Huntsman Training, **Exhibit N**; Smith Training, **Exhibit O**; and Rule 26 Disclosures at Documents 24-74, **Exhibit P**.) Plaintiff had possession of all training documents and did not create any evidence that the policy was sub-standard or deficient. Third and finally, Plaintiff failed to generate any evidence supporting a ratification claim.

Regardless of Plaintiff's dearth of *Monell* evidence, the death knell for all of *Monell* claims is the fact Plaintiff has generated no evidence of any other similar incidents. Plaintiff's *Monell* claims are based entirely on this single isolated event. The law is clear that an unconstitutional practice or custom must consist of more than "random acts or isolated events" and instead, must be the result of a "permanent and well-settled practice." *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1443–44 (9th Cir. 1988), overruled on other grounds by *Bull v. City and Cty. of San Francisco*, 595 F.3d 964 (9th Cir. 2010); *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). Thus, "a single incident of unconstitutional activity is not sufficient to impose liability under *Monell* unless" there is proof that the incident "was caused by an existing, unconstitutional municipal policy...." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985). Therefore, all Plaintiff's *Monell* claims fail as a matter of law.

### C.    PLAINTIFF'S ADA CLAIM (FIFTH CLAIM)

Plaintiff's fifth claim alleges the officers violated Title II of the ADA by "not modify[ing] their tactics to account for [Scott's] disability and in doing so both failed to reasonably accommodate his disability and discriminated against him based on his disability." (Compl. at ¶¶101-103.) According to Plaintiff, "[u]pon information and belief,

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-307 4587544_1 2/7/2022 8:10 AM

LVMPD does not instruct their officers to modify their tactics to effectuate arrest that reasonably accommodates disabilities when dealing with individuals with psychiatric disabilities and by failing to do so discriminated against [Scott] based on his disability." (*Id.*)

Although Plaintiff claims this cause of action is against "all defendants," the claim can only be maintained against LVMPD. *City & Cnty of S.F. v. Sheehan*, 575 U.S. 600, 611 (2015).

### 1.     Relevant ADA law.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Discrimination includes a failure to reasonably accommodate a person's disability. 28 C.F.R. § 35.130(b)(7). In the Ninth Circuit, Title II applies to arrests. *Sheehan v. City & County of S.F.*, 743 F.3d 1211, (9th Cir. 2014), reversed in part on other grounds by *City & County. of S.F. v. Sheehan*, 575 U.S. 600 (2015). Courts have recognized at least two types of Title II claims applicable to arrests: (1) wrongful arrest, where police wrongly arrest someone with a disability because they misperceive the effects of that disability as criminal activity; and (2) reasonable accommodation, where, although police properly investigate and arrest a person with a disability for a crime unrelated to that disability, they fail to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees.  *See Sheehan,* at 1232-33. In this case, Plaintiff is alleging the second type of ADA claim – failure to accommodate.

To state a claim under Title II of the ADA, a plaintiff generally must show: (1) he is an individual with a disability; (2) he is otherwise qualified to participate in or receive the benefit of a public entity's services, programs or activities; (3) he was either excluded from

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-307 4587544_1 2/7/2022 8:10 AM

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

participation in or denied the benefits of the public entity's services, programs or activities or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits or discrimination was by reason of his disability. *See id.* In a Title II claim grounded in a public entity's alleged failure to provide a reasonable accommodation under 28 C.F.R. §35.130(b)(7), the plaintiff bears the initial burden of producing evidence of the existence of a reasonable accommodation. *Id.* A public entity may defeat a reasonable accommodation claim by showing "that making the modifications would fundamentally alter the nature of the service, program, or activity." *Id.* Plaintiff bears the initial burden of producing evidence of an available reasonable accommodation, which the entity may then defeat by showing that the modification proposed would fundamentally alter the nature of the service, program, or activity. *Id.*, at 1233. "To recover monetary damages under Title II of the ADA, a plaintiff must prove intentional discrimination on the part of the defendant." *Sweiha v. Cty. of Alameda*, 2021 WL 292517, *5 (N.D. Cal. Jan. 28, 2021) (citing *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001)). To prove intentional discrimination, the plaintiff must show the defendant acted with deliberate indifference. *Id.* at 1139. "[D]eliberate indifference does not occur where a duty to act may simply have been overlooked, or a complaint may reasonably have been deemed to result from events taking their normal course." *Id.* "Rather, in order to meet the second element of the deliberate indifference test, a failure to act must be a result of conduct that is more than negligent, and involves an element of deliberateness." *Id.*

The Ninth Circuit has held that the presence of exigent circumstances informs the reasonableness of the accommodation request. *Sheehan*, 743 F.3d at 1231-32 (holding ADA applies to arrests and that "exigent circumstances from the reasonableness analysis under the ADA"). Because of the factual nature of this determination, "courts typically consider ADA claims relating to arrests at the summary judgment stage." *See e.g., Harper*, at *7.

