EXPERT REPORT BY KRIS SPERRY, MD SERVED ON 12/3/2021

# EXHIBIT 17

Kris Sperry, M.D.
Forensic Pathologist

Certified by the American Board of Pathology in:
Anatomic Pathology
Clinical Pathology
Forensic Pathology

November 4, 2021


Re:  Roy Scott


I have reviewed documents, records and photographs concerning the death of Roy Scott.  These materials include the following:

Autopsy Report
Toxicology Report
Medic West Ambulance records
Coroner's Report
Medical records, Rawson Neal Psychiatric Hospital
Numerous photographs of the shooting scene, Mr. Scott in the ER., and from the
        Autopsy Examination
Force Investigation Team In-Custody Death Investigation
Crime Scene Investigation Report
Detective Report
Medical Records, Valley Hospital
Eddie Davis Statement
Koatha Gorden Statement
Transcript of Deposition of Kyle Smith
BWC of Smith and Huntsman (video files NPR2020-0005019_404_#4 and NPR2020-0005019_404_#5)

The following is a narrative of the events, and specific events are denoted in brackets on the bodycam footage, and times are in parentheses:

In the early morning hours of March 3, 2019, Roy Scott dialed 911, and reported that three males with a saw were trying to break in to his apartment, located at 3601 Conlon Avenue.  Koatha Gorden, his neighbor, heard him shouting, "Why are you bothering me?"  Scott would not answer further questions for the dispatcher, and Scott hung up.  Officers Theodore Huntsman and Kyle Smith were dispatched to the residence, arriving at 0320 hours.  They knocked on the door, and Scott instructed the officers to break down the door because the persons he had described were within the apartment.  However, the officers could not hear anyone other than Mr. Scott, and saw him only through a window.  Officer Smith called his supervisor, Sgt. Cesar Garcia, and told him

Dr. Kris L. Sperry
11/5/2021
Page 2 of 12

that Mr. Scott was possibly mentally ill, and requested a Crisis Intervention Team (CIT), even though both he and Officer Huntsman were themselves CIT certified.  Smith knocked on the door, but Mr. Scott would not open the door.  Shortly thereafter, however, Mr. Scott exited the apartment, holding a metal pipe and a cell phone.  Mr. Scott was instructed to drop the pipe, which he complied, dropping the pipe in the stairwell [7:06 (video file NPR2020-0005019_404_#5)].  The officers directly contacted Mr. Scott at the bottom of the stairs which he had just descended, and Scott appeared agitated and confused, but was conversing with the officers.  Mr. Scott insisted that he did not have any other weapons, but then produced a short kitchen-style knife from his front pocket, and handed it to Huntsman, handle side, making no threatening movements with the knife.

The officers insisted that they wanted to pat down Mr. Scott to look for other weapons.  Mr. Scott told them that he had paranoid schizophrenia, and wanted to be placed inside a car [7:34 – 8:00 (video file NPR2020-0005019_404_#4)].  Mr. Scott actually was ready to remove his shirt to show the officers that he did not possess any other weapons.  Officer Smith, in his statement, stated that, "No, we don't want you to do that, and then we grabbed him."  Mr. Scott refused to let either of the officers pat him down, but when they attempted to do this, a struggle ensued. According to the officers, Mr. Scott dropped his weight to the ground, laying upon his back, and the struggle continued as the officers attempted to handcuff him.  However, the videos do not appear to show Mr. Scott falling on his own, but instead falling due to force being applied by one or both of the officers.

