EXPERT REPORT BY SCOTT DEFOE SERVED ON 12/3/2021

# EXHIBIT 19

## On-Scene Consulting

November 19, 2021

Mr. Peter Goldstein, Esq.
Peter Goldstein Law Group
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145

### Federal Rules of Civil Procedure 26 (a) (2) (B) Report

**ROCHELLE SCOTT, individually, and as co-special administrator of the estate of ROY ANTHONY SCOTT; and FREDRICK WAID, as co-special administrator of the estate of ROY ANTHONY SCOTT, Plaintiffs.**
**vs.**
**LAS VEGAS METROPOLITAN POLICE DEPARTMENT; KYLE SMITH, individually; THEODORE HUNTSMAN, individually; and DOES 1-10, inclusive, Defendants.**
**(Case No. 2:20-cv-01872-RFB-EJY).**

Dear Mr. Goldstein,

Thank you for retaining me to analyze and render opinions regarding the March 3, 2019, In-Custody Death of Mr. Roy Anthony Scott.  Pursuant to the requirements of Rule 26, I have studied reports, videos, La Vegas Metropolitan Police Department documents and other material (as listed under Materials Reviewed) provided to me thus far regarding this case.

Please be advised that if additional documents related to this matter are provided, it may be necessary to write a supplemental report in order to refine or express additional opinions.  It is also necessary to state at the beginning of this report that I do not make credibility determinations in expressing my opinions.

Scott A. DeFoe
Principal
On-Scene Consulting, LLC

On-Scene Consulting

**Materials Reviewed:**

1. Complaint for Damages, <u>Case No. 2:20-cv-1872</u>.

2.  Clark County Coroner, Autopsy Report, <u>Case No. 19-01202</u>, Roy Anthony Scott.

3.  State of Nevada, Department of Health and Human Services, Division of Public and Behavioral Health, Vital Statistics, Certificate of Death, <u>Case File No. 2019004679</u>, Roy Anthony Scott, 3/3/2019.

4.  NMS Labs, Toxicology Report, 3/15/2019, Scott, Roy, A., <u>Patient Identification Number 19-01202.</u>

5.  Clark County Coroner/Medical Examiner, Report of Investigation, Coroner Case, <u>Case No. 19-01202</u>, Roy Anthony Scott.

6.  Summary of Critical Incident Review Team (<u>CIRT</u>) Findings, (<u>CIRT No. 2019-009</u>), <u>Event Number LLV190300010224</u>, (<u>LVMPD 000945-946</u>).

7.  Las Vegas Metropolitan Police Department, Evidence and Property Procedures, <u>5/210.00</u>, Body-Worn Cameras, 5/210.00, (<u>LVMPD 001039-1045</u>).

8.  Las Vegas Metropolitan Police Department, Body-Worn Cameras, <u>Directive No. PO-069-19</u>, 10/14/2019, (<u>LVMPD 001046</u>).

9.  Las Vegas Metropolitan Police Department, Procedural Order, Body-Worn Cameras, <u>Directive No. PO-004-21</u>, 2/9/2021, (<u>LVMPD 001047-1053</u>).

10.  Las Vegas Metropolitan Police Department, 5/212.05, Foot Pursuits, (<u>LVMPD 001078-1080</u>).

11.  Las Vegas Metropolitan Police Department, Procedural Order, Directive No. PO-005-20, Foot Pursuits, 1/17/2020, (<u>LVMPD 001081-1083</u>).

12.  Las Vegas Metropolitan Police Department, Procedural Order, Foot Pursuits, <u>Directive No. PO-032-21</u>, 6/22/2021, (<u>LVMPD 001084-1086</u>).

On-Scene Consulting

13.  Las Vegas Metropolitan Police Department Administrative Notice, Legislative Changes-LVNR, 8/11/2020, (<u>LVMPD 001087</u>).

14.  Las Vegas Metropolitan Police Department, Administrative Notice, Training Suspended on Lateral Vascular Neck Restraint, (<u>LVNR</u>), <u>Directive No. AN-022-20</u>, 7/21/2020, (<u>LVMPD 001088</u>).

15.  Las Vegas Metropolitan Police Department, Administrative Notice, <u>Directive No. AN-017-20</u>, 6/30/2020, LVFD Crisis Response Team Pilot Expansion, (<u>LVMPD 001089</u>).

16.  Las Vegas Metropolitan Police Department, Use of Force Policy, <u>6/002.00</u>, (<u>LVMPD 000287-322</u>) (in effect at time of Roy Scott incident that occurred March 3, 2019).

16.  Las Vegas Metropolitan Police Department, Use of Force Policy, <u>6/002.00</u>, (<u>LVMPD 001090-1114</u>) (effective May 15, 2020).

17.  Las Vegas Metropolitan Police Department, Procedural Order, <u>Directive No. PO-035-20, 6/002.00</u>, (<u>LVMPD 001115-1140</u>).

18.  Las Vegas Metropolitan Police Department, Force Investigation Team Report, In-Custody Death, <u>LVMPD Event No. 190300010224</u>, 7/2/2019, (<u>LVMPD 000001-29</u>).

19.  Las Vegas Metropolitan Police Department, CAD Incident Recall with Audit Trail, Incident No. LLV190300010224, (<u>LVMPD 000030-59</u>).

20.  Las Vegas Metropolitan Police Department, Crime Scene Investigation Report, (<u>LVMPD 000077-80</u>).

21.  Las Vegas Metropolitan Police Department, Evidence Impound Report, <u>Event No. 190300010224</u>, (<u>LVMPD 000081-82</u>).

22.  Las Vegas Metropolitan Police Department, Body-Worn Camera Video Public Records Request, Rochelle Scott, (<u>LVMPD 000083-115</u>).

23.  Las Vegas Metropolitan Police Department, Arrest/Detective Report, <u>Case Report No. LLV190300010224</u>, (<u>LVMPD 000116-118</u>).

On-Scene Consulting

24.  Valley Hospital Medical Center Records, Roy Scott, <u>Patient No. 116470634</u>, Medical Record Number 63540998, (<u>LVMPD 000119-132</u>).

25.  Las Vegas Metropolitan Police Department, Voluntary Statement of Mr. Ed Davis on 3/3/2019, <u>Event No. 190300010224</u>, (<u>LVMPD 000133-148</u>).

26.  Las Vegas Metropolitan Police Department, Voluntary Statement of Sergeant Cesar Garcia, P8913, on 3/3/2019, Event No. 190300010224, (<u>LVMPD 000149-165</u>).

27.  Las Vegas Metropolitan Police Department, Voluntary Statement of Koatha Gorden, on 3/3/2019, <u>Event No. 19030001024</u>, (<u>LVMPD 000166-175</u>).

28.  POST Identification Number 35659, Training History for Theodore Huntsman, (<u>016848</u>), (<u>LVMPD 000176-180</u>).

29.  POST Identification Number 35738, Training History for Kyle Smith, (<u>016897</u>), (<u>LVMPD 000181-184</u>).

30.  Medic West Report, <u>Trip No. 301-19053943.01</u>, Roy A. Scott.

31.  Las Vegas Metropolitan Police Department, Employee Statement, Interview of Theodore Huntsman, P#16848 on 3/6/2019, (<u>LVMPD 000185-230</u>).

32.  Las Vegas Metropolitan Police Department, Employee Statement, Interview of Kyle Smith P#16897 on 3/6/2019, (<u>LVMPD 000231-277</u>).

