1
2
3
4      UNITED STATES DISTRICT COURT
5      DISTRICT OF NEVADA
6                    * * *
7  SCOTT, *et al.*,                          Case No. 2:20-cv-01872-RFB-EJY
8              PLAINTIFFS,                    **ORDER**
9      v.
10  SMITH, *et al.*,
11              DEFENDANTS.
12
13      I.      **INTRODUCTION**
14          Before the Court is Defendants Kyle Smith, Theodore Huntsman, and Las Vegas
15  Metropolitan Police Department's ("LVMPD") Motion for Summary Judgment. ECF No. 19.
16          For the foregoing reasons, the motion is granted in part and denied in part.
17
18      II.     **PROCEDURAL BACKGROUND**
19          Plaintiffs[1] filed the Complaint on October 7, 2020. ECF No. 1. The Complaint alleges nine
20  causes of action: (1) excessive force in violation of the Fourth Amendment against Defendants
21  Smith and Huntsman, (2) denial of medical care in violation of the Fourth Amendment against
22  Defendants Smith and Huntsman, (3) denial of familial relationship in violation of substantive due
23  process under the Fourteenth Amendment against Defendants Smith and Huntsman, (4) municipal
24  liability for an unconstitutional custom or policy against Defendant LVMPD, (5) disability
25  discrimination in violation of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), Title II
26
27
28

---

[1] Plaintiff, Rochelle Scott, is decedent Roy Anthony Scott's surviving daughter and is suing in her individual capacity and as co-special administrator of Scott's estate, along with Plaintiff Fredrick Waid, also a co-special administrator of Scott's estate.

of the Americans with Disabilities Act ("ADA"), 29 U.S.C. § 12131 et. seq., against all Defendants, (6) municipal liability for failure to train against Defendant LVMPD, (7) municipal liability for ratification against Defendant LVMPD, (8) battery against all Defendants, and (9) negligence against all Defendants. Id. Plaintiffs seek compensatory, hedonic damages, funeral and medical expenses, punitive damages, and costs and fees. Id. Defendants answered on January 6, 2021. ECF No. 8. Discovery closed on January 6, 2022. See ECF No. 18.

Defendants filed the instant Motion for Summary Judgment on February 7, 2022. ECF No. 19. Plaintiffs responded on April 5, 2022. ECF No. 25. Defendants replied on May 6, 2022. ECF No. 29. A hearing was held on the motion on June 22, 2022. ECF No. 31.

This Order follows.

### III.    FACTUAL BACKGROUND

#### a.  Undisputed Facts

The Court finds the following facts to be undisputed. Sometime in the early morning hours of March 3, 2019, Scott called 911 for assistance. He reported there were assailants outside of his apartment, one of whom was possibly holding a saw. LVMPD officers, Defendants Smith and Huntsman, were assigned to the call and arrived at Scott's apartment shortly thereafter. He was never suspected of a crime.

Both officers were wearing body cameras.

Upon arrival, the officers go to Scott's door, then knock and announce themselves as police officers. Scott yells for them to break his door down because there are people in his apartment. Besides Scott's voice, no other voices or noises are evident from outside the door. The officers tell Scott that they are not going to break his door down. About three minutes after the encounter had begun, Huntsman asks Scott, "have you been diagnosed with any mental health diseases?" Scott's response is unintelligible from outside of the door where the officers are still standing.

Smith and Huntsman then walk back downstairs to discuss what to do, as Scott has not exited his apartment. Smith tells Huntsman that he is not "going in" the apartment. Huntsman agrees saying that Scott appears "wacky." Smith calls the officers' assigned Sergeant, on a cell

phone. Smith explains to that person that they arrived at the site of the call, and no one appeared to be there except for the caller who was inside of the apartment. While Smith is on the phone, Huntsman shines his flashlight into the second story window where Scott is visible. Upon completion of the call, Huntsman confirms with Smith that both could see Scott. Huntsman then remarks that he could see "that crazed look in his eye—there ain't nobody in there." Huntsman then asks Smith what the Sergeant said, and Smith relays that the Sergeant told him that they could not do anything if they did not have a cause or basis to enter. Smith then abruptly yells toward the window at Scott: "Sir, go to the door." Smith then goes back up the stairs and then knocks on the door a few more times, then yells "Police Department come to the door." Finally, after a few seconds, Scott opens the door. This is approximately seven minutes after the encounter began.

Scott is compliant and walks out of his apartment. Smith goes back down the stairs, upon hearing the door open. Scott appears to be holding a pipe when he comes out of the apartment. Smith flashes his light at Scott once he appears, points his gun at Scott, and orders Scott to drop the pipe. Scott complies and walks downstairs. As he walks down, Scott says twice "What am I supposed to do." Smith tells him "Get down here." Scott, with a phone visible in his hand, walks towards a wall facing his apartment and turns to face the officers. Huntsman asks Scott if he has any other weapons on him. Scott then reaches into his pocket and hands a pocketknife to Huntsman and says "I am sorry." Huntsman directs Scott to turn around to face the wall. Scott tells the officers that he has "paranoid schizophrenia." He then asks twice, "can you just put me in the car please." Huntsman tells Scott that they were "just trying to talk" to him to figure out what is happening. Scott tells Smith that the light in his eyes is bothering him. Smith tells Scott "my partner is going to pat you down to make sure you don't have any weapons okay." Scott then says "I am scared." He tells the officers that he does not want to turn his back and face the wall because someone might get him. He says "I am paranoid." Smith tells Scott "You're fine. We are out here to help you okay." Scott repeatedly replies, "I am not fine." Smith says "we are just here to help you." Smith says that he wants to check Scott for weapons.

The officers then approach Scott wearing gloves. The officers approach him and put their hands on him to hold his arms. Scott then repeatedly says in a plaintive voice "please, please,

please." Huntsman then places Scott's left arm behind his back as Smith approaches from the other side. During this time, Scott repeatedly states, "what are you doing," and pleads with the officers to "stop." The officers tell Scott to stop moving so they can handcuff him. The officers continue to grab and hold Scott moving him away from the wall and placing his hands behind his back. He asks the officers "Why are you all doing this to me?" He visibly appears increasingly concerned and scared by the officers' actions.

Scott then either falls to the ground or is taken to the ground by the officers. He begins to resist being handcuffed by the officers, as he attempts to face them and asks again why they are doing this to him. While on the ground, Scott's pleas escalate in intensity – eventually turning to screams – as both officers grab ahold of his arms. Specifically, the body camera footage shows Scott initially lying on his back with the officers holding him down and holding his hands pressed to his body. The officers continue holding him in this position for approximately three minutes. Scott is now screaming over and over "please leave me alone." Now, he is actively resisting the officers' attempt to handcuff him. The officers eventually roll Scott over onto his stomach. Scott struggles against the officers, pleading for them to leave him alone, while the officers repeatedly tell him to stop. The officers physically struggle with Scott. Smith then places his weight on Scott's buttocks and legs. Huntsman places his weight on Scott's back and his knee on Scott's neck for well over a minute. The process of handcuffing Scott takes approximately two to three minutes.

Huntsman orders paramedics to the scene for a cut on Scott's lip. Officers then attempt to roll him on his side. After a few minutes, Scott stops yelling or thrashing around. Defendant Smith asks Scott if he is okay, Scott does not respond. The officers then check Scott's breath and pulse and conduct a sternum rub. They note that Scott appears to be alive and breathing. Huntsman contacts the dispatch operator and requests that medical team be expedited to the scene as Scott is having trouble breathing. Smith calls their Sergeant to report that Scott's breathing is faint.

The paramedics arrive on the scene some minutes later. Scott is still unresponsive. At some time later, Scott is reported to have died.