MAC:14687-307 4587544_1 2/7/2022 8:10 AM

2.     **Analysis of Plaintiff's ADA claim.**

a.     **The ADA claim is barred by the applicable statute of limitations.**

"Title II of the ADA does not contain an express statute of limitations." *Sharkey v. O'Neal*, 778 F.3d 767, 770 (9th Cir. 2015).   Therefore, a court borrows the limitations period for the "most analogous state-law claim, so long as it is not inconsistent with federal law or policy to do so." *Id.* (quotation omitted).  Nevada has a statutory provision similar to Title II.  Under NRS 651.070, "[a]ll persons are entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages and accommodations of any place of public accommodation, without discrimination or segregation on the ground of ... disability …"  Section 651.090 provides a private right of action for violations of §651.070.  The limitations period for bringing a claim under §651.090 is "1 year from the date of the act complained of."  *See* NRS 651.120.   Therefore, Scott had one year from the date of the incident to file suit.  *See Belssner v. State of Nevada*, 2:15-cv-00672 APG-PAL, 2017 WL 2990848, *2 (D. Nev. July 12, 2017); *but see Funke v. Hatten*, 2:19-cv-01335-RFB-EJY, 2021 WL 2346003, *9 (D.Nev. June 8, 2021) (rejecting same argument and finding two-year statute of limitations applied).

It is undisputed that the subject incident occurred on March 3, 2019 (Compl. at ¶18), and that Plaintiff did not file her Complaint until October 7, 2020.  Because Plaintiff did not comply with the applicable statute of limitations, the Title II claim should be dismissed with prejudice.

b.     **Analysis of the merits of plaintiff's ADA claim.**

Plaintiff is alleging that LVMPD failed to accommodate Scott's mental disabilities when while detaining him. However, Plaintiff has never identified any specific reasonable accommodations that LVMPD failed to provide Scott. As set forth in LVMPD's policy on handling persons with special needs, the department takes mental health issues seriously

MAC:14687-307 4587544_1 2/7/2022 8:10 AM

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

(Ex. M) and trains its officers exhaustively (Exs. N, O, &P.)

Here, the officers used their CIT training to attempt to accommodate Scott's mental disabilities. Scott exited his apartment with two potentially deadly weapons and, after surrendering the weapons, refused a routine, non-invasive standing pat down. Obviously, the officers could not secure Scott medical help without first assuring the safety of the scene for both themselves and, eventually, medical personnel. The officers needed to pat down Scott and handcuff him before they would be in a position to assist or help Scott without unreasonable risk. *See e.g., Harper v. Cty. of Merced*, 2020 WL 243118, *8-9 (E.D. Cal. Jan. 16, 2020); *Seremeth v. Board of County Com'rs Frederick County*, 673 F.3d 333 (4th Cir. 2012) (no ADA violation under Title II during their investigation of a domestic violence report by handcuffing the suspect with his hands behind his back, per protocol, as opposed to with his hands in front of his body or by failing to provide a qualified interpreter because officers were entitled to assure themselves that no threat existed against them or anyone else.)

Plaintiff's contention is that the officers should have been trained "to accommodate his mental illness by employing de-escalation strategies with the intent of achieving a safe and nonviolent self-surrender" including "engaging in non-threatening communications, respecting his comfort zone, waiting for the arrival of medical assistance and using the passage of time . . ." (Compl. at ¶117.) They did. Both officers were CIT trained – meaning they underwent *four days* of training in learning how to assess mental illness and how to detain those individuals. (Ex. C at 37-38; Ex. D at 73; Ex. P.) The officers followed their training by speaking calmly to Scott, continuously tried to reassure him that they were there to help him, provided him pat down alternatives, and did not rush the encounter. (Ex. C at 39-41.) During discovery, LVMPD produced its CIT training documents, including all power points. (Ex. P at Exhibits 33-67.) Plaintiff generated no evidence that LVMPD's

MAC:14687-307 4587544_1 2/7/2022 8:10 AM

training was insufficient – and certainly no evidence that it establishes deliberate indifference.

### D.   PLAINTIFF'S STATE LAW CLAIMS (EIGHTH AND NINTH CLAIM)

#### 1.   <u>Battery</u>

Plaintiff's eighth claim is a state law battery/wrongful death claim. (Compl. at ¶¶163-171.) This claim is identical to Plaintiff's Fourth Amendment excessive force claim. *See Ramirez v. City of Reno*, 925 F.Supp. 681, 691 (D. Nev. 1996); *Belch v. Las Vegas Metro Police Dep't.*, 2012 WL 4610803, *11 (D. Nev. 2012); (citing *Knappas v. City of Oakland*, 647 F.Supp. 2d 1129, 1164 (N.D. Cal. 2009)); *see also,* NRS §171.122(1) (providing those individuals "must not be subjected to any more restraint than necessary.") Therefore, defendants adopt the same arguments raised in § IV(A)(2)(a).