While on top of Scott, each officer then held one of Mr. Scott's arms, then one officer took control of his head and shoulders and the other officer took control of his arms and torso, and applied the handcuffs.  Officer Smith placed his knee across the back of Mr. Scott's neck and his torso for a period of 91 seconds, and placed the handcuffs.  Several neighbors heard Mr. Scott yelling, and they exited their apartments, trying to calm him down.  At this point, Mr. Scott begins to appear to calm down, but exhibited labored breathing, and then his feet stopped moving and he began to shake, as if he was having some kind of seizure.  Mr. Scott asks for water, but is given none.  Fourteen (14) minutes into the video, an officer states that Mr. Scott is still breathing, and shortly thereafter, a statement is made that Mr. Scott is "barely breathing."  However, 15 minutes into the video, an officer states that he is "barely breathing."  An officer checks Mr. Scott's pulse [15:11 (video file NPR2020-0005019_404_#4)], and asks to "expedite medical [21:18 (video file NPR2020-0005019_404_#4)]," but there is no mention that Mr. Scott is unconscious, with Huntsman stating that "he's having a hard time breathing" [21:18].  The handcuffs are still in place, with Mr. Scott's hands cuffed behind his back.  Huntsman at a later point performed a sternum rub without eliciting a reaction or reflex

Dr. Kris L. Sperry
11/5/2021
Page 3 of 12

from Scott [7:06 (video file NPR2020-0005019_404_#5)]. Simultaneously Officer Huntsman placed his knee and weight on Scott's lower back.

Mr. Scott had been rolled on his side, into the "recovery position" [15:41 (video file NPR2020-0005019_404_#4)]. This is at about 0346 hours, ~26 minutes after the officers had arrived at the scene; at this point, Mr. Scott is not moving and appears dead, but there is no attempt to administer even rudimentary cardiopulmonary resuscitation (CPR) by any officer before this point or at any time before the arrival of emergency medical services. During this interval, Smith tries to awaken Mr. Smith [21:52], with no result. Huntsman points a flashlight at Mr. Scott, stating, "his jaw is moving a little bit" [22:27]. Huntsman then states, "he moves his mouth, I don't know what's going on" [23:48]. At 26:46, Huntsman is asked if Mr. Scott has a pulse, and he checks for a pulse for about 36 seconds, then stating, "I can't tell." At 25:46, a pulse is again checked for, and the officer then states, "I'm not seeing a pulse." Prior to lapsing into unconsciousness, Mr. Scott can be heard on various video recordings saying, "Please," sixty-three (63) different times, as well as telling the officers that he is schizophrenic.

Clark American Medical Response (AMR) received the dispatch call at 03:43:07 hours, and are at the scene at 03:53:44 hours, then at Mr. Scott's side at 03:54:00 hours. Upon their arrival, they found Mr. Scott laying on his left side, with his hands still handcuffed. LVMPD had reported in their call for assistance that Mr. Scott had been "combative" and had a "psych" history. Upon their first examination, they found Mr. Scott to be unconscious, unresponsive, with agonal breathing that was labored, and without obvious signs of serious trauma. They instructed LVMPD to remove the handcuffs, and Mr. Scott was loaded onto a stretcher and put into the ambulance, whereupon he immediately stopped breathing and was pulseless. CPR was initiated; Mr. Scott was found to be in a pulseless electrical activity (PEA) cardiac rhythm, and an intraosseous infusion line was placed. Chest compressions were begun at 03:56:00 hours, along with oxygen administration through a bag-valve mask. Epinephrine and Narcan were given, with no change. Las Vegas Fire Rescue (LVFR) arrived at about 04:06:00 hours, and placed an I-gel airway. Mr. Scott's Glasgow Coma Scale (GCS) assessment at 04:08:00 was 3/15 (3 is the lowest score possible in this assessment scale). Mr. Scott regained a functional cardiac rhythm briefly, at 04:11, but this rapidly deteriorated to ventricular fibrillation, and he was administered cardioversion with 200 Joules, with no effective result. Another dose of epinephrine was administered at 04:15:00 hours without result, and cardiac compressions were continued. Transport to the hospital had begun at 04:14:59 hours. An endotracheal tube was inserted by LVFR at 04:18:00 hours; oxygen continued to be given. The ambulance arrived at the hospital at 04:24:16 hours, and he was transferred from the ambulance.