33.  AXON Flex 2 BWC, NPR 2020-0005019_404_#1, (<u>9:38</u>).

34.  AXON Flex 2 BWC, NPR 2020-0005019_404_#2, (<u>0:39</u>).

35.  AXON Flex 2 BWC, NPR 2020-0005019_404_#3, (<u>6:33</u>).

36.  AXON Flex 2 BWC, NPR 2020-0005019_404_#4, (<u>33:08</u>).

37.  AXON Flex 2 BWC, NPR 2020-0005019_404_#5, (<u>27:25</u>).

38.  AXON Flex 2 BWC, NPR 2020-0005019_404_#6, (<u>4:00</u>).

On-Scene Consulting

39.  AXON Flex 2 BWC, NPR 2020-0005019_404_#7, (0:45).

40.  AXON Flex 2 BWC, NPR 2020-0005019_404_#8, (32:17).

41.  AXON Flex 2 BWC, NPR 2020-0005019_404_#9, (11:03).

42.  AXON Flex 2 BWC, NPR 2020-0005019_404_#10, (4:46).

43.  AXON Flex 2 BWC, NPR 2020-0005019_404_#11, (0:41).

44.  AXON Flex 2 BWC, NPR 2020-0005019_404_#12, (0:43).

45.  AXON Flex 2 BWC, NPR 2020-0005019_404_#13, (0:40).

46.  AXON Flex 2 BWC, NPR 2020-0005019_404_#14, (3:01).

47.  AXON Flex 2 BWC, NPR 2020-0005019_404_#15, (3:10).

48.  AXON Flex 2 BWC, NPR 2020-0005019_404_#16, (2:55).

49.  AXON Flex 2 BWC, NPR 2020-0005019_404_#17, (1:55).

50.  AXON Flex 2 BWC, NPR 2020-0005019_404_#18, (1:30).

51.  AXON Flex 2 BWC, NPR 2020-0005019_404_#19, (2:12).

52.  AXON Flex 2 BWC, NPR 2020-0005019_404_#20, (0:42).

53.  AXON Flex 2 BWC, NPR 2020-0005019_404_#21, (0:56).

54.  AXON Flex 2 BWC, NPR 2020-0005019_404_#22, (6:38).

55.  AXON Flex 2 BWC, NPR 2020-0005019_404_#23, (0:36).

56.  AXON Flex 2 BWC, NPR 2020-0005019_404_#24, (0:45).

57.  AXON Flex 2 BWC, NPR 2020-0005019_404_#25, (6:28).

On-Scene Consulting

58. AXON Flex 2 BWC, NPR 2020-0005019_404_#26, (1:24).

59. AXON Flex 2 BWC, NPR 2020-0005019_404_#27, (0:36).

60. AXON Flex 2 BWC, NPR 2020-0005019_404_#28, (12:23).

61. AXON Flex 2 BWC, NPR 2020-0005019_404_#29 (0:36).

62. AXON Flex 2 BWC, NPR 2020-0005019_404_#30, (0:39).

63. AXON Flex 2 BWC, NPR 2020-0005019_404_#31, (1:12).

64. AXON Flex 2 BWC, NPR 2020-0005019_404_#32, (1:26).

65. AXON Flex 2 BWC, NPR 2020-0005019_404_#33, (4:37).

66. AXON Flex 2 BWC, NPR 2020-0005019_404_#34, (1:40).

67. Deposition Transcript and Exhibits of Kyle D. Smith taken on July 23, 2021.

68. Deposition Transcript and Exhibits of Theodore Grant Huntsman taken on September 27, 2021.

69. Las Vegas Metropolitan Police Departments' Fourth Supplemental Disclosure of Witnesses and Documents, Case No. 2:20-cv-1872-RFB-EJY.

70. Las Vegas Metropolitan Police Department Procedural Order, Body-Worn Cameras, Directive No. PO-xxx-20, (LVMPD 001054-1077).

71. Las Vegas Metropolitan Police Department Procedural Order, Use of Force Policy, Directive No. PO-046-20, 7/8/20, (LVMPD 001141-1164).

72. Las Vegas Metropolitan Police Department Procedural Order, Use of Force Policy, Directive No. PO-065-20, 11/5/20, (LVMPD 001165-1189).

On-Scene Consulting

## Summary

The following statement summaries represent documents/statements that were used in part during my review but are in no way meant to be exhaustive. The documents listed in the Materials Reviewed Section of this report represent the full library of documents reviewed thus far and used as a basis for my opinions.

**The below listed information is derived from Las Vegas Metropolitan Police Department, Force Investigation Team Report, In-Custody Death, LVMPD Event No. 190300010224, 7/2/2019, (LVMPD 000001-29):**

## III. INCIDENT DETAILS:

*"On March 3, 2019, at approximately 0309 hours, Las Vegas Metropolitan Police Department (LVMPD) Dispatch received a 911 call from Roy Scott who called to report there were three subjects, one armed with a saw, outside of his apartment located at 3601 El Conlon Avenue, #D-217.  As the dispatcher attempted to gather more details, Scott refused to answer any more questions and disconnected the call.  Several attempts were made to recall Scott, but he did not answer."*
*"At approximately 0320 hours, Officers Theodore Huntsman and Kyle Smith arrived at Scott's residence.  Neither officer observed anyone outside Scott's residence, nor anyone armed with a saw.  Officers knocked on Scott's apartment door several times, but Scott would not open the door.  While speaking through the door, Scott instructed the officers to break down the door due to subjects being inside his residence."*

*"Officers did not hear anyone else inside the apartment and determined that it was not necessary to kick in the door. Officers retreated down the stairs and looked toward Scott's apartment window, and Officer Huntsman saw Scott standing in the window area but could not see anyone else inside the apartment.  Officer Smith called his supervisor, Sergeant Cesar Garcia, P#8913, on the phone for further advice on how to handle the situation.  Sergeant Garcia instructed Officer Smith to try to make contact with Scott, so they could determine if Scott needed any medical attention and if he was a danger to himself.  Officer Smith knocked on the door again and attempted to make contact with Scott.  Scott refused to open the door.  As Officer Smith returned downstairs to the walkway, Scott finally opened his door and exited his apartment."*

*"As Scott proceeded down the stairs, he had a metal pipe, approximately 19.5 inches in length, in one hand and a cell phone in the other. Officers immediately instructed Scott to*

On-Scene Consulting

*put down the pipe. Scott complied and dropped the metal pipe on the stairwell. As officers made contact with Scott at the bottom of the stairs, he appeared agitated and confused. Officer Huntsman explained to Scott that he wanted to conduct a pat down search for other weapons; Scott insisted that he did not have any other weapons. As the conversation continued, Scott reached into his left front pants pocket and removed a brown-handled knife with an approximate four inch blade and handed it to Officer Huntsman."*

*"Due to previously having a metal pipe and a knife on his person, officers attempted to conduct a pat down search for more weapons on Scott. Scott refused to allow officers to pat him down and a struggle ensued. Scott dropped his weight to the ground and laid on his back. Officers were not able to position Scott's arm behind his back to handcuff him, so they held one of his arms down on the ground. Scott struggled with officers for several minutes as they attempted to handcuff him. Several neighbors heard Scott yelling and they exited their apartments. The neighbors tried to assist the officers by talking with Scott and trying to calm him down, but Scott continued to resist officers."*

*Officers Huntsman and Smith were able to position Scott on his stomach and secured him in handcuffs. After he was handcuffed, Scott was rolled onto his side and was placed in recovery position and medical personnel were summoned to the scene. Scott slowly calmed down, but his breathing became labored. As officers waited for medical personnel to arrive, they monitored Scott for a pulse and checked his breathing. When medical personnel arrived, the handcuffs were removed, and Scott was placed on a gurney. Scott had a faint pulse and had stopped breathing. Medical personnel administered cardiopulmonary resuscitation (CPR) to Scott, and he was transported to Valley Hospital Medical Center (Valley Hospital). Scott was pronounced deceased at Valley Hospital at 0438 hours on March 3, 2019, by Doctor Rodil."*

## Opinions:

Note: None of my opinions are intended to usurp the province of the jury and are not stated as ultimate issues. Rather, my opinions involve the consistency of the officers' actions with standard police practices.

## Opinion Number 1

It is my opinion Las Vegas Metropolitan Police Department Police Officers Theodore Huntsman, P#16848 and Kyle Smith, P# 16897, failed to act in a manner that was reasonable or appropriate in light of the strong indicia that Mr. Roy Anthony Scott was

On-Scene Consulting

mentally ill, experiencing a mental crisis and/or under the influence of a controlled substance. Throughout the United States and in Nevada, law enforcement agencies have recognized and trained their officers in multiple ways to safely interact with subjects such as Mr. Roy Anthony Scott who are suffering from a mental illness, experiencing a mental crisis and or under the influence of a controlled substance. The objective is to avoid unnecessary injury and or death. The underlying principle is reverence for human life. Law Enforcement Officers should be trained to recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies, time to assess and calm the situation, request additional equipment, provide reassurance that the officers are there to help, give the person time to calm down, move slowly, reduce environmental distractions and if necessary properly restrain the subject to eliminate or reduce the need to use force and to prevent the subject from injuring himself or herself.

In addition, law enforcement officers are taught that they should attempt to de-escalate and utilize proper defusing techniques throughout an incident. Defusing is a process of reducing the potential for violence and bringing emotional level to a manageable level to restore order. The primary objective is to calm the person so that a conversation can take place and the use of force can be avoided.