### b. Disputed Facts

The following facts are in dispute. The parties dispute whether, just prior to falling to the

ground, Scott attempted to reach into his jacket pocket, prompting Huntsman to place Scott's left arm behind his back. They dispute whether Scott voluntarily dropped to the ground or fell or was taken down to the ground in a takedown maneuver. Further, they dispute whether Scott resisted the officers with extraordinary strength. The parties also dispute the duration of how long Scott was face down in a prone position on the ground, how long Huntsman had his knee on Scott's back, the timing of the handcuffing, and how long Huntsman had his knee on Scott's neck. Moreover, they dispute whether the officers' use of force caused Scott to asphyxiate. Lastly, the parties dispute Scott's cause of death, including whether cardiac failure, resulting from hypoxia caused by the officers' use of force, was a proximate cause of his death.

## IV.    LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When considering the propriety of summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014). If the movant has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (internal quotation marks omitted). It is improper for the Court to resolve genuine factual disputes or make credibility determinations at the summary judgment stage. Zetwick v. County of Yolo, 850 F.3d 436, 441 (9th Cir. 2017) (citations omitted).

## V.    DISCUSSION

### a.  Federal Law Claims

The Court first addresses Plaintiffs' federal law claims. For the reasons discussed below,

1  the Court grants Defendants summary judgment only against Plaintiffs' second cause of action for

2  denial of medical care but denies it as to the rest of the federal law claims.

3  **i.  Excessive Force (First Cause of Action)**

4  Defendants seek summary judgment as to the claim under the First Cause of Action that

5  Defendants Smith and Huntsman used excessive force against Scott in violation of the Fourth

6  Amendment.

7  To make out a prima facie case under 42 U.S.C. § 1983, a plaintiff must show that a

8  defendant: (1) acted under color of law, and (2) deprived the plaintiff of a constitutional right.

9  Borunda v. Richmond, 885 F.2d 1384, 1391 (9th Cir. 1989).

10  Claims of excessive force are analyzed under the Fourth Amendment's "objective

11  reasonableness" standard. Graham v. Connor, 490 U.S. 386, 395-97 (1989). Under this standard,

12  "the question is whether the officers' actions are objectively reasonable in light of the facts and

13  circumstances confronting them, without regard to their underlying intent or motivation." Id. at

14  397.  In determining whether a particular use of force was unreasonable and thus in violation of

15  the Fourth Amendment, a court is to consider: "(1) the severity of the intrusion on the individual's

16  Fourth Amendment rights by evaluating the type and amount of force inflicted, (2) the

17  government's interest in the use of force, and (3) the balance between the gravity of the intrusion

18  on the individual and the government's need for that intrusion." Williamson v. City of National

19  City, 23 F.4th 1146, 1151 (9th Cir. 2022) (citing Graham, 490 U.S. at 397).

20  Defendants argue that Smith and Huntsman used objectively reasonable force in

21  performing a lawful detention of Scott. First, the officer's brief use of body weight to detain Scott

22  did not constitute deadly force. Second, the officers had a legitimate interest in using force against

23  Scott because they were attempting to take him into custody for a mental health hold pursuant to

24  Nevada Revised Statute § 433A.160.[2] Third, the officers reasonably perceived Scott as a threat

---

[2] Nevada Revised Statute § 433A.160(1)(a), in its current formulation, authorizes the police to place a person they have "probable cause to believe" is "in a mental health crisis . . . on a mental health crisis hold by" "[t]aking the person into custody without a warrant for assessment, evaluation, intervention and treatment at a public or private mental health facility or hospital." In Nevada, this is known as a "Legal 2000" detention. At the time of the March 2019 incident in this case, however, the statute only authorized an officer to take a person into custody if the officer had "probable cause to believe that person has a mental illness, and because of that illness, is likely to harm himself or herself or others if allowed his or her liberty." Nev. Rev. Stat. § 433A.160(1)(a) (emphasis added) (amended 2019);

1  because he had already possessed two weapons and was objecting to a pat down intended to ensure

2  he had no other weapons.

3        For support in finding that the force the officers used was reasonable, Defendants rely on

4  Gregory v. City of Maui, 523 F.3d 1103, 1105 (9th Cir. 2008). There, the decedent, who was

5  mentally distressed and under the possibly influence of drugs, was wielding a pen as a weapon;

6  the officers verbally ordered him to drop the pen; and when he refused, the officers wrestled him

7  to the ground and handcuffed him. Id. at 1106-07. Throughout the struggle, he kept shouting that

8  he could not breathe but continued to fight the officers. Id. at 1105. When the officers finally

9  handcuffed him, they discovered that he was not breathing. Id. They were unable to resuscitate

10  him. Id. The Ninth Circuit upheld the dismissal of the case, reasoning that the use of force was not

11  excessive in light of: the decedent's aggressive behavior throughout the confrontation, his

12  resistance when they tried to take his pen, the officers resorting to physical confrontation only after

13  verbal requests failed, and the lack of evidence that the officers used weapons. Id. at 1107-08.

14        Defendants also assert that this case is unlike Drummond v. City of Anaheim, 343 F.3d

15  1052 (9th Cir. 2003), an excessive force case involving a decedent who suffered from

16  schizophrenia. In Drummond, the decedent was "hallucinating and in an agitated state" in a

17  convenience store parking lot, and the defendant officers were called to take him into custody to

18  "help protect" him. Id. at 1054. Even though the decedent had not committed a crime, was not a

19  danger to himself or others, and did not offer resistance, the officers knocked him to the ground

20  and placed a knee to the back of his neck as they put him into protective custody. Two officers

21  continued to place their entire body weight on the decedent's back and neck, for several minutes

22  after he was restrained, controlled, prone, no longer a threat, and pleading for air. The decedent

23  suffered a heart attack and fell into a permanent coma. The Ninth Circuit held that, based upon the

24  undisputed and disputed facts asserted by the plaintiff, the force used was unconstitutionally

25  excessive, and reversed a grant of summary judgment in favor of defendant police officers. Here,

26  Defendants assert that Drummond stands for the proposition that it is unconstitutional for multiple

27  officers to put their entire body weight on the torso and neck of a handcuffed, prone, and non-

28

      see also 2019 Nev. Stat. 345, 351.

resisting suspect for several minutes. Defendants contend that Smith and Huntsman did not use force until Scott resisted their efforts to pat him down. Even then, the officers only briefly applied weight to Scott's back and buttocks to control him as he escalated his resistance. The officers carefully monitored the situation and only used necessary, minimal force, during the 90-second struggle, as indicated by the fact that they never used any tools, punches, kicks, or strikes against Scott.

In opposition, Plaintiffs contend that the force the officers subjected Scott to during their interaction with him was not objectively reasonable. First, the officers used unreasonable force when they used a takedown maneuver on Scott because there was no government interest to justify applying such force, as Scott had committed no criminal offense. In fact, the Ninth Circuit has held that individuals have a right to be free from the application of force when engaging in passive resistance, which is all Scott engaged during his encounter. Indeed, he had only called 911 seeking assistance during a mental health crisis. Second, the officers used unreasonable force when they applied their bodyweight to Scott, after he was already prone on the ground.

The Court concludes that a jury could find that the officers' use of force in this case was not objectively reasonable.

### 1.  Type and Amount of Force

A jury could find that the severity of intrusion on Scott's Fourth Amendment rights was significant based on the type and amount of force inflicted. Under this consideration, a court assesses the "specific factual circumstances of the case in classifying the force used. The nature and degree of physical contact are relevant to this analysis, as are the risk of harm and the actual harm experienced." Williamson, 23 F.4th at 1151-52 (citations omitted).