#### 2.   <u>Negligence</u>

To prove a claim of negligence, the plaintiff must show by a preponderance of the evidence that: (1) defendant had a duty to exercise due care towards a plaintiff; (2) defendant breached that duty; (3) the breach was the actual cause of plaintiff's injury; and (4) the breach was the proximate cause of the injury; and (5) damages.  *See Perez v. Las Vegas Medical Center*, 107 Nev. 1, 4, 805 P.2d 589, 590-91 (1992).

Nevada courts have never addressed the legal issue of whether state law negligence claims resulting from police contact are broader, California courts have held "[t]he Fourth Amendment 'reasonableness' standard is not the same as the standard of 'reasonable care' under tort law."  *Hayes v. Cnty. of San Diego*, 305 P.3d 252, 262-63 (Cal. 2013) (quoting *Billington v. Smith*, 292 F.3d 1177, 1190 (9th Cir. 2002)).  According to California law*, in deadly force cases*, negligence "encompass[es] a broader spectrum of conduct than excessive force claims under the Fourth Amendment." *Mulligan v. Nichols*, 835 F.3d 983, 991 (9th Cir. 2016).  In *Hayes*, the California Supreme Court recognized a negligence claim may exist, under California law, for police use of deadly force "if the tactical conduct and

MAC:14687-307 4587544_1 2/7/2022 8:10 AM

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

decisions leading up to the use of deadly force show, as part of the totality of circumstances, that the use of deadly force was unreasonable." Courts in this district have adopted California's reasoning. *See also Correa v. Las Vegas Metro Police Dep't.*, 2:16-cv-01852-JAD-NJK, 2019 WL 1639932, *6 (April 15, 2019).

This higher standard has only been applied when deadly force is used. *See Mulligan*, 835 F.3d at 991 n.7*; Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1125-26 (9th Cir. 2021).

Here, as set forth above in section § IV(A)(2)(a) no reasonably jury could conclude the officers used deadly force because placing a knee on a suspect's upper back/shoulder area for around 90-seconds is not deadly force. Because deadly force was not used in this case, the Plaintiff's negligence claim is based entirely upon the officers' and LVMPD's discretionary acts. (Compl. at ¶173.) The defendants are protected from liability for these discretionary acts by NRS 41.032. *See Gonzalez v. Las Vegas Metro Police Dep't.*, Docket No. 61120, 2013 WL 7158415, *3 (Order of affirmance, Nov. 21, 2013) ("decision to arrest or detain [suspect on a warrant] was part of a policy consideration" that invoked NRS 41.032. Further, the Nevada Supreme Court has found other Fourth Amendment activities - essentially, seizures other than uses of force - are covered by NRS 41.032. *See Maturi v. Las Vegas Metro Police Dep't.*, 110 Nev. 307, 310, 871 P.2d 932, 934 (1994) (decision of how to handcuff discretionary); *see also Ortega v. Reyna*, 114 Nev. 55, 62, 953 P.2d 18, 23 (1998) (decision to stop and to arrest motorist discretionary).

The Ninth Circuit has also considered NRS 41.032 and held that "[a]n officer's decision as to how to accomplish a particular seizure or search is generally considered discretionary under Nevada law, and officers are therefore immune from suit as to state-law claims arising therefrom in most cases." *Davis v. City of Las Vegas*, 478 F.3d 1048, 1060 (9th Cir. 2007); *Jones*, 873 F.3d at 1123; *see also Sandoval v. Las Vegas Metro Police Dep't.*, 756 F.3d 1154, 1168 (9th Cir. 2014) (police officers "exercise[ ] discretion and [are] thus generally immune from suit where the act at issue require[s] personal deliberation, decision, and judgment, rather than obedience to orders, or the performance of a duty in

MAC:14687-307 4587544_1 2/7/2022 8:10 AM

which the officer is left no choice of his own."). Thus, officers only lose this immunity from state-law claims when they act in bad faith or act with willful or deliberate disregard for the rights of a particular citizen. *See Jones*, 873 F.3d at 1133; *see also Davis*, 478 F.3d at 1060.

**V.      CONCLUSION**

Based upon the above, the LVMPD Defendants request summary judgment on all claims.

Dated this 7th day of February, 2021.

MARQUIS AURBACH

By *s/Craig R. Anderson*
Craig R. Anderson, Esq.
Nevada Bar No. 6882
10001 Park Run Drive
Las Vegas, Nevada 89145
Attorney(s) for Defendants LVMPD, Smith
and Huntsman

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing **DEFENDANTS LVMPD, KYLE SMITH AND THEODORE HUNTSMAN'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court for the United States District Court by using the court's CM/ECF system on the 7th day of February, 2021.

☒      I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

☐      I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants: n/a

*s/Sherri Mong*
an employee of Marquis Aurbach

MAC:14687-307 4587544_1 2/7/2022 8:10 AM

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816