Sperry Forensic Pathology Consultants, Inc.
302 Watermark Drive
Peachtree City, Georgia  30269
Telephone:  (770) 486-5380
e-mail Dr. Sperry:  stiffdoc@bellsouth.net

Dr. Kris L. Sperry
11/5/2021
Page 4 of 12

In the Emergency Room of Valley Hospital Medical Center, Mr. Scott was in PEA cardiac rhythm and was pulseless.  The advanced cardiac life support (ACLS) protocol was continued, and multiple rounds of epinephrine as well as sodium bicarbonate were administered, but Mr. Scott never regained a continuous pulse.  He was pronounced dead at 0438 hours, when his heart became completely asystolic.  No laboratory studies were performed.

An autopsy was performed on the following day, March 4, 2019, at the Clark County Coroner's Office, by Dr. Leonardo Roquero.  Numerous external abrasions were identified, on the occipital scalp, forehead, right eyebrow, right bridge of the nose, cheeks, posterior right shoulder, arm and elbow; lateral right thigh, anterolateral right knee and leg, posterior right knee, anterior left knee, and anterior-lateral left leg.  The only identified internal injuries were confined to focal hemorrhage in the left temporalis muscle and frontal scalp region.  Abrasions were identified around the wrists, which were consistent with the handcuff placement.  The heart was enlarged (540 grams), with atherosclerotic narrowing in the left anterior descending artery (50%), right coronary artery (25%) and circumflex coronary artery (25%).  The left ventricle was thickened (2.0 cm), but the remainder of the gross examination of the heart was unremarkable.  The aorta had some atherosclerosis.  The lungs were heavy (900 gm on the right and 820 gm on the left), with congestion and edema visible on the cut surfaces. The remaining organs were grossly normal.  Microscopically, the heart sections exhibited myocyte hypertrophy, myocardial and interstitial fibrosis, and epicardial scarring.  The lung sections revealed edema, with disrupted alveolar wall septae, and vascular wall hyalinization and thickening.  There were no other microscopic findings of significance.

Toxicology studies were performed on postmortem blood, which revealed the presence of amphetamine at 130 ng/ml, and methamphetamine at 1100 ng/ml.  No other drugs were identified, and the vitreous electrolyte values were normal.

The cause of death was certified as "Methamphetamine Intoxication," along with "Hypertensive and Atherosclerotic Cardiovascular Disease," Paranoid Schizophrenia, Clinical," and "Emphysema" as pathologic diagnoses.  "Multinodular Goiter" and "Diabetes Mellitus, Clinical" were also listed as pathologic diagnoses, and the various superficial injuries were listed separately as well.   The Manner of Death was determined to be, "Accident."  As stated below, I disagree with those determinations.

Officers Huntsman and Smith had knowledge that the dispatch call, which sent them to Mr. Scott's apartment, was in reference to a "421A," which refers to mental illness.

Dr. Kris L. Sperry
11/5/2021
Page 5 of 12

Officer Garcia, who was called by Officer Smith, also had this same knowledge.  Officer Huntsman stated Scott seemed under the influence and had a "1000 yard stare". Both Officers Huntsman and Smith were CIT certified, and also had indicated that they wanted a CIT team dispatched to their location; however, neither Huntsman or Smith appear to have utilized their CIT training with Mr. Scott (and did not wait until CIT trained personnel arrived at the scene), but decided to restrain Mr. Scott, despite the fact that he had been completely compliant with their requests up until the point that they decided to pat Mr. Scott down for weapons.  He had come from his apartment with a pipe, which he dropped when requested.  Upon questioning, he produced a kitchen-type knife, which he voluntarily surrendered when requested to do so, handing the knife handle-first to one of the officers.  He had told the officers that he had paranoid schizophrenia (which corroborated the information that had been given to them by dispatch).  Mr. Scott was scared, and his actions and behavior clearly indicated that he was seeking help from the officers (and he had called 911 when experiencing the delusions/hallucinations that other individuals were trying to hurt him).  However, when they asked to pat him down for any other weapons, he resisted, which is common among mentally ill individuals.  The was interpreted as a refusal to cooperate, and the officers then decided to restrain Mr. Scott, grabbing his arms and attempting to handcuff him.  He fell to the ground, and during their further efforts was eventually restrained, Officer Smith pushed his knee into Mr. Scott's neck and back.  After he was handcuffed, he never uttered any words, and while witnessed by the officers, his respirations obviously deteriorated, and he was "barely breathing," and his pulse was at best weak, then it could not be felt at all by the examining officer.  He was in acute distress.  Nonetheless, Mr. Scott remained handcuffed on the ground, and until the ambulance arrived, the handcuffs were not removed, nor were any resuscitative or CPR measures taken whatsoever.  The paramedics were at Mr. Scott at 0354 hours; if this time is in synchrony with the time line and the body cameras, this is a period of about nine minutes where Mr. Scott was unresponsive and obviously deteriorating, yet absolutely nothing was done to give him even the most minimal aid.