In addition, <u>law enforcement officers should be taught the below listed De-escalation Techniques</u>:

- Recognize the person may be overwhelmed by thoughts, beliefs, sounds (<u>voices</u>).
- Remember, a person's delusions or hallucinations are real to them.
- Understand that a rational discussion may not take place.
- Speak simply, move slowly.
- Announce actions before taking them.
- Attempt to gain voluntary compliance.
- Remove distractions and disruptive people.
- Be friendly, patient and encouraging but remain professional.
- Be aware that a uniform and a gun may frighten a person with mental illness.
- Reassure the person that no harm is intended.
- Get immediate emergency aid when needed.

Effective communication may enable a peace officer to gain cooperation and voluntary compliance in stressful situations.

The vast majority of law enforcement responsibilities involve effective communication. Communication involves both command presence and words resulting in improved safety. <u>Effective communication</u>:

On-Scene Consulting

- Provides skills that reduce the likelihood of physical confrontation.
- Can result in a reduction of injuries.
- Renders more effective public service and improves community relations.
- Decreases public complaints and internal affairs investigations.
- Decreases civil liability.
- Lessens personal and professional stress.

It is not the role of or within the capacity of peace officers to attempt to diagnose a person's disability; officers need to recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies.

In addition, I base my opinion on the policy in effect at the time of the incident in Las Vegas Metropolitan Police Department, Use of Force Policy, 6/002.00, (LVMPD 000287-322):

Levels of Resistance: "It is important for officers to bear in mind that there are many reasons a subject may be resisting arrest or may be unresponsive. The person in question may not be capable of understanding the gravity of the situation.  Officers must consider several factors when dealing with a non-compliant subject.  A subject may be non-compliant due to a medical condition, mental, physical, or hearing impairment, language barrier, drug interaction or emotional crisis, and have no criminal intent. These circumstances may not make the subject any less dangerous, but it may require a change in tactics that will be more effective while maintaining officer safety once these circumstances are known to the officer."

De-Escalation: "In their interaction with subjects, officers should use advisements, warnings, verbal persuasion and other tactics and alternatives to higher levels of force. Officers shall perform their work in a manner that avoids unduly jeopardizing their safety or the safety of others through poor tactical decisions."

In addition, I base my opinion on the current Las Vegas Metropolitan Police Department, Use of Force Policy, 6/002.00, (LVMPD 001090-1114):

Levels of Resistance: "It is important for officers to bear in mind that there are many reasons a subject may be non-compliant, resisting arrest, or unresponsive. The person in question may not be capable of understanding the gravity of the situation.  Officers must consider several factors when dealing with a non-compliant subject.  A subject may be non-compliant due to a medical condition; mental, physical, or hearing impairment; language barrier; drug interaction; emotional crisis; and have no criminal intent. These circumstances may not make the subject any less dangerous, but it may require a change

On-Scene Consulting

in tactics that will be effectively address or de-escalate the situation while maintaining officer safety."

De-Escalation (definition): "An officer's actions to slow down, stabilize, and resolve an incident as safely as possible by reducing danger through the use of verbal persuasion, tactics, resources and transitioning through force options."

De-Escalation: "In their interaction with a subject, officers, will, when feasible, use advisements, warnings, verbal persuasion, and other tactics as alternatives to higher levels of force.  Officers will perform their work in a manner that avoids unduly jeopardizing their safety or the safety of others through poor tactical decisions.  Officers will make efforts to control a confrontation and not allow it to escalate."

In my opinion, both officers' conduct did not comply with the above-stated LVMPD written policy in effect at the time of the incident (or the subsequently revised written policy), as the officers failed to take proper measures to de-escalate (as discussed above), even though such measures were appropriate based on Mr. Scott's condition (of being mentally ill, experiencing a mental crisis and/or under the influence of a controlled substance) as described above and below.

Additionally, in my opinion, the officers did not identify any crimes that Mr. Roy Anthony Scott actually committed.  In my opinion, his non-compliance with the officers (in their attempt to pat him down and at the time of the takedown) was possibly caused by him being mentally ill, experiencing a mental crisis and/or under the influence of a controlled substance.  Under the above-quoted LVMPD policy in effect at the time of the incident: "A subject may be non-compliant due to a medical condition, mental, physical or hearing impairment, language barrier, drug interaction or emotional crisis, and have no criminal intent."  (LVMPD 000292.)  (This is also current policy.  LVMPD 001096.) According to LVMPD Officer Theodore Huntsman, "technically…he was committing a crime against us as police officers," by "resisting and obstructing" (Deposition Transcript of Theodore Huntsman, Page 55).  In my opinion, Mr. Roy Anthony Scott was afraid and in no way was attempting to flee or physically harm the officers.  I also note that Officer Smith stated that Mr. Roy Anthony Scott did not commit any crime (Deposition Transcript of Kyle Smith, Pages 30, 130).

In addition, based on my review of the facts and testimony in this matter, Police Officers Theodore Huntsman, P#16848 and Kyle Smith, P# 16897, were aware that Mr. Roy Anthony Scott was Schizophrenic and clearly suffering from extreme panic and anxiety.

# On-Scene Consulting

Schizophrenia is not a single disorder.  It is a group of related disorders in which a person's ability to function is marked by severe distortion of thought, perception, feelings, and bizarre behavior.

Behaviors include:

- Bizarre delusional thinking.
- Hallucinations.
- Incoherent, disconnected thoughts and speech.
- Expressions of irrational fear.
- Deteriorated self-care.
- Poor reasoning.
- Strange and erratic behaviors.

Officers may come into contact with people affected by schizophrenia because certain medications taken by individuals who are affected by schizophrenia may cause agitation that can lead to a buildup of tension, anxiety, or panic.  When frightened, a person with this disorder may act out with even more bizarre or paranoid behavior.

In addition, I base my opinion on the following facts and testimony:

- "PR sounds possible 421A," (Las Vegas Metropolitan Police Department, CAD Incident Recall with Audit Trail, Incident No. LLV190300010224, LVMPD 000030).
- According to LVMPD Sergeant Cesar Garcia, the officers advised him that they felt Mr. Roy Scott was 421A-Mental Illness, (LVMPD 000158).
- According to LVMPD Police Officer Theodore Huntsman, Mr. Roy Scott came across as a mentally ill person, (LVMPD 000193).
- According to LVMPD Police Officer Theodore Huntsman, he believed Mr. Roy Scott needed some medical attention, (LVMPD 000193-194).
- According to LVMPD Police Officer Theodore Huntsman, Mr. Roy Scott told hm that he was Paranoid Schizophrenic, (LVMPD 000194-195).
- According to LVMPD Police Officer Kyle Smith, he let his partner know that Mr. Roy Scott was possibly 421A or under the influence of something, (LVMPD 000238).
- According to LVMPD Police Officer Kyle Smith, Mr. Roy Scott stated he is paranoid and that he is Schizophrenic, (LVMPD 000240).
- According to LVMPD Police Officer Kyle Smith, he had a prior contact Mr. Roy Scott a month ago and that he was possibly experiencing Excited Delirium and he took him to the hospital on a "legal," (LVMPD 000246).

On-Scene Consulting

- According to LVMPD Police Officer Kyle Smith, Mr. Roy Scott was against the wall and stated, "I'm schizo, I'm paranoid, I'm having issues," (LVMPD 000255).
- According to LVMPD Police Officer Kyle Smith, Mr. Roy Scott never made a threat, (LVMPD 000260).
- AXON Flex 2 BWC, NPR 2020-0005019_404_#4, at (7:53), Mr. Scott tells the officers he is Schizophrenic.
- AXON Flex 2 BWC, NPR 2020-0005019_404_#4, at (8:14), Mr. Scott stated, "But you are shining the light in my face."
- AXON Flex 2 BWC, NPR 2020-0005019_404_#4, at (8:14), Mr. Scott stated, "I'm paranoid sir."
- According to LVMPD Police Officer Kyle Smith, he agrees Mr. Scott told him that he was Schizophrenic, (Deposition Transcript of Kyle Smith, Pages 49-50).
- According to LVMPD Officer Theodore Huntsman, per the call taker, the caller stated the person appeared to be mentally ill, (Deposition Transcript of Theodore Huntsman, Page 16).
- According to LVMPD Officer Theodore Huntsman, Mr. Roy Scott stated at some point that he was Paranoid Schizophrenic, (Deposition Transcript of Theodore Huntsman, Page 34).
- According to LVMPD Officer Theodore Huntsman, he determined that Mr. Roy Scott was experiencing a mental crisis, (Deposition Transcript of Theodore Huntsman, Page 34).

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level by recognizing that an individual may be mentally ill and or experiencing a mental crisis.