The Court finds that, based upon the undisputed and disputed facts, the force in this case escalated to become a severe and substantial intrusion on Scott and his rights. The officers began by ordering him out of the apartment. While Scott was passive, simply standing against the wall, the officers escalated the force and intrusion by grabbing Scott without his consent and against his will. They then held his arms by his sides. The officers then allegedly used a takedown tactic which forced Scott to the ground. They continued to hold Scott while on the ground, keeping one of his

arms pinned behind him while pressing his other arm to this stomach torso so he could not control his arms and to keep him pinned to the ground. Initially, he was on his back with the officers pinning him down by using the exertion of force against him. As Scott continued to plead with the officers and to attempt to get up from the ground, the officers forced him over on his stomach. Both officers placed their body weight on Scott, as he lay prone on his stomach. While he could move his arms and legs, the officers' body weight and strength completely pinned and held him to the ground. While he was pinned in this position, Huntsman placed his knee and body weight on Scott's neck.

Further, the Court finds that the risk of harm and actual harm to Scott from the use of force was substantial. Taking the facts in the light most favorable to Plaintiffs and their expert, the Court concludes that a jury could find that the use of force by the officers had the potential for fatal consequences, and that it in fact caused his death. Plaintiffs' expert opined that exerting substantial force in the form of an officers body weight on a person's neck who was in Scott's position can have catastrophic and fatal consequences, even if only done for several seconds. While Defendants and their expert dispute that the officers use of force contributed to Scott's death, it is not the role of the Court at this stage to resolve factual disputes and make credibility determinations.

At bottom, the Court finds that, based upon the record, there are genuine issues of disputed fact as to the type and amount force used. There is a genuine issue of fact as to whether the officers used force to bring him down, or whether he voluntarily fell to the ground. There is also a fact issue as to the severity of the positional restraint used by the officers. There is also a genuine dispute as to the length of time and amount of pressure that was exerted on Scott's neck. Finally, there is dueling expert testimony regarding the impact of Huntsman's use of force on Scott's back and neck. The genuine factual disputes underlying this consideration prevent the Court from granting summary judgment.

## 2. Government Interest

The Court further finds that there are genuine issues of disputed fact as to the government's interest in the use of force against Scott. Assuming the facts in the light most favorable to Plaintiffs, a jury could find that there was de minimis or no government interest in the use of force. In

evaluating the governmental interest, the Court "generally considers factors including (a) the severity of the suspect's alleged crime; (b) whether the suspect posed an immediate threat to the officers' safety; and (c) whether the suspect was actively resisting arrest or attempting to escape." Isayeva v. Sacramento Sheriff's Dep't, 872 F.3d 938, 947 (9th Cir. 2017). "Among these considerations, the most important is the second factor—whether the suspect posed an immediate threat to others." Williamson, 23 F.4th at 1153 (internal quotation marks omitted). Nevertheless, these factors are not exclusive, and the Court must consider the totality of the circumstances. Bryan v. MacPherson, 630 F.3d 805, 826 (9th Cir. 2010).

First, as to the most important factor in the analysis, the Court finds that, viewing the evidence in a light most favorable to Plaintiffs, Scott posed no threat to the officers or anyone else during this incident. The officers had not received any information that Scott had threatened or was threatening anyone. Upon arriving at the scene, Scott was alone in his apartment and did not threaten the officers during their communications through the door. Instead, it was the officers who ordered him out of his apartment after he said that people were after him. When he eventually emerged from the apartment, he immediately dropped, upon command, the pipe he had in his hand. He never threatened the officers with it.

Furthermore, after leaving his apartment, Scott continued to behave in a nonthreatening manner. He stood against the wall as ordered and made no threatening gestures toward the officers. As he stood against the wall, he spoke to the officers in calm and pleading tone. When questioned about whether he had weapons, he pulled a pocketknife from his pants and handed it to the officers. He had not threatened the officers, anyone else or even himself with any weapon, including the pipe or pocketknife, throughout their encounter. He told them he suffered from schizophrenia, was paranoid, and scared. At that moment, he was not a threat to anyone and there was no immediate need for the officers to advance on him and place their hands on him when they did. At each stage of the encounter, it was the officers who escalated the level of force, not Scott. The undisputed and disputed facts demonstrate that he posed no threat to the officers when they initiated and escalated their use of force. As the Ninth Circuit has clearly proclaimed, "force is only justified when there is a need for force." Blankenhorn v. City of Orange, 485 F.3d 463, 481 (9th Cir. 2007) (interpreting

1    Graham). Scott's nonthreatening manner did not justify the officers' use of force.

2            Second, the Court concludes that a jury could find that the severity of the crime in this case

3    did not warrant the force used by the officers. Specifically, based upon the undisputed and disputed

4    facts taken in the light most favorable to Plaintiffs, Scott had not committed any crime at the time

5    that the officers initiated their use of force, even as they escalated their use of force against him. It

6    is undisputed that the officers never observed a crime committed by Scott nor were they told by

7    the 911 radio dispatcher that Scott had committed a crime. He never threatened them with a

8    weapon or with force. He also never threatened to harm himself. Indeed, Defendant Smith was the

9    one who ordered Scott out of the apartment which started the incident. Thus, the officers observed

10   no crime that justified their use of force at all.

11            The Court rejects Defendants' assertion that the officers' level of force was justified as a

12   matter of law by their need to affect a Legal 2000 detention under Nevada law. See NRS §

13   433A.160(1)(a) (amended 2019). At the time of the encounter in this case, the version of the statute

14   in force only authorized an officer to take a person into custody if there was "probable cause to

15   believe that person has a mental illness, and because of that illness, is likely to harm himself or

16   herself or others if allowed his or her liberty." Id. (emphasis added). The record does not support

17   a finding by this Court that the officers had probable cause to believe that Scott was likely to harm

18   anyone, including himself, if left at his liberty. He had not threatened anyone. He had been

19   compliant and passive with the officers until they grabbed him. He told the officers that he did not

20   want to face the wall, and that he was feeling paranoid. In fact, at the moment the officers grabbed

21   him and allegedly took him down, there was no apparent reason to use force in that moment. Even

22   after the officers grabbed him and could tell that he had no weapons, they could have released their

23   grip upon him. While it is undisputed that Scott had called police and might have been seeking

24   assistance, these facts by themselves do not establish the level of probable cause set forth in the

25   statute, at that time, to detain Scott. Id. At best, there is a genuine issue of disputed fact as to

26   whether the officers had probable cause to take Scott into custody. This dispute prevents a grant

27   of summary judgment.

28            Thus, even if the officers' intent was to effect a detention for his benefit, assuming the facts

1    in Plaintiffs' favor, it was clear that their actions were only exacerbating his distress and were not

2    justified as a matter of law.

3        Third, the Court finds that a jury could conclude that, even if Scott was resisting arrest, he

4    had a reasonable basis for doing so. "[A] person has a limited right to offer reasonable resistance

5    to an arrest that is the product of an officer's personal frolic. That right is not triggered by the

6    absence of probable cause, but rather by the officer's bad faith or provocative conduct."

7    Blankenhorn, 485 F.3d at 479. As an initial matter, the Court has just found that there are genuine

8    issues of disputed fact as to whether the officers even had legal authority to detain Scott, let alone

9    arrest him. Moreover, the Court has found that it is undisputed that the officers did not have a

10   factual basis for effecting a lawful arrest. The officers never observed Scott commit a crime nor

11   were they told that he had committed one. Thus, there are genuine issues of disputed fact as to

12   whether Scott's resistance was itself lawful opposition to an unlawful detention and whether the

13   officers' use of force constituted "bad faith or provocative conduct." This too prevents a grant of

14   summary judgment as to this claim.