The autopsy examination revealed the presence of methamphetamine and amphetamine (which is a known byproduct of illicit methamphetamine manufacture), but the levels detected were relatively low.  Additionally, both methamphetamine and amphetamine are known to undergo postmortem redistribution, which means that the quantities detected in autopsy blood specimens are frequently up to twice what the "real" (i.e., antemortem) concentrations would have been.  Although the presence of the methamphetamine and amphetamine cannot be ignored, it is completely relevant that Mr. Scott did not display any actions or behaviors indicative of toxic complications of these drugs.  On the contrary, he was nervous and had been experiencing delusions

Dr. Kris L. Sperry
11/5/2021
Page 6 of 12

and hallucinations that were typical of his paranoid schizophrenia, and never exhibited any actual agitated behavior until the officers went hands on.

Furthermore, in my opinion, Mr. Scott's death cannot be classified as being due to "Excited Delirium (ED);" ED, a syndromic compilation of several outward manifestations of psychotic behavior that includes refusal to comply with law enforcement officers, overt psychotic behavior, so-called "superhuman strength" and "imperviousness" to pain, does not apply in this instance (whether or not ED actually exists, as there is presently controversy over the existence of ED as a true syndrome, and a movement away from using this terminology exists currently in the ME and other medical communities, due to the extremely subjective nature of ED, as well as the fact that ED is often used to excuse the actions taken by law enforcement officers and others who are trying to restrain an individual who then abruptly dies during or after the restraint).  Mr. Scott was completely cooperative with the officers despite the hallucinations and delusions he was experiencing due to his known and diagnosed paranoid schizophrenia, and only began to struggle when the officers decided to restrain him, despite his quite reasonable offer to take off his upper body clothing so they could directly examine him for possible weapons.  Mr. Scott did not show any "superhuman strength" or "imperviousness to pain."  As a consequence, it is more proper to consider Mr. Scott's condition as being "Agitated Delirium," a definition that does not have the emotional connotations inherent in "Excited Delirium" as a diagnosis, and which also properly characterizes the agitated state that Mr. Scott and other similar individuals may exhibit as signs of their underlying mental illness, with the confusion produced by the hallucinations and delusions that they are experiencing.  As such, patients with "Agitated Delirium" are most effectively addressed by the implementation of trained Crisis Intervention Teams, who are specifically trained to "defuse" and ameliorate patients in crisis.

During the course of this process, Mr. Scott was eventually placed face-down (i.e., prone) and with the weight of two officers with their equipment exerted directly upon his neck and posterior chest for approximately 91 seconds, while his hands were being restrained behind his back. The application of such force on Mr. Scott was significantly more dangerous than it would have been on a young, healthy person who was in good physical shape; by contrast, Mr. Scott was a 65-year-old man with known paranoid schizophrenia and, consequently, having a high probability of having underlying medical conditions (such as heart problems) that would make such a restraint physically life-threatening.  Indeed, Mr. Scott had an enlarged heart with scarring of the heart muscle and thickening of the heart's left ventricle, typical of long-standing hypertensive heart disease, which put him at significant risk of a sudden cardiac death when he engaged in the strenuous physical activity that occurred during the struggle, and which was