Lastly, I base my opinion on my twenty-eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### **Opinion Number 2**

It is my opinion Las Vegas Metropolitan Police Department Police Officers Theodore Huntsman, P#16848 and Kyle Smith, P# 16897, actions by grabbing Mr. Roy Anthony Scott unnecessarily escalated the situation. Based on my review of the videos, facts, and testimony in this matter, Mr. Roy Anthony Scott was clearly mentally ill and

## On-Scene Consulting

experiencing a mental crisis.  In addition, Mr. Roy Anthony Scott never threatened the officers and did not pose an imminent or immediate threat to the safety of the officers or others; and he pleaded with them just to place him in their vehicle.  In addition, Mr. Roy Anthony Scott advised the officers that he suffers from Schizophrenia, and he was clearly paranoid and scared.  Mr. Roy Anthony Scott voluntarily put down the pipe that he possessed and handed the knife he possessed to them in a safe manner.  As stated in Opinion 1, he did not commit any offense.

In addition, based on my review of the Body-Worn Camera videos in this matter, it appears that Officer Kyle Smith used his right foot in a manner to cause Mr. Roy Scott to fall to the ground.

Though I do agree that prior to being in the control of Emergency Medical Services (EMS) personnel, Mr. Roy Anthony Scott would have to be searched for any additional weapons or contraband, it is my opinion there were safer and more reasonable alternatives available to Officers Theodore Huntsman, P#16848 and Kyle Smith, P# 16897, based on the totality of the circumstances.  There was no rush.  The officers could have utilized effective verbal strategies, de-escalation, and defusing techniques while they waited the arrival of EMS and additional Las Vegas Metropolitan Police Department Police Officers and a Supervisor.  Once EMS arrived and the additional Las Vegas Metropolitan Police Department Police Officers and a Supervisor, they could advise Mr. Roy Scott that they would have to place him on the multi-point soft restraint system on a gurney.  Once restrained on the gurney, they could conduct a pat down search of Mr. Roy Anthony Scott.

Another safer alternative would be that once additional Las Vegas Metropolitan Police Department Police Officers and a Supervisor, arrived at scene, they could formulate a plan that involved a Team Take Down where each officer could control Mr. Roy Anthony Scott's arms, one officer would control his legs and one officer would be designated to handcuff Mr. Roy Anthony Scott.  The supervisor or another designated officer could continue to reassure Mr. Roy Anthony Scott that as soon as he was handcuffed and searched, he would receive medical treatment and that he had not committed a crime.  By utilizing this effective tactic, it would allow Mr. Roy Anthony Scott to be handcuffed quickly and stood up without delay or hopefully searched while standing.  In addition, this effective tactic would alleviate a prolonged struggle and alleviate placing any weight on Mr. Roy Anthony Scott's back and neck and not compromise his breathing in any way.  It would also be a much safer tactic for Officers Theodore Huntsman, P#16848 and Kyle Smith, P# 16897.

On-Scene Consulting

In addition, based on my review of the videos in this matter, Mr. Roy Anthony Scott was not searched until <u>after</u> EMS personnel arrived and had begun providing medical treatment to Mr. Roy Anthony Scott.

In addition, I base my opinion on the policy in effect at the time of the incident in <u>Las Vegas Metropolitan Police Department, Use of Force Policy</u>, <u>6/002.00</u>, (LVMPD <u>000287-322</u>):

### "V. <u>DE-ESCALATION</u>:

Policing requires that at times an officer must exercise control of a violent or resisting subject to make an arrest or to protect the officer, other officers, or members of the community from risk of harm.  Clearly, not every potential violent confrontation can be de-escalated, but officers do have the ability to impact the direction and the outcome of many situations they handle, based on their decision-making and the tactics they choose to employ.

When reasonable under the totality of circumstances, officers should gather information about the incident, assess the risks, assemble resources and equipment, attempt to slow the momentum, and communicate and coordinate a response.  In their interaction with subjects, officers should use advisements, warnings, verbal persuasion and other tactics and alternatives to higher levels of force.  Officers should recognize that they may withdraw to a position that is tactically more secure or allows them greater distance to consider or deploy a greater variety of force options.  Officers shall perform their work in a manner that avoids unduly jeopardizing their safety or the safety of others through poor tactical decisions."

In addition, I base my opinion on <u>Las Vegas Metropolitan Police Department, Procedural Order, Directive No. PO-035-20, 6/002.00</u>, (LVMPD 001115-1140):

### "V. <u>DE-ESCALATION</u>:

Policing requires that at times an officer must exercise control of a violent or resisting subject to make an arrest or to protect the officer, other officers, or members of the community from risk of harm.  Clearly, not every potential violent confrontation can be de-escalated, but officers do have the ability to impact the direction and the outcome of many situations and the decision-making and the

On-Scene Consulting

tactics they choose to employ.  As a strategy to diminish the likelihood and the severity of force, officers will attempt to de-escalate confrontations.

When reasonable, officers should gather information about the incident, assess the risks, assemble resources and equipment, attempt to slow the momentum, and communicate and coordinate a response.  Officers should start to develop a tactical plan prior to arriving at the scene, and, when applicable, utilize intervention techniques by coordinating approaches to persons who are in crisis, are believed to be mentally ill, or have developmental disabilities.

In their interaction with a subject, officers, will, when feasible, use advisements, warnings, verbal persuasion, and other tactics as alternatives to higher levels of force.  Officers will perform their work in a manner that avoids unduly jeopardizing their safety or the safety of others through poor tactical decisions….

Officers will make efforts to control a confrontation and not allow it to escalate."

In my opinion, both officers' conduct did not comply with the above-stated LVMPD written policy in effect at the time of the incident (or the subsequently revised written policy), as the officers failed to take proper measures to assemble additional available resources and personnel (including EMS personnel and/or additional LVMPD personnel), failed to slow the momentum, failed to utilize effective verbal strategies, de-escalation, and defusing techniques, and failed to utilize safer alternative methods and tactics (as discussed above).

In addition, I base my opinion on the following facts and testimony:

- According to Witness Mr. Ed Davis, Mr. Scott has had a nervous problem the whole time he has known him and if you grab him, he gets to hollering and carrying on.  "He be having those fits and the ambulance people knew because they come out here so much," (LVMPD 000143).
- According to LVMPD Police Officer Theodore Huntsman, Mr. Roy Scott did not try to bite or punch him, (LVMPD 000194).
- According to LVMPD Police Officer Theodore Huntsman, Mr. Roy Scott dropped the pipe an presented the knife to the officers like he wanted to give it to them, (LVMPD 000204 & 207).
- According to LVMPD Police Officer Theodore Huntsman, Mr. Roy Scott told him that he was paranoid, (LVMPD 000209).

On-Scene Consulting

- According to LVMPD Police Officer Theodore Huntsman, Officer Smith grabbed Mr. Roy Scott's right arm and he grabbed his left arm and they fell to the ground, (LVMPD 000209).
- According to LVMPD Police Officer Theodore Huntsman, he didn't feel Mr. Roy Scott was trying to hurt them, just get away, (LVMPD 000214).
- According to LVMPD Police Officer Kyle Smith, Mr. Roy Scott stated he is paranoid and that he is schizophrenic, (LVMPD 000240).
- According to LVMPD Police Officer Kyle Smith, "so we grabbed him, and the struggle went down on the ground on its own," (LVMPD 000241).
- According to LVMPD Police Officer Kyle Smith, Mr. Roy Scott never made any threats towards him or his partner, (LVMPD 000249).
- According to LVMPD Police Officer Kyle Smith, Mr. Roy Scott was against the wall and stated, "I'm schizo, I'm paranoid, I'm having issues," (LVMPD 000255).
- AXON Flex 2 BWC, NPR 2020-0005019_404_#4, at (7:46), Mr. Scott grabbed the knife from the front of his pants and said, "There you go, I'm sorry."
- AXON Flex 2 BWC, NPR 2020-0005019_404_#4, at (8:00), Mr. Scott asked the officers if they could just, please put him in the car.
- AXON Flex 2 BWC, NPR 2020-0005019_404_#4, at (8:06), Mr. Scott again asked the officers if they could just, please put him in the car.
- AXON Flex 2 BWC, NPR 2020-0005019_404_#4, at (8:14), Mr. Scott stated, "I'm paranoid sir."
- AXON Flex 2 BWC, NPR 2020-0005019_404_#4, at (9:20), Mr. Scott asked the officers if they wanted him to take his shirt off at which time the officers initiated contact with Mr. Scott.
- According to LVMPD Police Officer Kyle Smith, Mr. Scott did not commit a crime, (Deposition Transcript of Kyle Smith, Page 30).
- According to LVMPD Police Officer Kyle Smith, he agrees Mr. Scott surrendered the pipe and knife without resistance and did not attack anyone with the knife or pipe, (Deposition Transcript of Kyle Smith, Page 31).
- According to LVMPD Officer Theodore Huntsman, Mr. Roy Scott stated at some point that he was Paranoid Schizophrenic, (Deposition Transcript of Theodore Huntsman, Page 34).
- According to LVMPD Officer Theodore Huntsman, you do not have to handcuff a subject of a Legal 2000, (Deposition Transcript of Theodore Huntsman, Page 35).
- According to LVMPD Officer Theodore Huntsman, you can ask a subject if they will voluntarily go on a gurney and if they do not, you can make them get on a gurney.  In some scenarios, they can put them in 4 Point Straps where they are

On-Scene Consulting

strapped in at both wrists and ankles and they can do that without putting handcuffs on a subject in some scenarios, (<u>Deposition Transcript of Theodore Huntsman, Page 36</u>).