15                              **3.  Balance of Interests**

16       Next, the Court finds, for the reasons previously stated in this order, that a jury could find

17   that the balance of interest heavily weighs in favor of Scott as the government had minimal or no

18   interest in the use of force implemented, because Scott posed no threat to anyone at the time that

19   severe, and ultimately lethal, force was used against him. To put it directly, a jury could find the

20   gravity of the intrusion was significant given Scott's death, and that the government's need for

21   intrusion was minimal given the lack of a threat Scott presented. Indeed, a jury could reasonably

22   determine that there was no need to use any force against Scott. As the Ninth Circuit in Drummond

23   and Glenn v. Washington County, explained, there is a limited government interest in using force

24   against an individual who is experiencing a mental health crisis but who poses no physical threat,

25   particularly when the purpose of the interaction is to take the individual into a mental health hold

26   for his or her protection and benefit. See 343 F.3d; 673 F.3d 864 (9th Cir. 2011). In terms of the

27   officers' attempt to assist Scott, use of force does not become reasonable simply because the

28   objective is to provide assistance to a person in mental distress. In Drummond, for instance, the

1   Court observed that Drummond "was a mentally disturbed individual not wanted for any crime,
2   who was being taken into custody to prevent injury to himself," such that "causing him grievous
3   injury d[id] not serve that objective in any respect." 343 F.3d at 1059. Again, at best, there is a
4   genuine issue of disputed fact as to whether the balance of interests here would support the officers'
5   use of force given the government's minimal interest here.

6   **4.   Consideration of Alternatives**

7   Finally, the Court finds that one additional, but salient consideration, must be considered
8   in its objective reasonableness analysis: the availability of other strategies that involved less or no
9   force. In analyzing the objective reasonableness of a particular use of force, courts may take into
10  account whether the officer considered the existence of alternative tactics, if any, to effect an arrest
11  or detention. Bryan, 630 F.3d at 831. In this instant case, the Court finds that, based upon the
12  undisputed and disputed facts, there were alternative less forceful tactics that the officers could
13  have used. As Scott posed no threat to anyone or himself, there was no immediate need to take
14  him into custody. Accordingly, rather than grab Scott and allow him to be taken to the ground, the
15  officers simply could have talked to him until they felt he was more calm or until they reached a
16  mutually agreeable approach to take him to a mental health facility.

17  In sum, the Court finds that, based on all these considerations, there are genuine factual
18  disputes as to whether the officers used excessive force against Scott that prohibit it from granting
19  Defendants' summary judgment on this claim.

20  **ii.   Qualified Immunity**

21  The Court rejects the Defendants' assertion of qualified immunity in this case.

22  "The doctrine of qualified immunity protects government officials from liability for civil
23  damages insofar as their conduct does not violate clearly established statutory or constitutional
24  rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231
25  (2009).

26  Qualified immunity is an immunity from suit rather than a defense to liability, and it
27  "ensures that officers are on notice their conduct is unlawful before being subjected to suit."
28  Tarabochia v. Adkins, 766 F.3d 1115, 1121 (9th Cir. 2014). In deciding whether officers are entitled

1   to qualified immunity, courts consider, taking the facts in the light most favorable to the

2   nonmoving party, (1) whether the facts show that the officer's conduct violated a constitutional

3   right, and (2) if so, whether that right was clearly established at the time. Id.

4         Under the second prong, courts "consider whether a reasonable officer would have had fair

5   notice that the action was unlawful." Id. at 1125 (brackets in original omitted). "This requires two

6   separate determinations: (1) whether the law governing the conduct at issue was clearly established

7   and (2) whether the facts as alleged could support a reasonable belief that the conduct in question

8   conformed to the established law." Green v. City and County of San Francisco, 751 F.3d 1039,

9   1052 (9th Cir. 2014). "A Government official's conduct violates clearly established law when, at

10  the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every

11  'reasonable official would have understood that what he is doing violates that right.'" Ashcroft v.

12  al-Kidd, 563 U.S. 731, 741 (2011) ((brackets in original) (quoting Anderson v. Creighton, 483

13  U.S. 635, 640 (1987)). While a case directly on point is not required for a right to be clearly

14  established, "existing precedent must have placed the statutory or constitutional question beyond

15  debate." Id. Further, the right must be defined at "the appropriate level of generality . . . [, and the

16  court] must not allow an overly generalized or excessively specific construction of the right to

17  guide [its] analysis." Cunningham v. Gates, 229 F.3d 1271, 1288 (9th Cir. 2000); see also Ashcroft,

18  563 U.S. at 741-42. The plaintiff bears the burden of proving that the right was clearly established.

19  Tarabochia, 766 F.3d at 1125.

20        In deciding a claim of qualified immunity where a genuine issue of material fact exists, the

21  court accepts the version asserted by the non-moving party. Ellins v. City of Sierra Madre, 710

22  F.3d 1049, 1064 (9th Cir. 2013). Summary judgment must be denied where a genuine issue of

23  material fact exists that prevents a finding of qualified immunity. Sandoval v. Las Vegas Metro.

24  Police Dep't, 756 F.3d 1154, 1160 (9th Cir. 2014).

25        Defendants argue that they are entitled to qualified immunity because the officers' use of

26  force was reasonable. They contend that the officers did not use deadly force, and no court has

27  ever held that brief use of body weight to control a resisting suspect prior to handcuffing is deadly

28  force. Rather, they argue, that the Ninth Circuit's caselaw on positional asphyxia holds that officers

can use body weight to control and restrain a prone resisting suspect, but that officers should remove all body weight once the suspect is handcuffed and no longer a threat. The officers, Defendants assert, did that here. Second, Defendants argue that they are entitled to qualified immunity because the law regarding the officers' use of force was not clearly established. According to them, no Supreme Court or Ninth Circuit case put the officers on notice that their use of bodyweight under the facts and circumstances of this case could be unconstitutional. The Court disagrees.

The Court first finds that Plaintiffs have presented facts demonstrating that Defendants' alleged conduct violated Scott's constitutional rights. In deciding whether Defendants may assert qualified immunity where facts are disputed, the Court accepts Plaintiffs' version of events as the non-moving party. Based on Plaintiffs' assertions, Defendants Smith and Huntsman violated Scott's Fourth Amendment right by using excessive force, resulting in death, when they employed force against an individual going through a mental health crisis who posed no threat, was compliant and passive with the officers, but who was nonetheless subject to being grabbed and forced to the ground unexpectedly and against his will. At the time force was initiated against him, he had committed no crime and there was no legal basis to take him into custody under Nevada law for a Legal 2000 detention. He pleaded with the officers to leave him alone and release him, as their use of force, without a legal basis, escalated. What is more, as Scott became increasingly distressed and panicked, the officers continued to escalate the force by rolling him on his stomach and placing their body weight on him. As a result, one of the officers placed his body weight on Scott's back and neck for several minutes causing his ultimate death from hypoxia.

The use of force alleged by Plaintiffs is unconstitutional. First, it is unconstitutional to use force when force is not legally justified. As the Ninth Circuit has held "force is only justified when there is a need for force." <u>Blankenhorn</u>, 485 F.3d at 481; <u>see also</u> <u>Andrews v. City of Henderson</u>, 35 F.4th 710, 719 (9th Cir. 2022) (explaining that <u>Blankenhorn</u> established that it was unconstitutional to take down and pile on top of a suspect who had been calm and posed no threat to officer safety). Here, the Court finds that the officers sought to use force to detain Scott when they had no legal basis to do so, as he had committed no crime and did not even satisfy the threshold

1   for a Legal 2000 arrest.