Dr. Kris L. Sperry
11/5/2021
Page 7 of 12

exacerbated by the significant mental stress that he underwent during the course of the struggle and restraint.  Such heart problems are relatively common given his other characteristics (age group, mental health problems, and likely drug problems).  During the restraint process, an officer held him down by knee pressure on the back of the neck (which alone carries a great risk of injury and death), and he was held prone for about 91 seconds, which is more than enough time to impair his respiratory capacity and place further strain on his cardiovascular system.  The other Officer put weight and force on Scott's lower back. Once Mr. Scott lapsed into unconsciousness, he never uttered another word, and his condition began to obviously deteriorate, as witnessed and commented upon by the two officers; however, they did not remove the handcuffs until the ambulance arrival, nor did they even try to administer any help to Mr. Scott while he was dying in front of them.  The sternum rub did not elicit any physical or audible response by Scott.

My opinions regarding the restraint of Roy Scott and his death are as follows:

- Roy Scott, a 65-year-old man, had a known history of mental illness (paranoid schizophrenia), and was suffering from hallucinations and delusions directly due to this mental illness.

- Mr. Scott himself had called 911, stating that unknown individuals were trying to forcibly enter his apartment, and requested help.

- The officers who arrived, Huntsman and Smith, both knew that Mr. Scott suffered from mental illness.

- Once the officers arrived, Mr. Scott was completely cooperative, obeying the officers' requests by dropping the pipe he was carrying, and turning over (handle first) the knife he had in his pocket.  Mr. Scott offered to remove his shirt to show that he was unarmed, but the officers instead decided to restrain him.

- Mr. Scott's death cannot be classified as being due to "Excited Delirium (ED)"; rather, it is more proper to consider Mr. Scott's condition as being "Agitated Delirium" – as explained in more detail above.

- Both Officers Huntsman and Smith had Crisis Intervention Team training, and had furthermore requested CIT assistance with Mr. Smith.  However, neither

Sperry Forensic Pathology Consultants, Inc.
302 Watermark Drive
Peachtree City, Georgia  30269
Telephone:  (770) 486-5380
e-mail Dr. Sperry:  stiffdoc@bellsouth.net

Dr. Kris L. Sperry
11/5/2021
Page 8 of 12

officer utilized their CIT training, nor did they wait for the arrival of any other so
trained officers before they decided that Mr. Scott should be restrained.

- Mr. Scott predictably began to struggle when the restraint attempt began, and
  was wrested to the ground, whereupon he was held in a prone position while an
  officer placed his knee on Mr. Scott's neck and back while handcuffs were
  placed.  Soon, he lapsed in to unconsciousness, after uttering "please" at least
  63 times.

- People are able to speak even when experiencing hypoxia.  Mr. Scott's speaking,
  such as his repeatedly saying, "Please", did not mean that he was breathing;
  rather, he was not getting adequate oxygenation.

- Bruising and blood on Mr. Scott's head and body show that considerable force
  was used by the officers.

- Mr. Scott was never a danger to himself or any other person during the course of
  this entire event.  He was afraid of the hallucinated persons whom he believed
  were trying to harm him, but was not afraid of the police, whom he believed
  were there to help him.

- When the officers asked to pat him down for any other weapons, Mr. Scott
  resisted, which is very common among mentally ill individuals.  Such resistance
  and mental illness do not correlate to a danger that a mentally ill individual will
  attempt to harm or attack anyone (such as a police officer or a third party).

- Once the restraint was effectuated, Mr. Smith began noticeably to deteriorate, as
  is evident from the officers' own statements.  However, even though he was
  rolled onto his left side, the handcuffs were not removed until the ambulance
  and paramedical personnel arrived, at which point Mr. Scott was completely
  unresponsive and in the process of dying.  He experienced a complete
  cardiorespiratory arrest when he was placed inside of the ambulance, and
  never regained consciousness, and only had return of spontaneous circulation
  for very brief periods in the ambulance and at the hospital, where he was
  eventually pronounced dead shortly after his arrival.  (The cause and manner of
  his death are further discussed below.)