- According to LVMPD Officer Theodore Huntsman, the training he received when talking to a subject you perceive to be Paranoid Schizophrenic that is asking not to be touched is to continue to talk to the subject.  <u>There is no time limit</u>.  You talk to them and try to de-escalate the situation, (<u>Deposition Transcript of Theodore Huntsman, Page 43</u>).

Lastly, I base my opinion on my twenty-eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### <u>Opinion Number 3</u>

It is my opinion the Las Vegas Metropolitan Police Department failed to <u>properly train</u> Las Vegas Metropolitan Police Department Police Officers Theodore Huntsman, <u>P#16848</u> and Kyle Smith, <u>P# 16897</u>, in Crisis Intervention Techniques, based on the facts outlined in <u>Opinions 1-2</u> of this report.

Crisis Intervention curriculum teaches officers skills such as de-escalation, (e.g., <u>talking slowly, having more patience, asking subject questions, time and distance, de-escalation, and defusing, provide reassurance, recognizing the signs and symptoms of mental illness</u>), how to provide mental health referrals/resources, and about the voluntary treatment options.  By increasing understanding by officers of mental illness and improving the response to mental health calls will reduce the need for the use of force, decrease injuries and deaths to officers and people in a mental health crisis, reduce the stigma of mental illness and increase access and engagement in services for people with mental illness.

In addition, I base my opinion on my law enforcement experience with the Los Angeles Police Department (<u>LAPD</u>) while assigned to: Patrol, Vice, Special Problems Unit, Detectives, and Special Weapons and Tactics (<u>SWAT</u>) to include being the Supervisor-in-Charge of LAPD SWAT's Crisis Negotiation Team.  In addition, the utilization of a mental health professional at the onset of an incident such as this incident can be an invaluable tool.  The Los Angeles Police Department Mental Evaluation Unit (<u>MEU</u>) responds to thousands of similar incidents on an annual basis and supports uniformed personnel by providing valuable insight and information.

On-Scene Consulting

Lastly, I base my opinion on my twenty-eight-year law enforcement career where I have utilized the services of LAPD's Mental Evaluation Unit on hundreds of incidents to effectively resolve situations involving mentally ill subjects.

### Opinion Number 4

It is my opinion Las Vegas Metropolitan Police Department Police Officer Theodore Huntsman, P#16848 and Kyle Smith, P# 16897 used inappropriate and unreasonable force when they placed a knee, other bodily force, and body weight on Mr. Roy Anthony Scott's back and neck during the handcuffing process. It is my opinion that safer alternatives could have and should have been used (see Opinion 2 above); or while Las Vegas Metropolitan Police Department Police Officer Kyle Smith, was restraining the legs and lower torso of a Mr. Roy Anthony Scott, Police Officer Theodore Huntsman should have handcuffed Mr. Roy Anthony Scott without applying significant weight to his back or neck.  In addition, both Police Officers should have known that by putting a knee and body weight on the back and neck of Mr. Roy Anthony Scott it may cause Mr. Roy Anthony Scott to experience difficulty breathing and struggle to breathe as well as further increase his anxiety associated with his mental illness.

In addition, I base my opinion on U.S. Department of Justice, Office of Justice Programs, National Law Enforcement Technology Center, Positional Asphyxia-Sudden Death, June 1995: Sudden in-custody death is not a new phenomenon-it can occur at any time, for a variety of reasons.  Any law enforcement agency may experience a sudden in-custody death, and while rare, such deaths appear to be associated most often with the following variables

The Defendants knew or should have known that when an individual is restrained in a face-down position, and breathing may become labored:
- Weight is applied to the person's back-the more weight, the more severe the degree of compression.
- The individual experiences increased difficulty breathing.
- The natural reaction to oxygen deficiency occurs-the person struggles more violently.
- The officer applies more compression to subdue the individual.

It is my opinion that the Basic Physiology of a Struggle is applicable in this matter. A person lying on his stomach has trouble breathing when pressure is applied to the back. The remedy seems relatively simple: get the pressure off his back.  In addition, it is my opinion that Defendants should have recognized that there are certain factors that may

## On-Scene Consulting

render some individuals more susceptible to positional asphyxia following a violent struggle, particularly when prone in a face-down position.

The risk of positional asphyxia is compounded when an individual with predisposing factors become involved in a violent struggle with an officer or officers, particularly when physical restraint includes use of behind the back handcuffing combined with placing the subject in a stomach-down position.

Every day, police officers encounter situations that require them to restrain persons. Properly trained officers learn how improper restraining techniques can block the flow of air into the individual's lungs contributing to a life-threatening condition known as "positional, or restraint, asphyxia." Proper training also covers multiple effective options available such as avoiding compression of the chest, rolling the subjects over on his side, and sitting or standing the subject up.

In addition, it is my opinion based on my review of the facts in this matter, Police Officers Theodore Huntsman, P#16848 and Kyle Smith, P# 16897, did not have a Ripp Hobble Restraint Device on them at the time that they initiated force with Mr. Roy Anthony Scott. A Ripp Hobble Restraint Device is typically a webbed belt that is often constructed of polymer thermoplastic, 42 to 52 inches long and 1 inch wide with a loop and self-locking clip for use on the ankles, knees, or elbows. The Ripp Hobble Restraint Device could have been used to wrap Mr. Roy Anthony Scott's ankles and prevent him from kicking his legs.

In addition, I base my opinion on AELE Monthly Law Journal, Restraint and Asphyxia, Part Two-Compressional Asphyxia, January 2009:

> "2. **Conclusions:** Police trainers must be aware of potential deaths from compressional asphyxia. Officers must be taught to avoid putting their body with on a confined person as soon as active resistance has ended of the person has been adequately trained from causing harm to himself or others. Dr. Reay's article in the May 1996, FBI Law Enforcement Bulletin emphasized:
>
> 'Instructors must stress vigilance in monitoring the subject's condition. The process of hypoxia is insidious, and subjects might not exhibit any clear symptoms before they simply stop breathing. Generally, it takes several minutes significant hypoxia to occur, but it can happen more quickly if the subject had been violently active and is already out of breath. If the subject experiences extreme difficulty breathing or stops breathing altogether, officers must take steps to resuscitate the subject and obtain medical care immediately.'"

On-Scene Consulting

In addition, I base my opinion on the current <u>Las Vegas Metropolitan Police Department,</u>
<u>Use of Force Policy</u>, <u>6/002.00</u>, (<u>LVMPD 001090-1114</u>):

> "**I.  <u>GENERAL RULES</u>:**
>
> 2.  Officers will use care and constraint in choosing a force option when the
> subject is at extremes of age, (<u>elderly persons or young children</u>), physically frail,
> or disabled."