2          The Court further finds that, even if Scott was subject to a Legal 2000 arrest, it was

3   unconstitutional for them to use substantial or nontrivial force on a passive and compliant

4   individual like Scott. See Bryan, 630 F.3d at 829-830. Officers may not subject an individual to

5   nontrivial force when he has not resisted, or has merely engaged in passive resistance to, an

6   officer's commands. See id.; see also Gravelet-Blondin v. Shelton, 728 F.3d 1086, 1093 (9th Cir.

7   2013) ("The right to be free from the application of non-trivial force for engaging in mere passive

8   resistance was clearly established prior to 2008"); Nelson v. City of Davis, 685 F.3d 867, 881-82

9   (9th Cir. 2012) (acknowledging that the Ninth Circuit has "recognized that a failure to fully or

10  immediately comply with an officer's orders neither rises to the level of active resistance nor

11  justifies the application of a non-trivial amount of force"). Assuming the facts in Plaintiffs' favor,

12  there was no need or legal basis to initiate force against Scott, and there certainly was no need or

13  basis to escalate that force with the takedown maneuver or the use of body weight on his back and

14  neck. Separately, there is also a genuine issue of fact as to whether any resistance by Scott could

15  be construed as a lawful opposition to an unlawful detention. See Blankenhorn, 485 F.3d at 479.

16         In addition, it is unconstitutional for an officer to use substantial force against an individual

17  suspected of a minor crime and who posed no threat to officer safety. See Young v. County of Los

18  Angeles, 655 F.3d 1156, 1168 (9th Cir. 2011) ("The principle that it is unreasonable to use

19  significant force against a suspect who was suspected of a minor crime, posed no apparent threat

20  to officer safety, and could not be found to have resisted arrest, was thus well-established in

21  2001. . . ."). In this case, Scott was not suspected of even committing a minor crime. Rather, he

22  was allegedly being taken in custody for his own benefit – without a legal basis. Under such

23  circumstances, the use of force, especially the substantial force employed in this case, is

24  unconstitutional.

25         As for the second prong of the qualified immunity inquiry, the Court finds that Plaintiffs

26  have also met their burden in showing that Defendants violated clearly established rights. The

27  cases cited above in the Court's discussion regarding the first prong of the qualified immunity

28  analysis demonstrate that the law regarding Defendants' unconstitutional conduct was clearly

1    established at the time of the officer's March 2019 encounter with Scott. <u>See, e.g.,</u> <u>Blankenhorn</u>,

2    485 F.3d at 481; <u>see also</u> <u>Andrews</u>, 35 F.4th at 719; <u>Young</u>, 655 F.3d at 1168.

3        The Court disagrees with Defendants that the law was not clearly established as to their

4    conduct in this case. Defendants' qualified immunity analysis focuses almost exclusively on the

5    application of force to Scott's neck. The Court, however, must consider the entire interaction

6    between Scott and the defendants when determining the objective reasonableness of force and the

7    applicability of qualified immunity. The Court also disagrees with Defendants' narrow

8    construction of the principle clearly established in <u>Drummond</u>. It would be anathema to the

9    qualified immunity jurisprudence for the Court to import a specific factual timeframe for an

10   nontrivial use of force in this case, i.e., a knee pressed with substantial pressure to the neck of an

11   individual, as being clearly (or not) established, because the qualified immunity inquiry does not

12   require that level of detail, <u>see</u> <u>Gates</u>, 229 F.3d at 1288, and in this case, there are genuine issues

13   of disputed fact as to the extent of the force and its duration, <u>see</u> <u>Sandoval</u>, 756 F.3d at 1160.

14       Separately, the Court finds that qualified immunity must also be denied because there are

15   genuine issues of disputed fact regarding: a.) whether there was probable cause to even detain

16   Scott under Nevada law, b.) whether Scott exhibited any conduct or behavior that warranted even

17   placing hands on him, c.) whether the officers used a takedown maneuver on Scott to force him to

18   the ground, d.) how actively Scott was resisting the officers at various stages of the encounter, e.)

19   how long Huntsman's knee was on Scott's neck, f.) when Scott was subdued and handcuffed, and

20   g.) whether there were less intrusive or nonintrusive tactics available to the officers. These disputes

21   require the Court to deny qualified immunity to the Defendants. <u>Id.</u>

22       Accordingly, the Court denies Defendants' qualified immunity defense and motion for

23   summary judgment on this claim.

24                          **iii.   Denial of Medical Care (Second Cause of Action)**

25       Defendants contend first that it is undisputed that the officers met their constitutional

26   obligations for provision of medical care to Scott. They assert that one minute and thirty seconds

27   after Scott was handcuffed, the officers requested medical for precautionary reasons. At the time

28   of the medical request, Scott had not complained of injury nor was he having difficulty breathing.

1    When Scott showed signs of medical distress, Defendant Huntsman requested that medical

2    expedite. Throughout the encounter the officers monitored Scott's breathing and pulse and

3    provided updates. Therefore, Defendants argue, the officers met their constitutional obligations to

4    promptly summon medical assistance. Second, Defendants assert that, at a minimum, there is no

5    clearly established law prohibiting the way the officers handled Scott's medical treatment.

6         The Fourth Amendment requires that law enforcement officers provide objectively

7    reasonable post-arrest care. Tatum v. City and County of San Francisco, 441 F.3d 1090, 1098-99

8    (9th Cir. 2006). Plaintiffs concede this claim cannot survive summary judgment and abandon it.

9         The Court therefore grants Defendants summary judgment as to this claim.

10              **iv.   Denial of Familial Relationship (Third Cause of Action)**

11        Defendants assert that the officers did not engage in sufficiently "conscience shocking"

12   behavior to establish a Fourteenth Amendment denial of familial relationship claim. The officers

13   were only attempting to lawfully handcuff Scott and, once their task was completed, immediately

14   placed him into the recovery position and summoned medical. There is no evidence the officers

15   intended to harm Scott or acted with deliberate indifference towards his health. Plaintiffs, on the

16   other hand, contend that the officers acted with deliberate indifference to Scott's needs. There was

17   no urgency for them to act because Scott never threatened or attacked them. He merely sought to

18   avoid being touched and handcuffed. Thus, by using excessive force against him while he was

19   experiencing a mental health crisis, they acted with deliberate indifference. All this, Plaintiffs

20   assert, is sufficient to establish a claim for Fourteenth Amendment deprivation of familial

21   relationship.

22        The Court concludes that a jury could find that the officers acted with deliberate

23   indifference to Scott's needs in violation of Plaintiffs' substantive due process right to a familial

24   relationship.

25        A substantive due process claim may be asserted by both the parents and children of a

26   person killed by law enforcement officers. Curnow v. Ridgecrest Police, 952 F.2d 321, 325 (9th

27   Cir. 1991). "[O]fficial conduct that shocks the conscience in depriving parents [or children] of that

28   interest is cognizable as a violation of due process." Jones v. Las Vegas Metro. Police Dep't, 873

F.3d 1123, 1132-33 (9th Cir. 2017) (internal quotations marks omitted). In determining whether excessive force shocks the conscience in this context, the court must first ask "whether the circumstances are such that 'actual deliberation [by the officer] is practical.'" Porter v. Osborn, 546 F.3d 1131, 1137 (9th Cir. 2007) (quoting Moreland v. Las Vegas Metro. Police Dep't, 159 F.3d 365, 372 (9th Cir. 1998)). Where actual deliberation is practical, then an officer's "deliberate indifference" may suffice to shock the conscience. Osborn, 546 F.3d at 1137. The term "deliberation" is not to be interpreted in a narrow, literal, or technical sense. See Wilkinson v. Torres, 610 F.3d 546, 554 (9th Cir. 2010). On the other hand, if an officer is forced to act quickly because of an escalating situation or the evasive actions of a suspect, then it will be deemed that an insufficient period of time for deliberation existed and the heightened purpose to harm standard will apply. See Tan Lam v. City of Los Banos, 976 F.3d 986, 1003-04 (9th Cir. 2020); Wilkinson, 610 F.3d at 554. Thus, where a law enforcement officer "must make a snap judgment" because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose "to cause harm unrelated to the legitimate object of arrest." Osborn, 546 F.3d at 1137, 1140.