- The autopsy of Mr. Scott revealed an enlarged heart with left ventricular
  hypertrophy, characteristic of long-standing hypertensive heart disease

---

Sperry Forensic Pathology Consultants, Inc.
302 Watermark Drive
Peachtree City, Georgia  30269
Telephone:  (770) 486-5380
e-mail Dr. Sperry:  stiffdoc@bellsouth.net

Dr. Kris L. Sperry
11/5/2021
Page 9 of 12

(confirmed by microscopic examination of the kidneys and lungs), underlying conditions which substantially contributed to his death when he when he was subjected to the physical effects of the restraint (and prone positioning with force upon his neck and upper back), as well as the mental strain caused by anxiety and fear he experienced when the restraint began and proceeded.

- Mr. Scott was found to have a small amount of methamphetamine and amphetamine in his blood; the actual quantitation measurement was most probably even much lower, due to postmortem redistribution of this drug.  In other words, after a person dies, postmortem redistribution of methamphetamine and amphetamine generally increase to a level that is higher than what was actually in the person at the time of death or earlier; i.e., while he was alive and at the time of death, Mr. Scott likely had a lower level of methamphetamine and amphetamine in his system than that which was measured in the autopsy.  Based upon the documented sequence of events that occurred before, during, and after he was forcibly restrained, although the presence of these drugs cannot be ignored, I would not consider their presence to constitute significant contributory elements to his death.

- I disagree with the Manner of Death opinion of the autopsy pathologist, Dr. Roquero, who certified the death as being an "Accident."  More properly, and in concordance with nationally accepted and implemented Manner of Death practices among medical examiners across the country, the Manner of Death for Mr. Scott should properly be classified as a "Homicide," as his death was caused and contributed to by the actions of others (specifically the police officers).

- Basically, Mr. Scott died specifically because he was physically restrained by the two police officers who responded to Mr. Scott's own 911 call.  If trained CIT personnel had arrived before any decision was made to restrain him, and the restraint had never taken place, it is my opinion to a reasonable degree of medical certainty that Roy Scott would not have died.  The physical and psychological strain placed upon Mr. Scott during the restraint are direct and substantial contributing causes of his death.

- The officers' application of force caused restraint asphyxia for Mr. Scott, as the restraint applied to Mr. Scott – by virtue of two full-grown police officers applying pressure to him in the prone position while his hands were restrained (as more specifically described above) – obstructed his breathing.  Restraint asphyxia often causes the victim to suffer from a lack of oxygen – i.e., hypoxia – which

Dr. Kris L. Sperry
11/5/2021
Page 10 of 12

causes the victim to fall into pulseless electrical activity (PEA) cardiac rhythm, as shown in EKG data (or rhythm strip data).  As a result of the officers' application of force, Mr. Scott experienced PEA, as documented in the medical records.  *See* SCOTT000043, SCOTT000330, SCOTT000335, SCOTT000337, SCOTT000338.  PEA involves heart rhythm disturbance which commonly results in cardiac arrest.  Cardiac arrest is fatal unless it is rapidly reversed.  In summary, restraint asphyxia caused hypoxia, which induced PEA and ensuing cardiorespiratory arrest that proved fatal to Mr. Scott.

- Mr. Scott's death was foreseeable, because all of the causation (described in the paragraph directly above) involved foreseeable consequences that naturally, frequently, and commonly occur as direct results.  The continuous application of substantial weight to the back of the neck and posterior chest of a prone person whose hands are restrained behind the back would naturally (foreseeably) obstruct the person's breathing in such a manner as to cause hypoxia, which commonly (foreseeably) causes PEA, which commonly (foreseeably) results in fatal cardiorespiratory arrest.