It is my opinion it was unnecessary and unreasonable for the officers to apply force that
had the above-described health dangers and mental dangers of the officers' placing a
knee, other bodily force, and body weight on Mr. Roy Anthony Scott's back and neck
during the handcuffing process.  This opinion is supported by numerous circumstances,
considerations, and other additional opinions of mine, including but not limited to the
following.  In my opinion, Mr. Roy Anthony Scott did not pose an imminent or
immediate threat to the safety of the officers or others.  He did not pose any such threat,
as he never threatened the officers; he pleaded with the officers just to place him in their
vehicle; and Mr. Roy Anthony Scott complied with the officers' prior orders, as he
voluntarily put down the pipe that he possessed and handed the knife he possessed to
them in a safe manner.  In addition, as stated in <u>Opinion 1</u>, in my opinion, Mr. Roy
Anthony Scott had not committed any offense; and the crimes alleged by Officer
Huntsman (<u>resisting and obstructing</u>) were minor, rather than being severe.  In addition
Mr. Scott  had not engaged in "Aggressive Resistance" or "Aggravated Aggressive
Resistance" (<u>as defined under then-applicable policy</u>, <u>LVMPD 000291-92</u>) or
"Assaultive" resistance or "Life-Threatening" resistance (<u>as defined under current policy</u>,
<u>LVMPD 001095-96</u>), as Mr. Roy Anthony Scott did not display the intent to harm the
officer, himself or another person during the incident.  In addition, in my opinion, Mr.
Roy Anthony Scott was not "actively resisting arrest or attempting to evade arrest by
flight" at any point during the incident, which is relevant in the determination of the
reasonableness of the use of force (<u>LVMPD 000290</u>, <u>LVMPD 001092</u>); I state this
opinion, because the officers never informed that Mr. Roy Anthony Scott that he was
under arrest, and Mr. Roy Anthony Scott did not attempt flight.  In addition, it is my
opinion that safer alternatives could have and should have been used (see <u>Opinion 2</u>
above).  In light of these circumstances and the totality of circumstances of the incident,
it was not necessary or reasonable for the officers to apply force in a manner that could
cause Mr. Roy Anthony Scott to experience difficulty breathing and struggle to breathe as
well as further increase his anxiety associated with his mental illness.  All of these
considerations further support my opinion that Las Vegas Metropolitan Police
Department Police Officer Theodore Huntsman, <u>P#16848</u> and Kyle Smith, <u>P# 16897</u>
used inappropriate and unreasonable force when they placed a knee, other bodily force,

## On-Scene Consulting

and body weight on Mr. Roy Anthony Scott's <u>back and neck</u> during the handcuffing process.

In addition, I base my opinion on **<u>Las Vegas Metropolitan Police Department, Force Investigation Team Report, In-Custody Death, LVMPD Event No. 190300010224, 7/2/2019, (LVMPD 000009</u>):**

> "<u>Police Officer Kyle Smith's Body Worn Camera footage depicts the following</u>:

> <u>T11:38:35Z</u>- Officers are able to turn Scott over to his stomach and place his hands behind his back.  Officer Huntsman places his knee across Scott's back shoulder area to secure him on the ground so Scott can be secured in handcuffs.

> <u>T11:41:15Z</u>-Scott is rolled to his side and placed in a recovery position.  Officers are waiting for medical personnel to respond.

> In addition, I base my opinion on my review of <u>AXON Flex 2 BWC, NPR 2020-0005019_404 </u>#5, (<u>27:25</u>):

> <u>4:04</u>: Mr. Scott and Officers Smith and Huntsman go to the ground.

> <u>7:01</u>: Mr. Scott is rolled onto his stomach.

> <u>7:15-7:31</u>: Officer Huntsman's knee is on Mr. Scott's back.

> <u>7:31-7:51</u>: Cannot determine if Officer Huntsman's knee is on Mr. Scott's back or neck.

> <u>7:51-8:35</u>: Officer Huntsman's knee is on Mr. Scott's neck."


<u>In addition, I base my opinion on the following facts and testimony</u>:

- According to Witness Mr. Ed Davis, the officer put his knee on his back and knees on his head "part," (<u>LVMPD 000141</u>).
- According to LVMPD Police Officer Theodore Huntsman, Mr. Roy Scott was on his stomach, and he had his knee across his back, (<u>LVMPD 000216</u>).
- According to LVMPD Police Officer Kyle Smith, his partner had his legs across Mr. Roy Scott's torso, (<u>LVMPD 000242</u>).
- According to LVMPD Police Officer Kyle Smith, he slipped into a position where he was practically sitting on Mr. Roy Scott, (<u>LVMPD 000242</u>).
- According to LVMPD Police Officer Kyle Smith, Mr. Roy Scott never made a threat, (<u>LVMPD 000260</u>).
- According to LVMPD Police Officer Kyle Smith, Mr. Scott did not commit a crime, (<u>Deposition Transcript of Kyle Smith, Page 30</u>).

On-Scene Consulting

- According to LVMPD Police Officer Kyle Smith, Officer Huntsman was putting weight on Mr. Scott's shoulder blade region, (<u>Deposition Transcript of Kyle Smith, Page 57</u>).
- According to LVMPD Officer Theodore Huntsman, he never felt his life was in danger during his interaction with Mr. Roy Scott, (<u>Deposition Transcript of Theodore Huntsman, Page 29</u>).
- According to LVMPD Officer Theodore Huntsman, Mr. Roy Scott never punched or kicked him, (<u>Deposition Transcript of Theodore Huntsman, Page 33</u>).
- According to LVMPD Officer Theodore Huntsman, he placed his weight on Mr. Roy Scott's shoulder for approximately one minute and placed his knee on Mr. Roy Scott's neck for a short period, (<u>Deposition Transcript of Theodore Huntsman, Page 58</u>).

Lastly, I base my opinion on my twenty-eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

<u>**Opinion Number 5**</u>

It is my opinion Las Vegas Metropolitan Police Department Police Officers Theodore Huntsman, <u>P#16848</u> and Kyle Smith, <u>P# 16897</u>, failed to recognize that Mr. Roy Anthony Scott was in medical distress and having a difficulty breathing and take appropriate action.

In addition, it is my opinion based on my training and experience that <u>Agonal Respirations</u> or what is commonly referred to as Agonal Breathing looks or sounds like: snoring, heavy breathing; labored or exaggerated breathing; gurgling; guttural sounds; groaning; snorting; and or gasping. Agonal Respirations are often heard by those people who are near a person prior to death.

Whenever practicable, members should take appropriate steps to provide initial medical aid, (<u>e.g., First Aid, CPR, use of an Automated External Defibrillator</u> (<u>AED</u>)), in accordance with their training and current certification levels.

Based on this initial assessment, peace officers may need to provide basic care for victim(<u>s</u>). Such care may include providing basic emergency medical care until relieved by other personnel with equal or higher levels of training.

If the victim is unable to speak or is not responsive, then appropriate steps should be taken to assess the victim's:

On-Scene Consulting

- Airway
- Breathing
- Circulation

I.  The responding peace officer should determine if the victim is breathing:

If the victim is not breathing with a pulse:

- Begin rescue breathing.

If the victim is not breathing with no pulse:

- Begin CPR.

If the victim is breathing:

- Complete primary assessment.

If the victim has a pulse, is breathing, but unconscious:

- Check for indications of life-threatening conditions, (e.g., major bleeding, shock, etc.).
- Place the victim in a recovery position (on the side with the head supported by the lower forearm), if appropriate to aid breathing and allow fluids or vomit to drain from the mouth.

In addition, I base my opinion on Clark American Medical Response (AMR), (NV), Patient Care Report, Roy Scott, Case No. 190053943:

> Narrative:
>
> Dispatched for the trouble breathing.  Arrived on scene to find LVMPD at an apartment complex.  Patient was found lying left lateral in handcuffs on the sidewalk.  LVMPD had reported PT had been "combative" and had "PSYCH" history. ***Patient was unresponsive, unconscious, breathing was agonal and labored.***

In addition, I base my opinion on the following facts and testimony:

- According to LVMPD Police Officer Theodore Huntsman, they waited on medical to show up and start assessing him, (LVMPD 000221).
- According to LVMPD Police Officer Theodore Huntsman, they did not provide medical treatment to Mr. Roy Scott, (LVMPD 000221).

On-Scene Consulting

- According to LVMPD Police Officer Kyle Smith, other than turning Mr. Roy Scott over he did not provide him any medical attention, (<u>LVMPD 000260</u>).
- According to LVMPD Police Officer Kyle Smith, he observed Mr. Scott have an overwhelming calm and his breathing was slow and he started talking less, (<u>Deposition Transcript of Kyle Smith, Page 80</u>).
- According to LVMPD Police Officer Kyle Smith, none of the officers performed CPR on Mr. Scott, (<u>Deposition Transcript of Kyle Smith, Page 83</u>).
- According to LVMPD Officer Theodore Huntsman, he did a sternum rub on Mr. Roy Scott's chest and did not get a reflex response, (<u>Deposition Transcript of Theodore Huntsman, Page 61</u>).
- According to LVMPD Officer Theodore Huntsman, nobody attempted to do CPR on Mr. Roy Scott until medical personnel arrived, (<u>Deposition Transcript of Theodore Huntsman, Page 64</u>).
- According to LVMPD Officer Theodore Huntsman, when he was checking Mr. Roy Scott's pulse, he does not know if he was checking his own pulse, (<u>Deposition Transcript of Theodore Huntsman, Page 64</u>).