Here, Plaintiffs' theory is that the officers acted with deliberate indifference to Scott's needs, and that such deliberate indifference establishes the "shocks the conscience" requirement for the purposes of establishing a Fourteenth Amendment deprivation of familial relationship claim. In contrast, Defendants' theory is that this case involves the purpose to harm standard because Smith and Huntsman were required to make split-second decisions while lawfully arresting Scott. The Court finds that, based upon the undisputed facts, the officers had sufficient time and lack of exigency such that they had time to deliberate.

Nine minutes pass between the time the officers arrive on the scene and the time they decide to place their hands on Scott. More specifically, almost six minutes pass from the time the officers arrive on the scene before Huntsman asks Smith regarding their Sergeant's assessment of their initial encounter with Scott. Calmly, Smith relays that the Sergeant told him that they could not do anything if they did not have a cause or basis to enter. Both officers, while shining their flashlights at Scott's window at different times, acknowledge seeing him inside, Smith even determining that

1    Scott "looks normal." After the call with the Sergeant, Smith and Huntsman spend more than a
2    minute trying to get Scott to open the door until Scott finally does. More than two minutes pass
3    between the time Scott opens the door and Huntsman grabs Scott's left arm. During these more
4    than two minutes, Scott complies with Smith's order to drop the pipe in his hand, asks two times
5    what he is supposed to do, hands Huntsman the pocketknife he had in his pocket, tells the officers
6    he has "paranoid schizophrenia," asks to be put in the car, complains about the light being shined
7    in his face, explains he is paranoid and therefore does not feel comfortable turning towards the
8    wall to be pat down, and then, in a calm demeanor, states that he is not fine, and finally, asks if he
9    can take off his shirt.

10         Before Huntsman grabs Scott's left arm, Scott was not acting in a manner that would
11   require either officer "to 'act decisively,' "without the luxury of a second chance' to address a life-
12   threatening situation." Moreland, 159 F.3d at 372. In fact, after the officers arrived on the scene,
13   they had sufficient time to speak with Scott, assess the scene, and call their Sergeant. Further, they
14   did not need to order Scott out of his apartment, nor did they have the legal authority to detain him
15   at that point. Nevertheless, after Scott came out of his apartment, he did not threaten anyone,
16   including himself. He was passive and compliant. He admitted to suffering from schizophrenia
17   and being paranoid. He attempted to calmly interact with the officers. At the time the officers their
18   initiated contact with Scott, and as they continued to escalate their force, there was no threat to
19   anyone or a legal need to initiate or escalate such force. Even as Scott pleaded with the officers to
20   leave him alone and release him, the officers continued to escalate their use of force despite its
21   clear detrimental effect on his mental state. Accordingly, the facts show that the officers had
22   sufficient time to deliberate before they decided to use and escalate force against Scott. Cf. Greer
23   v. City of Hayward, 229 F. Supp. 3d 1091, 1108 (N.D. Cal. 2017) ("Here, the officers had time to
24   deliberate while they lay on Greer's back as he struggled to breathe."); Wroth v. City of Rohnert
25   Park, No. 17-CV-05339-JST, 2019 WL 1766163, at *9 (N.D. Cal. Apr. 22, 2019) ("[O]nce officers
26   have subdued a suspect to the point that there is no longer a threat, it becomes practical to deliberate
27   about the type and degree of force to use in continuing to restrain the suspect.").

28         Next, applying the deliberate indifference standard and viewing the evidence in a light most

favorable to Plaintiffs, the Court finds that there are genuine issues of fact for a jury to resolve, for the purposes of establishing whether the officers acted with deliberate indifference. For instance, there is dueling evidence in the record that a jury must weigh as to: (a) whether use of force (both the takedown and the restraint) on Scott was at all necessary; (b) whether there were opportunities to use lesser intrusions to subdue Scott; and (c) whether the continued use of force on Scott's neck exhibited deliberate indifference when Scott began to cry out with increasing intensity while pinned to the ground. Therefore, there are material factual disputes in the record as to whether the officers acted with deliberate indifference. Further, assuming the facts in Plaintiffs' favor, a jury could find that the officers acted with deliberate indifference in a non-emergency situation, or that they acted with a purpose to harm Scott.

In sum, genuine issues of fact remain as to Plaintiffs' denial of familial relationship claim.

Lastly, the Court finds that Defendants have failed to show that they are entitled to qualified immunity on this claim. Once again, the Court accepts Plaintiffs' version of events as the non-moving party in deciding whether Defendants are entitled to qualified immunity where facts are disputed. As to the first prong, the Court incorporates by reference its analysis above finding that actual deliberation was practical, that the officers had sufficient time to deliberate using force against Scott, that such use of force led to Scott's death, even though there was no imminent need to use force against Scott, and that such conduct amounted to deliberate indifference to Scott's needs in violation of Plaintiffs' due process right to familial association. Second, and despite Defendants' argument to the contrary, the Ninth Circuit "has recognized that a child has a constitutionally protected liberty interest under the Fourteenth Amendment in the 'companionship and society'" to a parent. Hayes v. County of San Diego, 736 F.3d 1223, 1229-30 (9th Cir. 2013); see also Rosenbaum v. Washoe County, 663 F.3d 1071, 1079 (9th Cir. 2011) ("[T]he substantive due process right to family integrity or to familial association is well established[.]").[3]

Accordingly, the Court denies Defendants qualified immunity and summary judgment on Plaintiffs' denial of familial relationship claim.

---

[3] A grant of qualified immunity would also be inappropriate here because there are material facts in dispute regarding this claim. See Sandoval, 756 F.3d at 1160.

- 21 -

**v.  <u>Monell</u> Liability (Fourth, Sixth, and Seventh Causes of Action)**

Defendants first argue that the Court should find that the officers did not violate Scott's constitutional rights, and accordingly find that all Plaintiffs' <u>Monell</u> claims[4] fail as a matter of law. In the alternative, Defendants argue that, even if the Court finds a constitutional violation, Plaintiffs' <u>Monell</u> claims still warrant dismissal because there is no evidence of a <u>Monell</u> violation. First, Plaintiffs never identified a single policy or practice that they allege to be unconstitutional. LVMPD has an exhaustive and comprehensive use of force policy and policies dealing with the handling of people with mental illnesses, and Plaintiffs have produced no evidence challenging the sufficiency of these policies. Thus, there is nothing to support a <u>Monell</u> claim under the "unconstitutional policy or custom" theory. Second, the evidence shows that LVMPD exhaustively trains its officers in both use of force and its treatment of individuals who suffer from mental illness. Plaintiffs had possession of all training documents and did not find any evidence that the policy was sub-standard or deficient. Thus, there is nothing to support a <u>Monell</u> claim under the "failure to train" theory. Plaintiffs also failed to generate any evidence supporting a ratification claim. Finally, even if Plaintiffs had evidence to support a <u>Monell</u> claim under any of the above theories, these claims cannot survive because Plaintiffs have generated no evidence of any other similar incidents. In fact, Defendants contend, Plaintiffs' <u>Monell</u> claims are based entirely on a single isolated incident.