- The fatality would have been foreseeable for a person without enhanced risk factors.  Notably, the fatality was even more likely (more foreseeable) based on Mr. Scott's elevated risk factors, as the officers were aware of his elevated age (65), paranoid schizophrenia, and likely drug use – all of which correlate to increased risk of heart problems (such as Mr. Scott's above-described heart conditions) that would make the cardiorespiratory arrest more likely to occur.  In other words, the facts known to the officers rendered Mr. Scott's death a highly foreseeable result of the force that the officers applied.

- Not only did the restraint cause Mr. Scott to die in the manner set forth above, but also it posed additional risks of causing other serious harm or fatality.  For example, even if he had survived, there would have been a substantial risk of brain damage, which would have been foreseeable because it commonly results from the type of restricted oxygen flow that Mr. Scott suffered.  As another example, severe damage to internal organs, such as the kidneys, or tissues would have been foreseeable because it commonly results from the type of restricted oxygen flow that Mr. Scott suffered; in turn, such internal damage would foreseeably cause organ failure that would result in fatality.  Per the foregoing, the restraint applied to Mr. Scott was extremely dangerous and posed substantial risk of fatality and substantial risk of serious and permanent injury, and these dangers and risks were foreseeable at the time the restraint was applied; the danger and risks included not only the manner in which Mr.

Dr. Kris L. Sperry
11/5/2021
Page 11 of 12

Scott actually died, but also other harms that would have been foreseeable results of the force that was applied.  The restraint that was applied posed inherent dangers of causing fatality or serious and permanent injury.

- Mr. Scott exhibited distress during the 91-second application of force, for example, saying, "Please," sixty-three (63) different times.  In light of the foregoing dangers of the application of force to a restrained person in the prone position, his distress should have been interpreted as a danger signal that led to the immediate cessation of the application of force; upon his exhibiting distress, by saying, "Please", he should have been placed on his side, with his handcuffs removed, and CPR administered so as to potentially open Mr. Scott's airways to increase oxygen flow; these measures would have significantly increased the chances of his survival.  It was foreseeable that failing to take such measures would further significantly diminish his chances of survival.

- The officers here apparently were not trained in the dangers in applying weight to someone in the prone position (*see, e.g.,* Smith Depo. Tr. 60:2-8), even though there are significant dangers in doing so, as discussed above.  As discussed above, those dangers were well-known, prior to the time of the incident involving Mr. Scott.

- Mr. Scott experienced conscious pain and suffering while the restraint was applied to him in the prone position, while he was unable to breathe and was in a state of panic and agitation due to the officers' restraint of him, combined with his mental state.  Prior to his death, the application of force to his posterior was extremely physically painful and also created the emotional suffering (even in a psychotic patient) of facing death.  These opinions are based on: my medical evaluation of the force that was applied to him and their relation to the human biological mechanisms of pain and suffering; the conscious pain and suffering that are generally associated with the above-described phenomena (e.g., asphyxia, hypoxia, the onset of cardiopulmonary arrest); and Mr. Scott's verbal statements of distress, such as his repeatedly saying, "Please".  Furthermore, as stated above, Mr. Scott was in acute distress – which would have brought conscious pain and suffering – when, after he was handcuffed, he never uttered any words, and while witnessed by the officers, his respirations obviously deteriorated, he was "barely breathing," and his pulse was at best weak, and then could not be felt at all by the examining officer.

---

Sperry Forensic Pathology Consultants, Inc.
302 Watermark Drive
Peachtree City, Georgia  30269
Telephone:  (770) 486-5380
e-mail Dr. Sperry:  stiffdoc@bellsouth.net

Dr. Kris L. Sperry
11/4/2021
Page 12 of 12

All of the above opinions have been rendered to a reasonable degree of medical certainty.

Kris Sperry, M. D.

Sperry Forensic Pathology Consultants, Inc.
302 Watermark Drive
Peachtree City, Georgia  30269
Telephone:  (770) 486-5380
e-mail Dr. Sperry:  stiffdoc@bellsouth.net