Lastly, I base my opinion on my twenty-eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### <u>Opinion Number 6</u>

It is my opinion the Las Vegas Metropolitan Police Department failed to properly train Las Vegas Metropolitan Police Department Police Officers Theodore Huntsman, <u>P#16848</u> and Kyle Smith, <u>P# 16897</u>, on the danger/risks associated with the of maximally prone restraint techniques and subjects who may be exhibiting signs of Agitated Delirium or Excited Delirium <u>prior to</u> the March 3, 2019, In-Custody Death of Mr. Roy Anthony Scott.

In addition, I base my opinion on <u>U.S. Department of Justice, Office of Justice Programs, National Law Enforcement Technology Center, Positional Asphyxia-Sudden Death, June 1995</u>:

> Sudden in-custody death is not a new phenomenon-it can occur at any time, for a variety of reasons.  Any law enforcement agency may experience a sudden in-custody death, and while rare, such deaths appear to be associated most often with the following variables
>
> **Cocaine-induced bizarre or frenzied behavior:** When occurring while confined by restraints, cocaine-induced excited delirium (<u>an acute mental disorder characterized by impaired thinking, disorientation, visual hallucinations, and</u>

On-Scene Consulting

illusions) may increase a subject's susceptibility to sudden death by effecting an increase of the heart rate to a critical level.

**Drugs and/or alcohol intoxication:** Drug and acute alcohol intoxication is a major risk factor because respiratory drive is reduced, and *subjects may not realize they are suffocating.*

**Violent struggle extreme enough to require the officers to employ some type of restraint technique:** Subjects who have engaged in extreme violent activities may be more vulnerable to subsequent respiratory muscle failure.

**Unresponsive of a subject during or immediately after a struggle:** Such unresponsive behavior may indicate cardiopulmonary arrest and the need for immediate medical attention.

It is important to understand how preexisting risk factors, combined with the subject's body position when subdued or in transit, can compound the risk of sudden death.

In addition, I base my opinion on the following facts and testimony:

- According to LVMPD Police Officer Theodore Huntsman, the LVMPD gives minimal training on Excited Delirium, (LVMPD 000218).
- According to LVMPD Police Officer Kyle Smith, he was never trained or learned the dangers of placing somebody on their stomach prone and putting weight on them, (Deposition Transcript of Kyle Smith, Page 60).
- According to LVMPD Police Officer Kyle Smith, the recovery position was not taught to LVMPD officers at the time of this incident, (Deposition Transcript of Kyle Smith, Pages 101-102).
- According to LVMPD Officer Theodore Huntsman, he has not been trained that if you continue to put pressure on someone's back or neck, it can result in hypoxia, (Deposition Transcript of Theodore Huntsman, Page 67).

In addition, I base my opinion on the following: over thirty years of martial arts, self-defense, and defensive tactics training, receiving, and providing training during my employment with the Los Angeles Police Department and the utilization of maximally prone restraint techniques.

Lastly, I base my opinion on my twenty-eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

On-Scene Consulting

## **Opinion Number 7**

It is my opinion the Las Vegas Metropolitan Police Department failed to determine through their investigation and review process that there was a failure to effectively de-escalate the situation and that the force used in this matter was inappropriate and unreasonable. It is my opinion that there was a gross lack of situational awareness and fundamental tactical errors in this incident. It is also my opinion that there was a failure by the Las Vegas Metropolitan Police Department to provide training to Police Officers Theodore Huntsman, P#16848 and Kyle Smith, P# 16897, prior to March 3, 2019, on following subject matters: Proper Response and Interaction with the Mentally Ill, Working as a Team, Verbal Strategies, Active Listening Skills, Crisis Intervention Training, Defusing and De-Escalation Techniques, Excited Delirium, Positional/Restraint Asphyxia, Cardio Pulmonary Resuscitation (CPR) to include compromised and or Agonal Breathing.

In addition, I base my opinion on U.S. Department of Justice, Office of Justice Programs, National Law Enforcement Technology Center, Positional Asphyxia-Sudden Death, June 1995:

### **Collection of Potential Evidence:**

Officers involved in confrontational situations should collect information that may later be of value in a civil or perhaps criminal action.

A use of force report should include details of how the individual was restrained. The following information should be included:

- What was the nature of the post arrest restraint procedure?
- What type of restraint was used?
- How long was the subject face down and/or restrained?"

In addition, it is my opinion that ratification of the use of deadly force and the Defendants conduct prior to the use of deadly force can be seen as endorsing and perpetuating inadequate training and failure to enforce written polices and established standards.

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

On-Scene Consulting

In addition, it is my opinion that Police Officers Theodore Huntsman, <u>P#16848</u> and Kyle Smith, <u>P# 16897</u>, use of force/lethal force in this matter did not comport with standard police practices, LVMPD written policies, and violated their training or the training that they should have received that resulted in the death of Mr. Roy Anthony Scott, <u>including but not limited to for the following reasons</u>:

- Highest level of force a Police Officer can use.
- This was not an immediate Defense of Life situation.
- Must be a last resort before using lethal force.
- Must be the direst of circumstances.
- Deadly force is likely to cause great bodily injury or death.
- Must show a reverence for human life.
- There were other reasonable measures available.
- All other reasonable measures were not exhausted.
- Subjective Fear is insufficient.
- Over reaction is excessive force.

Lastly, I base my opinion on my twenty-eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

**<u>My Qualifications for Reviewing this Case:</u>**

My opinions are based on my education, training, and experience. Upon my graduation in June 1988 from Northeastern University in Boston with a Bachelor's Degree in Criminal Justice, I was hired as Criminal Investigator/Special Agent GS-1811. Upon completion of Criminal Investigator/Basic Agent School at the Federal Law Enforcement Training Center (<u>FLETC</u>)-6-month academy, I was assigned to the Organized Crime Drug Task Force where I functioned as an agent and undercover operative. The investigations focused on targeting criminal organizations that were involved in large scale narcotic smuggling and money laundering operations.

I was assigned to the Office of the Special Agent In-Charge, in San Francisco from August 1988 until I joined the Los Angeles Police Department in November of 1989. While in the academy, I was selected by the staff to be my Recruit Class Leader. Upon my graduation from the LAPD Academy, I was assigned to 77th Division. In addition to being assigned to 77th Division, I was assigned to Northeast Division (<u>Patrol</u>), Northeast Division (Special Projects Unit-SPU), Northeast Division C.R.A.S.H (<u>Gang Detail</u>). I

On-Scene Consulting

was selected to be transferred to Operations Central Bureau C.R.A.S.H., where I worked a plain clothes detail targeting specific gangs throughout Operations Central Bureau.

I applied and was selected to be a Police Officer III at Wilshire Area Vice where I functioned as an undercover operative targeting prostitution, gambling, bookmaking, and other Vice related offenses. While working Wilshire Vice, I was ambushed and received two gunshot wounds.  I received the Purple Heart in 2010.  Upon return from my injuries, I attended mandated Field Training Officer School and was assigned as a Field Training Officer at Wilshire Division.  I trained recruits upon their graduation from the Los Angeles Police Academy in tactics, use of force, report writing, vehicle stops, calls for service, court testimony, emergency procedures, pursuit policy, accident investigations, perimeters, Department policies and procedures, and effective communication skills. While assigned as a Field Training Officer, I was involved in an In-Policy Lethal Use of Force incident, while working with a Probationary Police Officer who had recently graduated from the Los Angeles Police Academy.

I was promoted to the rank of Detective and attended Basic Detective School.  Upon completion of Basic Detective School, I was assigned to Wilshire Area Narcotics, Field Enforcement Section, where I functioned in an undercover capacity.