In response, Plaintiffs contend that Defendants' summary judgment motion errs by arguing that all <u>Monell</u> claims require evidence of other similar incidents. First, there is a viable <u>Monell</u> policy or practice claim because there was a lack of affirmative policies or procedures guiding LVMPD officers on applying force in manners that would avoid the dangers of placing weight on prone subjects constituting deliberate indifference, considering Defendant LVMPD's history with the maneuver's dangers. Second, Defendants Smith and Huntsman were not trained in the dangers of application of weight on a prone subject, and there was no training or policy to avoid or limit the placing of weight on a prone subject. The severe harm to civilians was the highly predictable consequence of this deficient absence of training. This is confirmed by the subsequent death, under

---

[4] <u>See</u> <u>Monell v. Dep't of Soc. Servs. of City of New York</u>, 436 U.S. 658 (1978).

similar circumstances as Scott's, of an individual named Bryon Williams that prompted policy changes. Lastly, the absence of discipline can constitute ratification for the purposes of prevailing on a Monell claim. Here, the officers were not disciplined for their use of force against Scott. Plaintiffs asserts that the internal review was a sham as it did not evaluate the propriety or lawfulness of the takedown or explain how Scott ended up on the ground. The review also did not assess or evaluate the propriety or lawfulness of placing bodyweight when Scott was prone.

The Court concludes that a jury could find that Defendant LVMPD violated Plaintiffs' constitutional rights as established under Monell.

The Ninth Circuit has explained that a litigant may recover from a municipality under § 1983 on three different theories: commission, omission, or ratification. Clouthier v. Cnty. of Contra Costa, 591 F.3d 1232, 1249-50 (9th Cir. 2010). "Commission" refers to a local government implementing its official policies or established customs that are deliberately indifferent to a constitutional right, which includes, for example, the inadequate training of government officials. Id. "Omission" refers to the government's omission to an official policy - such as a failure to train. Id. Finally, "ratification" refers to an authorized policymaker's purposeful approval of a subordinate's unconstitutional conduct. Id.

### 1. Commission Theory

The Court concludes that Plaintiffs' commission theory based Monell liability claim should survive summary judgment because there are genuine issues of fact as to whether Defendant LVMPD had a policy or practice of subduing individuals by unlawfully placing weight on a prone subject, or whether it lacked a policy to avoid such uses of force. For instance, Plaintiffs have adduced evidence that six months after Scott's death, LVMPD officers used the same prone restraint in subduing Byron Williams. After Williams's death, county coroners concluded that the prone restraint contributed to Williams's death. Like Scott, Williams was restrained with a knee on his neck in the prone position for over one minute, a technique that Defendant LVMPD calls the "segmenting" technique. Separately, there is also deposition testimony from Defendant Huntsman that to his knowledge, "segmenting is still taught," despite the in-custody deaths of Scott and Williams.

### 2.   Omission ("Failure to Train") Theory

Additionally, the Court finds that Plaintiffs' omission theory based <u>Monell</u> liability claim should survive summary judgment because there are genuine issues of fact as to whether the municipality failed to train its officers. First, the parties dispute the extent and scope of the relevant training in this case. Second, Defendants argue that the officers were Crisis Intervention Trained ("CIT") and implemented that training in their attempts to subdue Scott. Plaintiffs' medical expert report, however, states that the officers here were not trained in the dangers in applying weight to someone in a prone position, despite the significant dangers in doing so, which were well-known prior to the time of the incident involving Mr. Scott. Plaintiffs also retained a use-of-force consultant who opined that LVMPD failed to properly train Smith and Huntsman on the dangers and risks associated with the use of maximally prone restraint techniques on subjects who may be exhibiting signs of Agitated Delirium or Excited Delirium prior to Scott's death. There is also deposition testimony from Defendant Huntsman that he was never trained that continued pressure to an individual's back or neck could cause hypoxia.

### 3.   Ratification Theory

Lastly, the Court finds that Plaintiffs' ratification theory based <u>Monell</u> liability claim should survive summary judgment because there are genuine issues of material fact as to whether Defendant LVMPD ratified an unconstitutional practice by failing to discipline the subject officers, and by failing to change its approach to prone restraint following Scott's death. As stated above, there is evidence in the record that LVMPD officers used the same type of force against Byron Williams, resulting in Williams's death, and there is also testimony from Defendant Huntsman that Defendant LVMPD continues to use the "segmenting" technique. <u>See</u> <u>Henry v. County of Shasta</u>, 132 F.3d 512, 520 (9th Cir. 1997) ("The subsequent acceptance of dangerous recklessness by the policymaker tends to prove a preexisting disposition and policy.").

Therefore, the Court denies Defendants summary judgment on all Plaintiffs' <u>Monell</u> claims as well.

### vi.   Americans with Disabilities Act (Fifth Cause of Action)

### 1.   Proper Defendants

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Plaintiffs pursue this claim against all Defendants, including against Defendants Smith and Huntsman in their individual capacities. Individuals, however, cannot be held liable under the ADA. See 42 USC § 12131. Accordingly, Plaintiffs' ADA claim only proceeds against Defendant LVMPD.

## 2.  Statute of Limitations

Defendants first contend that Plaintiffs' ADA claim is barred by the applicable statute of limitations. They argue that, because Title II of the ADA does not contain an express statute of limitations, the Court borrows the limitations period from the most analogous state law claim available, Nevada Revised Statute § 651.070. Under this state statute, the limitations period for bringing a claim under the relevant state law is one year. Accordingly, Defendants argue that Scott had one year from the date of the incident to file suit, and it is undisputed that the subject incident occurred on March 3, 2019, and that Plaintiffs did not file the Complaint until October 7, 2020. Because Plaintiffs did not comply with the applicable statute of limitations, Defendants argue that the Title II claim should be dismissed with prejudice. Plaintiffs disagree, contending that the ADA claim is timely.

The Court agrees with Plaintiffs. In Funke v. Hatten, No. 19-CV-01335, 2021 U.S. Dist. LEXIS 107173 (D. Nev. June 8, 2021), a case also involving a similar Title II, ADA claim, this Court found that Nevada Revised Statute § 651.070's one year statute of limitations did not

> provide an analogous claim for [plaintiff]'s allegations in this case. This finding is readily supported by a comparison of the language and object of these two statutes. Title II addresses discrimination in the provision of "services" by "public entities," whereas NRS § 651.070 is directed to discrimination in "public accommodation" including private entities. In the latter regard, this Nevada statute more closely tracks and is analogous to Title III of the ADA which is also directed to discrimination in "public accommodation" by individuals or entities, including private entities. 42 U.S.C. § 12182.

> A consideration of the nature of the ADA claim here only

underscores why these statutes are not analogous. The nature of [plaintiff]'s Title II claim is not directed to discrimination in the provision of 'public accommodation' by Metro or any private entity. The claim here is based upon Metro's alleged discrimination in the provision of its services as a public entity. The Court does not find that Nevada provides a direct analogue to Title II of the ADA.

The Court finds that the most analogous statute of limitations for [plaintiff]'s Title II claim is the two-year statute of limitations for state personal injury and federal § 1983 claims. See generally, Shade v. Las Vegas Metro. Police Dep't, 2017 WL 4390100, at *2 (D. Nev. Sept. 30, 2017). This is consistent with other courts who have applied the statute of limitations period for personal injury claims when there is no direct analogue to an ADA Title II claim in state law. See. e.g., McCormkick v. Miami Univ., 693 F.3d 654, 664 (6th Cir. 2012)(finding the statute of limitations period for a Title II claim in Ohio to be that for personal injury claims because Ohio has no analogue to Title II).

Id. at *9. As in Funke, Plaintiffs do not allege discrimination in "public accommodations." Instead, they allege discrimination in the provision of Defendant LVMPD's services as a public entity. Thus, the two-year statute of limitations for state personal injury claims should apply. Accordingly, the applicable two-year statute of limitations date was March 3, 2021. Here, Plaintiffs' Complaint was filed on October 7, 2020, therefore the ADA claim is not time barred.