I was promoted to the rank of Sergeant I and assigned to Hollenbeck Division.  Prior to my assignment, I attended mandated Basic Supervisor School.  In conjunction with Supervisor School, I was selected to attend the West Point Leadership Academy Supervisor Training.  The training focused on team building, leadership, and decision making.  While assigned to Hollenbeck Division, I conducted roll call training on a daily basis on numerous subject matters to include Use of Force Options (Non-Lethal and Lethal), Tactics, Calls for Service, Calls for Service involving the Mentally Ill, Vehicle Pursuit Policy, LAPD Policies and Procedures, Use of Force Policy, Updated Legal Bulletins, Training Directives, and other Standardized Roll Call Training.  I directly supervised a Watch of Officers and provided supervisory oversight during calls for service, tactical situations, perimeter tactics, containment and control issues and use of force incidents.  I conducted audits, personnel investigations, Standard Based Assessments (Ratings), Use of Force Investigations, Administrative Projects, and prepared commendations for officer's field performance.  While assigned to Hollenbeck Division, I was selected as the Officer-In-Charge of Hollenbeck Division's Special Enforcement Group.  I directly supervised (14) Police Officers and Detectives assigned to the Unit.  Our unit worked in conjunction with Hollenbeck Detectives and specifically targeted career criminals in the Division.  I provided ongoing mandated Department

On-Scene Consulting

Training as well tactical, firearms, less than lethal and search warrant tactics training to the Officers and Detectives.  As a Unit, we prepared and served numerous search warrants.  I provided search warrant tactical briefing and de-briefing of each warrant at the conclusion of the service.  I completed audits, administrative projects, Use of Force Investigations, personnel complaints, and other administrative duties as deemed necessary by the Area Commanding Officer.

During this time, I was selected to be loaned to Internal Affairs, Headquarters Section.  I investigated personnel complaints that were too large in scope for a geographical Division.  At the conclusion of my loan, I was selected to Management Services Division, Special Projects, and Office of the Chief of Police.  I completed in-depth staff projects for review by the Chief of Police.  In addition, I was assigned with conducting research and editing the 2000 LAPD Department Manual.  Also, during this time, I earned my Master's Degree in Public Administration from California State University, Long Beach.

I applied and was selected as a Sergeant II at 77th Division Vice.  I directly supervised ten undercover officers and four uniformed officers.  I provided all facets of training to the officers assigned to Vice at that time to include Use of Force Policy, Legal Updates, Department Directives, Training Bulletins, Standardized Roll Call Training, Tactics Training, Undercover Operations training, Surveillance training, and any other training deemed necessary by my Area Commanding Officer.  I conducted audits, personnel investigations, administrative projects, Use of Force Investigations, and special projects.

During this time, I was selected by the Chief of Police to be loaned to the Rampart Corruption Task Force.  I conducted Use of Force audits on Specialized Units in Central and South Bureaus.  I reported directly to the Office of the Chief of Police.

In 2000, I applied and was selected to Metropolitan Division K9 Platoon as a Sergeant II+1.  I directly supervised (18) K9 Handlers.  Metro K9 conducted K9 Operations for the entire Department covering all Patrol Divisions and Specialized Units.  I provided all facets of training to the K9 Officers to include: K9 Operations, tactics, search warrant services, Mobile Field Force Options, Less than Lethal Force Options, Lethal Force Options, Department Directives, Training Bulletins, and other training dictated by the Officer-in-Charge and Commanding Officer.  In addition, I taught K9 Operations at in-service training, Watch Commander School, Field Training Officer (FTO) School, and Basic Detective School.   While at K9, I investigated and completed K9 contacts, personnel complaints, Use of Force Investigations.  In addition, I directed and was

On-Scene Consulting

directly involved in Use of Force incidents.  I received the LAPD Medal of Valor and
LAPD Police Star for two lethal use of force incidents while assigned to K9.

In 2005, I was selected as a Sergeant II+1 in Special Weapons and Tactics (SWAT). I
directly supervised sixty SWAT Officers.  I conducted and facilitated all facets of SWAT
training to include Weapons Training (.45 caliber, MP-5, M-4, Benelli Shotgun,
Remington 870 Bean Bag Shotgun, .40mm, SAGE, MX-26 Taser) on a monthly basis.  In
addition, I facilitated and conducted training in the following training Cadres: Breacher
(Explosive), Crisis Negotiation-Mental Health, MEU, SMART, Suicide Prevention,
Counter-Terrorism Cadre, Climbing, Hostage Rescue, Sniper Training, Air Support
Training (Fast rope, Aerial Platform Shooting).  I directly supervised SWAT missions
and High-Risk Search Warrant Services to include all facets (preparation, briefing,
deployment, de-briefing).  I was the Supervisor-in-Charge of the Crisis Negotiation
Team.  I provided on-going crisis negotiation training, mental health training,
de-briefs, 40-hour POST Certified CNT School, and suicide prevention training.  I
worked in conjunctional with the mental health community to provide and facilitate
training with LAPD SMART, LAPD Mental Evaluation Unit (MEU), Behavioral Science
Services Section (BSS), and the Didi Hirsch Suicide Prevention Training.  In addition, I
was assisted the West Point Military Academy with the development of their crisis
negotiation curriculum.

During this time, I was selected as the sole LAPD SWAT representative to respond to
Mumbai India with Counterterrorism following the terrorist attack in November 2008.  I
taught use of force, tactics, and SWAT deployment to 250 Mumbai Special Tactical
Police Officers.  Upon my return, I assisted with the development of multiple
venue/multiple attacker tactics.

In June 2010, I retired from the Los Angeles Police Department with 20 years in service
to pursue an opportunity in the private sector. I held supervisory positions for the last 14
years of my career.  During my tenure with the LAPD, I received over 100
Commendations to include: The Medal of Valor, Purple Heart, and the Police Star.
From June 2010 through April 2013, I was the Vice President of Security Operations at
Caruso Affiliated in Los Angeles, CA.  My responsibilities included: Identified and
conducted Risk and Vulnerability Assessments for all Caruso Affiliated Developments,
projected developments/investments, and residences.  Utilized strategic-level analysis
from the intelligence community, law enforcement and the private sector.  Ensured a
coordinated ability to identify and monitor potential or actual incidents among critical
infrastructure domains and all personal and professional interests of Caruso Affiliated.

On-Scene Consulting

Mitigated expected threats.  Utilized preplanned, coordinated actions in response to infrastructure warnings or incidents.  Responded to hostilities.  Identified and eliminated the cause, or source, of an infrastructure event by the utilization of emergency response measures to include on-site security personnel, local law enforcement, medical and fire rescue, and relevant investigative agencies.  Conducted all facets of security training for the company and employees.  Formulated Business Continuity and CEO Succession Plans for the company and all affiliated business interests.  Conducted ongoing audits and internal investigations.

From June 2013 to June 2014, I was hired as a Deputy Sheriff at the Riverside Sheriff's Department where I conducted all facets of patrol service to include calls for service, self-initiated field activity, arrests, citations, and court testimony. In addition, during my tenure with the Riverside County Sheriff's Department, I was assigned to Robert Presley Detention Center (RPDC). Processed and monitored inmate population from initial intake, housing, court, transportation, and release. Conducted searches of inmate population as well as the facility on an ongoing basis. I was a member of the Cell Extraction Team while assigned to Robert Presley Detention Center and was directly involved in over 20 cell extractions as a Team Leader and Team Member to include video-taping the cell extraction.  Utilized experience as a gang officer, Detective and Sergeant with LAPD to conduct interviews and interrogations of prisoners regarding a myriad of investigations. Provided information to gang detail. Functioned as a mentor to newly appointed Deputy Sheriffs as well as Supervisors. Attended and certified in RSO Supplemental Jail Operations Core Course prior to deployment at RPDC. Attended on-going training to include Use of Force (Lethal and Non-Lethal), Crisis Negotiation Training, Active Listening Skills Training, Report Writing, Response and Deployment to Critical Incidents, and Proper Protocols and Procedures when responding to a medical incident or suicide.

From June 2014 to March 2016, I was the Director of Security at Universal Protection Service where I supervised 84 Security Professionals at the City National Plaza. Conducted and or facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals.  Ensured all Security Professionals were compliant with BSIS security training and licensing.  Conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft.  Conducted ongoing Risk and Vulnerability Assessments of the City National Plaza to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through

## On-Scene Consulting

Environmental Design (CPTED), and protocols to respond and mitigate threats. Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. Coordinated all security efforts to ensure safety at Special Events.  Conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis.


From March 2016 to September 5, 2017, I was the Director of Security at L&R Group of Companies.  Identified and conducted Risk and Vulnerability Assessments for all L&R Group of Companies developments and projected developments throughout the United States. Conducted and/or facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals.  Ensured all Security Professionals were compliant with BSIS security training and licensing.  Conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft.  Conducted ongoing Risk and Vulnerability Assessments to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats. Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. Coordinated all security efforts to ensure safety at Special Events.  Conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis as well as respective law enforcement agencies throughout the United States on security matters.


Attached are my curriculum vitae, listing of testimony and fee schedule.

Scott A. DeFoe