### 3.  Analysis

The Court now addresses this claim on the merits.

Defendants argue that Plaintiffs' ADA claim fails. Here, Plaintiffs are alleging that Defendant LVMPD failed to accommodate Scott's mental disabilities while detaining him. Yet, Defendants contend that Plaintiffs fail to identify any specific reasonable accommodations that LVMPD did not provide Scott. Moreover, both officers were also CIT – meaning they underwent four days of training in learning how to assess mental illness and how to detain individuals with mental illness. Accordingly, the officers used this training to accommodate Scott's mental disabilities, including by calmly speaking to Scott, continuously trying to reassure him that they were there to help him, providing him pat down alternatives, and not rushing the encounter. Defendant LVMPD also produced its CIT training document, while Plaintiffs generated no

1    evidence that LVMPD's training was insufficient or deliberately indifferent.

2           In turn, Plaintiffs argue that the ADA claim survives summary judgment because

3    accommodations could have been made by employing de-escalation strategies with the intent of

4    achieving a safe and nonviolent self-surrender, and by engaging in non-threatening

5    communications, respecting Scott's comfort zone, waiting for medical assistance, and using the

6    passage of time to defuse the situation peacefully rather than encouraging a deadly confrontation.

7           The Court concludes that a jury could find that Defendant LVMPD failed to reasonably

8    accommodate any of Scott's mental disabilities in violation of Title II of the ADA.

9           A failure to reasonably accommodate a person's disability can constitute discrimination

10    under Title II of the ADA. 28 C.F.R. § 35.130(b)(7). Title II also governs arrests. Sheehan v. City

11    and County of San Francisco, 743 F.3d 1211, (9th Cir. 2014). Courts have recognized at least two

12    types of Title II claims applicable to arrests: (1) wrongful arrest, where police wrongly arrest

13    someone with a disability because they misperceive the effects of that disability as criminal activity

14    and (2) reasonable accommodation, where, although police properly investigate and arrest a person

15    with a disability for a crime unrelated to that disability, they fail to reasonably accommodate the

16    person's disability in the course of investigation or arrest, causing the person to suffer greater

17    injury or indignity in that process than other arrestees. Id. at 1232-33.

18           In this case, Plaintiffs are alleging the second type of ADA claim – failure to accommodate.

19    To state such a claim, a plaintiff generally must show: (1) he is an individual with a disability; (2)

20    he is otherwise qualified to participate in or receive the benefit of a public entity's services,

21    programs or activities; (3) he was either excluded from participation in or denied the benefits of

22    the public entity's services, programs or activities or was otherwise discriminated against by the

23    public entity; and (4) such exclusion, denial of benefits or discrimination was by reason of his

24    disability. Id. To recover monetary damages under Title II of the ADA, a plaintiff must prove

25    intentional discrimination on the part of the defendant. Duvall v. Cty. of Kitsap, 260 F.3d 1124,

26    1138 (9th Cir. 2001). To prove intentional discrimination, the plaintiff must show the defendant

27    acted with deliberate indifference.

28           The Court finds that Plaintiffs' ADA claim should survive summary judgment because the

issues of material fact discussed above in the excessive force and denial of familial relationship analyses claims also exist here. For example, there are factual disputes that go to whether the officers failed to reasonably accommodate Scott's obvious and known mental health difficulties, including whether the officers could have, but failed to, use less intrusive interventions in attempting to subdue Scott. There are also factual disputes as to whether the officers' use of force was deliberately indifferent to Scott.

Thus, while the Court grants summary judgment to Defendants Smith and Huntsman as to this claim, the Court denies it as to Defendant LVMPD.

### b.  State Law Claims

The Court now addresses Plaintiffs' state law claims. For the foregoing reasons, the Court denies Defendants summary judgment on both causes of action.

### i.  Battery (Eighth Cause of Action)

Defendants assert that, because a state law battery claim is identical to a Fourth Amendment excessive force claim, applying the arguments raised in support of summary judgment on the excessive force claim, warrant summary judgment in their favor on this cause of action as well. Plaintiffs argue the opposite, contending that the battery claim survives for the same reasons the excessive force claim survives. Moreover, the battery claim is supported by evidence that goes beyond the scope of the mere takedown and prone restraint use-of-force. It includes a broader range of conduct, covering all the officers' acts of touching Scott – for example, grabbing Scott and handling him in a manner whereby he ended up on the ground, whether by takedown or other another method, holding him on the ground, moving him into the prone position, and using force while he was prone.

"A battery is an intentional and offensive touching of a person who has not consented to the touching." Humboldt Gen. Hosp. v. Sixth Judicial Dist. Court of Nev., 376 P.3d 167, 171 (Nev. 2016). The Court finds that there is clear evidence in the record that the officers intentionally touched Scott without his consent, and there is a genuine issue as to whether the touching was "offensive."

Thus, the Court denies Defendants summary judgment as to this claim.

**ii. Negligence (Ninth Cause of Action)**

Defendants argue that the negligence claim should be dismissed because the officers are subject to discretionary-act immunity under Nevada Revised Statute § 41.032. As set forth above, Defendants argue, no reasonably jury could conclude the officers used deadly force because placing a knee on a suspect's upper back and shoulder area for around 90-seconds is not deadly force. Because deadly force was not used in this case, Plaintiffs' negligence claim is premised entirely upon Defendants' discretionary acts. Plaintiffs disagree. They contend that the burden of showing that discretionary immunity applies is on Defendants, and Defendants concede that "uses of force" are not covered by discretionary-act immunity. Also, immunity does not apply unless, inter alia, the state actor's decision is based on considerations of social, economic, or political policy. Here, Plaintiffs assert that a jury could find that Defendants breached their duty when they used deadly or excessive force against Scott, and therefore Defendants' decisions were not based on these considerations.

To prevail on a negligence claim, a plaintiff must show that "(1) the defendant owed the plaintiff a duty of care, (2) the defendant breached that duty, (3) the breach was the legal cause of the plaintiff's injuries, and (4) the plaintiff suffered damages." DeBoer v. Senior Bridges of Sparks Family Hosp., Inc., 282 P.3d 727, 732 (Nev. 2012).

Nevada uses a two-part test to resolve discretionary immunity questions. Martinez v. Maruszczak, 168 P.3d 720, 729 (Nev. 2007). To fall within the scope of discretionary immunity, "a decision must (1) involve an element of individual judgment or choice, and (2) be based on considerations of social, economic, or political policy." Id. Further, discretionary act immunity is an affirmative defense and Defendants carry the burden of proving it applies.

The Court finds that discretionary-act immunity does not apply to this claim because it has not been established by Defendants that the officers' choice was based on considerations of "social, economic, or political policy." Id. Indeed, for the reasons there are genuine issues of fact undergirding the excessive force and denial of familial relationship analyses, there also genuine issues of fact as to whether the officers breached their duty to Scott in subduing him with excessive force and whether the officers are nevertheless entitled to discretionary-act immunity. See Davis

v. City of Las Vegas, 478 F.3d 1048, 1059-60 (9th Cir. 2007).

Therefore, the Court denies Defendants summary judgment as to this claim.

### VI.   CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants Kyle Smith, Theodore Huntsman, and Las Vegas Metropolitan Police Department's Motion for Summary Judgment is GRANTED in part and DENIED in part. It is granted as to Plaintiffs' denial of medical care against all Defendants and as to their ADA cause of action against Defendants Smith and Huntsman. Summary judgment is denied as to all the other causes of action against Defendants.

**IT IS FURTHER ORDERED** that the parties shall submit a joint pretrial order by April 4, 2023.

**DATED:** <u>March 14, 2023</u>

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**